## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE ROCKPORT COMPANY, LLC, *et al.*, | Case No. 18-11145 (LSS) |
| Debtors.[1] | Joint Administration Requested |
| | **Hearing Date: June 5, 2018 at 2:00 p.m. (ET)**<br>**Objection Deadline: May 29, 2018 at 4:00 p.m. (ET)** |

## MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION AND SALE HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF

The Rockport Company, LLC ("**Rockport**") and certain of its affiliates that are debtors

and debtors in possession (collectively, the "**Debtors**") in the above-captioned Chapter 11 cases

(the "**Chapter 11 Cases**") hereby file this motion (this "**Motion**") for entry of an order (the

"**Bidding Procedures Order**"), under Sections 105, 363, 365, 503 and 507 of Title 11 of the

United States Code, 11 U.S.C. §§ 101-1532, *et. seq.* (the "**Bankruptcy Code**"), Rules 2002,

6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective Employer Identification Numbers are: Rockport Blocker, LLC (5097), The Rockport Group Holdings, LLC (3025), TRG 1-P Holdings, LLC (4756), TRG Intermediate Holdings, LLC (8931), TRG Class D, LLC (4757), The Rockport Group, LLC (5559), The Rockport Company, LLC (5456), Drydock Footwear, LLC (7708), DD Management Services LLC (8274), and Rockport Canada ULC (3548).  The debtors' mailing address is 1220 Washington Street, West Newton, Massachusetts 02465.

Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), (i) approving the proposed bidding procedures (the "**Bidding Procedures**") pursuant to which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of all or substantially all of the Debtors' assets (collectively, the "**Assets**"); (ii) approving the Stalking Horse Protections provided by the Debtors to the Stalking Horse Bidder (each as defined below); (iii) scheduling an auction (the "**Auction**"), if necessary; (iv) establishing the Assumption and Assignment Procedures (as defined below) for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, including notice of proposed cure costs; (v) scheduling a hearing (the "**Sale Hearing**") to approve the Sale; and (vi) granting related relief.

The Debtors further request that, at the Sale Hearing, this Court enter an order (the "**Sale Order**"), a form of which is attached as Exhibit H of the Stalking Horse Agreement (as defined below), (i) authorizing the sale of the Assets to the Stalking Horse Bidder or other ultimate purchaser of such assets as determined in accordance with the Bidding Procedures (any such prevailing bidder shall hereinafter be referred to as the "**Successful Bidder**"), free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and the Successful Bidder; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief. This Motion is supported by the *Declaration of Paul Kosturos in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**") filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court*

RLF1 19331738V.1

*for the District of Delaware*, dated February 29, 2012. Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

3.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing the Chapter 11 Cases for relief under the Bankruptcy Code.  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

5.      Debtor Rockport Canada ULC is the operating entity for the Debtors' business in Canada.  The Debtors anticipate commencing an ancillary proceeding under Part IV of the Companies' Creditors Arrangement Act (Canada) in Toronto, Ontario, Canada before the Ontario Superior Court of Justice (Commercial List).  Additional information about the Debtors' businesses and affairs, capital structure and prepetition indebtedness and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

## RELIEF REQUESTED

6.    By this Motion, pursuant to Sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors request entry of the following:

    a.    the Bidding Procedures Order,

        i.    authorizing and approving the Bidding Procedures in connection with the Sale;

        ii.    approving the Stalking Horse Protections for the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures;

        iii.    scheduling an Auction for the Assets, if necessary;

        iv.    scheduling the Sale Hearing to consider approval of the proposed Sale on or before July 13, 2018;

        v.    authorizing and approving the (A) notice of the Sale, the Bid Deadline (as defined below), the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 thereto (the "**Sale Notice**"), and (B) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease related to the Assets of the potential assumption and assignment of their executory contract or unexpired lease (the "**Contracts and Leases**") and the calculation of the amount necessary to cure any monetary defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3 thereto (the "**Potential Assumption and Assignment Notice**");

        vi.    authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

        vii.    granting related relief.

    b.    the Sale Order,

        i.    authorizing and approving the sale of all, or a portion of, the Debtors' Assets to the Successful Bidder free and clear of all liens, claims, interests and encumbrances, except certain permitted

encumbrances as determined by the Debtors and the Successful
Bidder;

ii.     authorizing and approving the assumption and assignment of
certain Contracts and Leases in connection with the proposed Sale;
and

iii.    granting related relief.

## PRE-PETITION MARKETING AND SALE PROCESS

7.     In December 2017, the Debtors retained Houlihan Lokey, Inc. ("**Houlihan**")–an
investment banker with expertise in mergers and acquisitions, recapitalization, and financial
restructuring—to explore a potential sale of the Debtors' Assets.  As part of this effort, Houlihan
began facilitating a robust marketing process for the potential purchase of all, or certain of, the
Debtors' Assets (each, a "**Potential Transaction**") and contacted one hundred and ten (110)
potential strategic and financial acquirers (collectively, the "**Interested Parties**") to garner
interest in pursuing such transaction.

8.     Approximately sixty (60) Interested Parties executed a non-disclosure agreement
("**NDA**") to review certain confidential business and financial information of the Debtors and
received a confidential information memorandum and access to an initial set of diligence
materials in a data room.  On or around January 12, 2018, Houlihan distributed a process letter to
the remaining Interested Parties inviting such Interested Parties to submit initial, non-binding
indications of interest (the "**Initial IOIs**") by no later than February 6, 2018, at 5:00 p.m.
(prevailing Eastern Time) (the "**Initial IOI Submission Deadline**").

9.     In all, Houlihan received Initial IOIs from ten (10) Interested Parties.  Shortly
after the Initial IOI Submission Deadline, a more comprehensive data room was made available
to certain Interested Parties.  Of the ten (10) Interested Parties who submitted Initial IOIs, seven
(7) Interested Parties were granted access to the data room and six (6) Interested Parties met with

senior management of Rockport in person to review the opportunity and to ask any and all questions pertaining thereto.

10.     On or about March 2, 2018, Houlihan requested that the six (6) Interested Parties that remained interested in pursuing a transaction submit their best and final letter of intent (each a "**Final Bid**") for the Debtors' Assets by March 29, 2018 at 12:00 p.m. (prevailing Eastern Time) (the "**Prepetition Bid Deadline**").  On March 7, 2018, Houlihan posted a form asset purchase agreement in the data room for review and comment by the Interested Parties in connection with submission of their Final Bid.  Prior to the Prepetition Bid Deadline, three (3) Interested Parties submitted a Final Bid.  On April 4, 2018, a fourth verbal bid (the "**Late Bid**," and together with the Final Bids, the "**Bids**") was received from an Interested Party.

11.     After reviewing and carefully considering the Bids received from the four (4) Interested Parties, the Debtors determined, in consultation with their advisors, that CB Marathon Opco, LLC (the "**Stalking Horse Bidder**"), an affiliate of Charlesbank Equity Fund IX, Limited Partnership, had submitted the highest or otherwise best offer (the "**Charlesbank Bid**"), pursuant to which the Stalking Horse Bidder agreed to acquire substantially all of the Debtors' Assets (other than the North American Retail Assets) for a purchase price of (i) $150 million in cash (the "**Base Cash Amount**") subject to certain working capital adjustments plus the NAM Store Inventory Amount[2] (the "**Initial Cash Consideration**"); (ii) a warrant to purchase up to 5% of common equity of the indirect parent of the Stalking Horse Bidder once the Stalking Horse Bidder receives a return equal to 2.5 times its initial equity investment as of the Closing

---

[2] As further described in the Stalking Horse Agreement, the "**NAM Store Inventory Amount**" is an amount equal to the cost of the inventory located at any North American retail location acquired by the Stalking Horse Bidder.

Date (as defined in the Stalking Horse Agreement) (the "**Warrant**"); and (iii) the assumption of certain liabilities (collectively, the "**Stalking Horse Purchase Price**").

12.     Thereafter, the Debtors, in consultation with their advisors, determined to pursue the Charlesbank Bid as the Stalking Horse Bidder for the Assets, subject to definitive documentation.  To this end, after good faith, arm's-length negotiations between the parties and in consultation with their advisors and key stakeholders, the Debtors and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement, dated as of May 13, 2018 (the "**Stalking Horse Agreement**"),[3] pursuant to which the Stalking Horse Bidder will acquire the Purchased Assets (as defined in the Stalking Horse Agreement), subject to higher or otherwise better offers.

13.     Upon the earlier of (i) twenty-five (25) days from the Petition Date or (ii) entry of the Bidding Procedures Order,[4] and in compliance with Section 7.1 of the Stalking Horse Agreement, the Debtors will continue to market and solicit offers for all or a portion of the Assets to a wide range of potential purchasers and will work diligently with all parties that have expressed an interest in the Debtors' Assets to date.  In this way, the Debtors intend to maximize (i) the number of participants in the sale process and (ii) the value of the Assets.

---

[3] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stalking Horse Agreement.  A copy of the Stalking Horse Agreement is attached hereto as <u>Exhibit B</u>.  The Debtors are not filing the schedules to the Stalking Horse Agreement with this Motion, but may be obtained by contacting counsel to the Debtors.

[4] As discussed further below, upon entry into the Stalking Horse Agreement and until the earlier of (i) twenty-five (25) days from the Petition Date or (ii) entry of the Bidding Procedures Order, the Debtors agreed to pause the active solicitation of the Assets.  *See* Sections 7.1(b),(c) of the Stalking Horse Agreement.  During this period, however, the Debtors may provide all information provided to the Stalking Horse Bidder to those twelve (12) or less parties who entered into confidentiality agreements and provided either a written or oral indication of interest to the Debtors consistent with Section 7.1(b) of the Stalking Horse Agreement and engage in discussions with such parties with respect to such information (but may not engage in negotiations for or knowingly encourage an Acquisition Proposal with such parties).  Upon the earlier of (i) twenty-five (25) days from the Petition Date or (ii) entry of the Bidding Procedures Order, there is no restriction on the Debtors' ability to solicit bids for and market the Assets.  *Id.*

## NEED FOR A TIMELY SALE PROCESS

14.     The Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase all or substantially all of the Assets.  Given the Debtor's extensive prepetition marketing efforts, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets.  Moreover, the facts and circumstances of these Chapter 11 Cases, the ongoing negative cash flow of the Debtors' overall business, and risk of losing customers and vendors justify the timeline proposed by the Debtors herein.   The most likely competing bidders are among those who previously executed confidentiality agreements or had access to the data room during the prepetition sale and marketing process.  Thus, these parties likely need minimal time to submit competing bids. Moreover, if new bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture.

15.     Moreover, the Debtors determined that the bid submitted by the Stalking Horse Bidder was the highest and best because, among other reasons it allows the wholesale and eCommerce businesses to continue to operate as a going concern and preserves the jobs of the Debtors' wholesale and ecommerce employees (while still preserving the possibility that the Stalking Horse Bidder will take certain North American retail locations).  As set forth above, the Debtors determined the Charlesbank Bid represented the highest and best bid for the Assets. Moreover, in connection with the Stalking Horse Agreement, the Debtors heavily negotiated a sale timeline that will enable them to maximize the value received for the Assets in connection with the sale process, while minimizing any further deterioration of the Assets.   Thus, the Debtors have determined that pursuing the Sale in the manner and within the time periods

prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## THE STALKING HORSE AGREEMENT

16.     By this Motion, the Debtors request authority to, among other things, provide the Stalking Horse Bidder with standard stalking horse protections, in particular (a) the payment of a break-up fee in an amount equal to 3% of the Base Cash Amount (the "**Break-Up Fee**") and (b) reimbursement in an amount up to $2,000,000 for reasonable and documented out-of-pocket costs, fees and expenses of the Stalking Horse Bidder (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act) related to the transactions contemplated by the Stalking Horse Agreement (the "**Expense Reimbursement**", and together with the Break-Up Fee, collectively the "**Stalking Horse Protections**").  In event the Expense Reimbursement is payable following termination by the Stalking Horse Bidder pursuant to Section 4.4(e) of the Stalking Horse Agreement, payment will be made promptly as provided for in Section 4.6 of the Staking Horse Agreement.

17.     The Stalking Horse Agreement includes various customary representations, warranties and covenants in the context of a sale under Section 363 of the Bankruptcy Code by and from the Debtors and the Stalking Horse Bidder.  In addition, the Stalking Horse Agreement includes certain conditions to closing the contemplated Sale and customary termination rights.

18.     In accordance with Local Rule 6004-1, the chart below summarizes the significant terms of the Stalking Horse Agreement.[5]

---

[5] To the extent that there is any inconsistency between the terms of the Stalking Horse Agreement and the summary of such terms in this Motion, the terms of the Stalking Horse Agreement shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

| **MATERIAL TERMS OF THE STALKING HORSE AGREEMENT**[6] | |
|---|---|
| **Purchase Price** | The Stalking Horse Purchase Price shall consist of (i) the Initial Cash Consideration; (ii) the Warrant; and (iii) the assumption of the Assumed Liabilities.<br><br>*See* Stalking Horse Agreement §§ 2.3, 2.7, and 3.1(a). |
| **Assets** | The Purchased Assets are:<br><br>a)  all Accounts Receivable (other than as set forth in Section 2.2(c) of the Stalking Horse Agreement);<br><br>b)  the Acquired Store Cash Amount;<br><br>c)  all Inventory other than Excluded Inventory;<br><br>d)  except as otherwise set forth in Section 2.2(n) of the Stalking Horse Agreement, all rights relating to deposits (including customer deposits and security deposits for rent, utilities, telephone or otherwise), prepaid or deferred charges and expenses related to the Purchased Contracts; provided, however, all rights relating to deposits and prepaid charges and expenses paid in connection with or relating to any Excluded Assets shall be Excluded Assets;<br><br>e)  the Furniture and Equipment other than Excluded Furniture and Equipment;<br><br>f)  the Purchased Intellectual Property which, for the avoidance of doubt, shall be transferred pursuant to the IP Assignment Agreements and not this Agreement;<br><br>g)  the Purchased Contracts;<br><br>h)  all of the Real Property Documents that are not Excluded Occupancy Agreements;<br><br>i)  all Documents  (other than those described in Section 2.2(j) of the Stalking Horse Agreement) to the extent not prohibited by applicable Laws;<br><br>j)  all Permits used in the Business and pending applications therefor;<br><br>k)  all rights under or pursuant to all representations, warranties and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided to, any Seller under any Purchased Contract, other than any representations, warranties and guarantees pertaining to any Excluded Assets or rights and defenses pertaining to any Excluded |

---

[6] All references to sections or schedules in this summary refer to the Stalking Horse Agreement, unless otherwise specified.

RLF1 19331738V.1

|  | Liabilities; |
|--|--------------|
|  | l) all goodwill and other intangible assets associated with the Business; |
|  | m) the Purchased Equity Interests; |
|  | n) all rights of Sellers under non-disclosure or confidentiality, non-compete, non-solicitation or no-hire agreements relating to the Purchased Assets, the Assumed Liabilities (or any portion of the foregoing); |
|  | o) any rights, claims or causes of action of any Seller against Third Parties relating to the Purchased Assets or the Assumed Liabilities as of the Closing, or of any kind against any Acquired Company, and all rights of indemnity, warranty rights, rights of contribution, rights to refunds (other than Tax refunds), rights of reimbursement and other rights of recovery, including insurance proceeds, possessed by Sellers as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to any Acquired Company, Purchased Asset or Assumed Liability; |
|  | p) all Avoidance Actions (whether known or unknown, contingent or otherwise) accruing or arising prior to the Closing Date against (a) any of the Acquired Companies; (b) any counterparty to a Purchased Contract; (c) any vendor, supplier, lessor or other Person listed on Schedule 2.1(p) of the Stalking Horse Agreement or (d) any Transferred Employee (collectively, the "**Purchased Avoidance Actions**"); |
|  | q) to the extent transferable, rights in connection with and assets of the Transferred Plans; and |
|  | r) to the extent transferable, all rights of indemnity pursuant to section 10.1.1(a) of the Master Purchase Agreement, dated as of January 25, 2015, by and among Relay Intermediate, LLC, Reebok International Ltd. and Adidas AG. |
|  | For the avoidance of doubt, to the extent that any of the assets described in Section 2.1 of the Stalking Horse Agreement are owned by one or more Acquired Company, such assets shall not be transferred pursuant to the Transactions and shall, after the Closing, remain assets of the applicable Acquired Companies. |
|  | *See* Stalking Horse Agreement § 2.1. |
| **Assumed Liabilities** | The Stalking Horse Bidder shall assume the following liabilities: |
|  | a) all Liabilities arising from the ownership of the Purchased Assets after the Closing Date, it being understood that Liabilities arising from the ownership of the Purchased Assets or the operation of the Business prior to the Closing Date shall not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities arises other than to the extent contemplated by Section 2.3(d) or |

11

| | |
|---|---|
| | Section 2.3(e) of the Stalking Horse Agreement; |
| | b) all Liabilities for Taxes imposed with respect to, arising out of or relating to the Purchased Assets, the Assumed Liabilities or the Business other than Excluded Taxes; |
| | c) all Liabilities relating to the termination of any Transferred Employees on or following the Closing Date, including all Liabilities related to the WARN Laws, to the extent applicable, for any action resulting from separation of employment of the Transferred Employees on or after the Closing Date; |
| | d) all Purchaser Paid Cure Costs, and (ii) all Accounts Payable; |
| | e) all Liabilities specifically assumed by Purchaser pursuant to Article IX of the Stalking Horse Agreement; |
| | f) all Transfer Taxes; and |
| | g) those Liabilities listed on Schedule 2.3(g) of the Stalking Horse Agreement]. |
| | *See* Stalking Horse Agreement § 2.3. |
| **Agreements with Management or Key Employees** Local Rule 6004-1(b)(iv)(B) | None. |
| **Releases** Local Rule 6004-1(b)(iv)(C) | The Stalking Horse Agreement contemplates that each Seller and Secured Noteholder shall execute a release in the form attached as Exhibit G of the Stalking Horse Agreement of all potential claims against the Acquired Companies. In addition, the Stalking Horse Agreement contemplates that each Acquired Company shall execute a release in the form attached as Exhibit M of the Stalking Horse Agreement of all potential claims against the Debtors and their estates. *See* Stalking Horse Agreement §§ 4.2(i), (j), 8.2 and Ex. G, M |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | This Motion and the Stalking Horse Agreement contemplate an auction. *See* Stalking Horse Agreement § 7.1 The Stalking Horse Agreement contemplates certain limitations on the Debtors' ability to shop the Assets until the earlier of (i) twenty-five (25) days from the Petition Date or (ii) entry of the Bidding Procedures Order by the Court. *See* Stalking Horse Agreement §7.1(b). |

| | |
|---|---|
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | Subject to the terms of the Sale Order and any other applicable order entered by the Court, the Closing shall occur no later than two (2) Business Days following the satisfaction (or wavier by the Party entitled to waive that condition) of the conditions set forth in Section 10.1, Section 10.2, and Section 10.3 of the Stalking Horse Agreement (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction (or waiver by the Party entitled to waive that condition) of such conditions), unless another time or date, or both, are agreed to in writing by the Parties; provided, however, that in no event shall the Closing occur earlier than June 27, 2018 without the prior written consent of Purchaser.<br><br>*See* Stalking Horse Agreement § 4.1. |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | On the Effective Date, the Stalking Horse Bidder, the Debtors and the Escrow Agent shall execute and deliver to each other an escrow agreement in the form <u>Exhibit C</u> to the Stalking Horse Agreement (the "**Escrow Agreement**") and Purchaser shall deposit with the Escrow Agent $15,000,000 (the "**Deposit**") pursuant to the terms thereof.  The Deposit shall not be subject to any Encumbrance, attachment, trustee process or any other judicial process of any creditor of Sellers or Purchaser, except that Sellers' right, title and interest in the Deposit under the Stalking Horse Agreement and applicable Law shall be subject to a lien and security interest granted by any Seller to the Escrow Agent (to the extent required by the Escrow Agreement).  Interest accrued on the Deposit shall become a part of the Deposit (such collective amount, the "**Deposit Amount**") and shall be paid to the Party entitled to the Deposit in accordance with Section 3.1(c) of the Stalking Horse Agreement.  The Deposit Amount shall be credited to the Purchase Price if the Closing occurs, and otherwise distributed pursuant to the Escrow Agreement.<br><br>*See* Stalking Horse Agreement § 3.1(b). |
| **Interim Arrangements with Stalking Horse Bidder**<br>Local Rule 6004-1(b)(iv)(G) | As part of the Sale, the Debtors and the Stalking Horse Bidder are not entering into any interim agreements or arrangements in connection with the Stalking Horse Bid or the Stalking Horse Agreement. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | None.[7] |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | None. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | Pursuant to Section 8.9(a) of the Stalking Horse Agreement, each of Sellers and Purchaser, at its own expense, agree to preserve and keep the records, or in the case of Sellers, arrange for the preservation and keeping of the records, held by it relating to the Business until the later of (i) six (6) months after the Closing Date or (ii) the date of entry of a final decree closing the Bankruptcy Case, and shall make such records available to the other Party as may be reasonably required by such Party in connection with, among other things, any insurance claims, Proceedings or Tax Claims against or governmental investigations of Sellers or Purchaser or any of Purchaser's Affiliates, administering the Bankruptcy Case, including in connection with any motion or claim objection filed or to be filed by or against any of Sellers or its Affiliates in the Bankruptcy |

---

[7] Pursuant to terms of Houlihan's engagement letter with the Debtors and subject to Bankruptcy Court approval, Houlihan will be paid certain transaction fees from the proceeds of the Sale at the closing of the Sale.  In addition, the terms of the interim order approving debtor-in-possession financing provide that payment of cash proceeds of the Sale will be paid to the DIP ABL Agent and the DIP Note Purchasers at the closing of the Sale.

|  | Case or reconciling claims filed in the Bankruptcy Case, winding up Sellers, the liquidation, sale or other disposition of any Excluded Assets and the closing of the Retained Accounts, the filing of Tax Returns, terminating and winding up of any Benefit Plans (other than the Transferred Plans), or in order to enable Sellers or Purchaser to comply with its obligations under this Agreement and the other Transaction Documents.<br><br>Notwithstanding the above, in the event Sellers wish to destroy records subject to the preservation requirements of Section 8.9(e) of the Stalking Horse Agreement, Sellers are entitled to destroy such records by (i) giving ninety (90) days prior written notice to Purchaser and Purchaser shall have the right at its option and its expense, upon prior written notice given to Sellers within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of the Original Notice; or (ii) seeking (on written notice to Purchaser) and obtaining an Order of the Bankruptcy Court, *provided, however*, that such Order will provide that the Purchaser shall have the right at its option and its expense to take possession of the records within one hundred and eighty (180) days after the date of such Order.<br><br>Neither Purchaser nor any Seller shall be obligated to provide the other party with access to any records pursuant to Section 8.9 of the Stalking Horse Agreement where such access would violate any Law or, after consultation with legal counsel of the Party who possesses such records, it is the opinion of such Party's legal counsel that providing access to such records would likely lead to the loss of any privilege provided to such Party or such records.<br><br>*See* Stalking Horse Agreement § 8.9. |
|---|---|
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | Purchaser is acquiring any and all claims and causes of action arising under Chapter 5 the Bankruptcy Code, including Sections 544 through 553 thereof, or any similar laws of the United States or any state, territory or possession thereof, or the District of Columbia (including any preference or fraudulent conveyance action under such laws) (whether known or unknown, contingent or otherwise) accruing or arising prior to the Closing Date against (a) any of the Acquired Companies; (b) any counterparty to a Purchased Contract; (c) any vendor, supplier, lessor or other Person listed on Schedule 2.1(p) of the Stalking Horse Agreement; or (d) any Transferred Employee.<br><br>*See* Stalking Horse Agreement § 2.1(p). |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The Seller seeks to sell the Purchased Assets to the Stalking Horse Bidder on the terms set forth in the Stalking Horse Agreement free and clear of all Encumbrances (other than Permitted Encumbrances) and is seeking a finding that the Stalking Horse Bidder is not a successor of any Seller.<br><br>*See* Stalking Horse Agreement §§ 2.3, 2.5, 7.2(d), and 8.2<br><br>Sellers acknowledge and agree that on the Closing Date the Purchased Assets shall be transferred to Purchaser free and clear of all Encumbrances and liabilities (including, for the avoidance of doubt, all forms of successor liability), other than the Permitted Encumbrances and the Assumed Liabilities, as provided for in the Sale Order.  Without limiting the generality of the foregoing, as of the Closing Date, the Sellers and the Secured Noteholders shall execute and deliver the releases contemplated by Section 4.2(j) of the Stalking Horse Agreement.  The Sellers shall obtain the written agreement of the Secured Noteholders to be bound by Section 8.2 of the Stalking Horse Agreement. |

| | |
|---|---|
| | *See* Stalking Horse Agreement § 8.2. |
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | None. |
| **Credit Bid** Local Rule 6004-1 | In no event shall Secured Noteholders (or any assignees, transferees or purchasers of the secured Indebtedness held by any Secured Noteholder) be permitted to credit bid for the Purchased Assets as all or part of any competing bid for the Purchased Assets at any Auction at which the Stalking Horse Bidder is bidding pursuant to the terms of the Stalking Horse Agreement.

*See* Stalking Horse Agreement § 7.4. |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | It is anticipated that the proposed Sale Order will seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | Subject to entry of the Bidding Procedures Order and those conditions specified in the Stalking Horse Agreement, including those conditions contained in Section 8.1 thereof, the Stalking Horse Bidder shall be entitled to payment of (i) the Break-up Fee and (ii) Expense Reimbursement.[8]

*See* Stalking Horse Agreement § 8.1. |

## NORTH AMERICAN RETAIL ASSETS

19.   Under the terms of the Stalking Horse Agreement, the Debtors' North American retail assets (*i.e.*, retail leases and related inventory in the U.S. and Canada) (the "**North American Retail Assets**") are currently identified as Excluded Assets.  The Stalking Horse Bidder, however, is still considering whether to acquire any portion of the North American Retail

---

[8]  Pursuant to Section 4.6(a) of the Stalking Horse Agreement, upon the closing of an Alternative Transaction with a Person that is not the Purchaser, Purchaser would be entitled to payment of the Break-Up Fee and Expense Reimbursement provided that (i) the Stalking Horse Agreement has not been validly terminated by Sellers in accordance with Section 4.4 prior to the Bid Deadline or (ii) the Stalking Horse Agreement has not been validly terminated by the Purchaser in accordance with Section 4.4 prior to the Auction.  "Alternative Transaction" is defined in the Stalking Horse Agreement, in part, to mean a transaction or series of related transactions pursuant to which Sellers accept a bid for all or a substantial and material portion of the Purchased Assets, from a Person other than Stalking Horse Bidder, as the highest or best offer, in accordance with the Bidding Procedures Order or otherwise.  There, however, is no requirement that an Alternative Transaction be deemed a Qualified Bid under the Bidding Procedures.  It is possible that, although the Purchaser remains committed to the Sale past the Bid Deadline and up to the date of the Auction, the Purchaser validly terminates the Purchase Agreement due to breaches by the Sellers and the Sellers do not receive any Qualified Bids under the Bidding Procedures, and the Debtors are then required to pursue a lesser transaction or piecemeal liquidation that could constitute an Alternative Transaction under the terms of the Stalking Horse Agreement.  Under this scenario, the Purchaser would be entitled to payment of the Break-up Fee and Expense Reimbursement under the terms of the Stalking Horse Agreement.  Similarly, after having remained committed to the Sale up through the Bid Deadline, there could be a scenario whereby the Purchaser is entitled to payment of the Break-up Fee and Expense Reimbursement notwithstanding the Sellers having terminated the Stalking Horse Agreement after the Bid Deadline due to the Purchaser's breach (pursuant to Section 4.4(f) of the Stalking Horse Agreement), provided the Sellers close an Alternative Transaction following such termination.

Assets.  As a result, the Stalking Horse Agreement provides that for a period of twenty-five (25) days following the Petition Date (the "**No Liquidation Period**"), the Debtors shall not sell or otherwise dispose of any Inventory (as defined in the Stalking Horse Agreement) other than in the ordinary course of business.  The No Liquidation Period is intended to preserve ordinary inventory levels at the retail locations should the Stalking Horse Bidder decide to acquire the leases relating to any of the Debtors' North American retail locations.  In the event that the Stalking Horse Bidder chooses to acquire any of the Debtors' North American Retail Assets, the purchase price shall be adjusted consistent with Section 3.1 of the Stalking Horse Agreement.  In addition, the Stalking Horse Bidder shall be liable for any cure costs with respect to the assumption and assignment of any related North American retail leases.

20.    Although the Stalking Horse Bidder is contemplating acquiring a portion of the North American Retail Assets, based on discussions with the Stalking Horse Bidder, the Debtors do not believe that the Stalking Horse Bidder intends to acquire all or substantially all of the North American Retail Assets.  Further, based on the Debtors' extensive prepetition marketing efforts and the prepetition Bids received for the Assets, the Debtors do not expect there to be any significant interest in the North American Retail Assets.  Thus, the Debtors need to be in a position to wind down their North American retail business immediately upon the conclusion of the No Liquidation Period (with the goal of concluding such process by July 31, 2018 and thereby stemming in incurrence of August administrative rent).    Accordingly, contemporaneously with the filing of this Motion, the Debtors have filed a motion seeking authority to conduct store closing sales with respect to the North American Retail Assets subject to the Debtors ability to remove any retail location from the relief granted therein to the extent

necessary to comply with the Stalking Horse Agreement or otherwise maximize value in connection with the Sale process.

## BIDDING PROCEDURES

### A.    Overview

21.    The Bidding Procedures are designed to promote a competitive, fair, and expedient sale process that seeks to maximize the value of the Debtors' estates.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the milestones set forth in the Stalking Horse Agreement, and DIP financing agreements, and with the Debtors' overall chapter 11 objectives.

22.    As the Bidding Procedures are attached as <u>Exhibit 1</u> to the Bidding Procedures Order, they are not restated in their entirety herein.  Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.[9]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
| --- | --- |
| **Qualification of Bidders**<br>Local Rule 6004- | Prior to the Bid Deadline, each party, other than the Stalking Horse Bidder, who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties:[10] |

---

[9] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

[10] The "**Notice Parties**" include:  (1) proposed counsel for the Debtors: Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, collins@rlf.com, and Michael J. Merchant, merchant@rlf.com; (2) Houlihan Lokey, Inc., 245 Park Avenue, 20th Floor, New York, NY 10167 Att: Chris Di Mauro, CDiMauro@HL.com, Steven Tishman, STishman@HL.com, and Sanaz Memarsadeghi, SMemarsadeghi@HL.com; (3) counsel to the Prepetition Noteholders and the DIP Note Purchasers, (a) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: My Chi To, mcto@debevoise.com, and Daniel E. Stroik, destroik@debevoise.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn:  Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neill, joneill@pszjlaw.com; (4) counsel to the ABL Administrative Agent and the ABL DIP Agent, (a) Riemer Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts, 02108, Attn: Donald E. Rothman, drothman@riemerlaw.com, Lon M. Singer, lsinger@riemerlaw.com, Jaime Rachel Koff, jkoff@riemerlaw.com, and Jeremy Levesque, jlevesque@riemerlaw.com, and (b) Ashby & Geddes, P.A., 500 Delaware Ave., 8th Floor, Wilmington, Delaware 19801, Attn: Gregory A. Taylor, GTaylor@ashbygeddes.com; and (5) counsel to the Committee, if any.

| 1(c)(i)(A) | |
|---|---|
| | i.    a written disclosure of the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid; and<br><br>ii.   an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors to a Potential Bidder) in form and substance satisfactory to the Debtors (without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions).<br><br>A Potential Bidder that delivers the documents and information described above and that the Debtors determine, in consultation Citizens Business Capital ("**Citizens**"), in its capacity as DIP ABL Agent (as defined in the Interim DIP Order), and the Prepetition Noteholders and DIP Note Purchasers (as defined in the Interim DIP Order), and the official committee of unsecured creditors, if any, appointed in these chapter 11 cases (the "**Committee**", and together with the DIP ABL Agent, the Prepetition Noteholders, the DIP Note Purchasers,  the "**Consultation Parties**"), is (based on evidence of available financing, experience and other considerations) able to consummate the Sale, and whose Qualified Bid is received by the Notice Parties no later than the Bid Deadline is deemed qualified (a "**Qualified Bidder**").  *See* Bidding Procedures at pgs. 1-2.<br><br>The Stalking Horse Bidder shall be deemed a Qualified Bidder.  *See* Bidding Procedures Order at pg. 4. |
| **Qualified Bids**<br>Local Rule 6004-1(c)(i)(B) | **Bid Deadline: June 29, 2018 at 5:00 p.m. (prevailing Eastern Time)**<br><br>A bid will be considered a "**Qualified Bid**" only if the bid is submitted by a Qualified Bidder and the Debtors determine, in consultation with the Consultation Parties, that such bid complies with all of the following:<br><br>i.     it is received by the Notice Parties prior to the Bid Deadline;<br>ii.    it states that the applicable Qualified Bidder offers to purchase, in cash, all of the Assets upon the terms and conditions that the Debtors, in consultation with the Consultation Parties, reasonably determine are no less favorable than those set forth in the Stalking Horse Agreement;<br>iii.   it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below), its offer shall remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder and (ii) the date that is thirty (30) days after the Sale Hearing;<br>iv.   it includes confirmation that there is no condition precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the bid;<br>v.    it contains no due diligence or financing contingencies of any kind;<br>vi.   it includes a duly authorized and executed copy of an asset purchase agreement (which shall be substantially similar to the Stalking Horse Agreement), which includes the purchase price for the Assets expressed in U.S. Dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto, together with a copy marked to show any amendments and modifications to the Stalking Horse Agreement (a "**Competing Purchase Agreement**") and a proposed order for approval of the Sale by this Court;<br>vii.   it specifies the liabilities proposed to be paid or assumed by such Qualified Bid;<br>viii.   it includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price in cash, such as will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Qualified |

<table>
<tr><td></td><td>
Bidder's financial and other capabilities to consummate the transaction contemplated by the Competing Purchase Agreement;

ix.  it has a value to the Debtors, determined by the Debtors' reasonable business judgement after consultation with the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (a) the amount of the Stalking Horse Protections, plus (b) $500,000;

x.  it identifies with particularity which Contracts and Leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related Cure Costs and the provision of adequate assurance of future performance to the Counterparties to such Contracts and Leases;

xi.  it includes an acknowledgement and representation that the bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Competing Purchase Agreement; and (d) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

xii.  it includes evidence, in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Competing Purchase Agreement;

xiii.  it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to ten percent (10%) of the Purchase Price provided for in the bid (a "**Good Faith Deposit**");

xiv.  it states that the bidder consents to the jurisdiction of this Court; and

xv.  it contains such other information as may be reasonably requested by the Debtors, in consultation with the Consultation Parties.

*See* Bidding Procedures at pgs. 2-4.

The Stalking Horse Agreement will be deemed a Qualified Bid. *Id.* at pg. 4
</td></tr>
<tr><td>**Credit Bidding**<br>Local Rule 6004-1(b)(iv)(N)</td><td>The Stalking Horse Agreement, the Bidding Procedures, and the Bidding Procedures Order provide that in no event shall Secured Noteholders (or any assignees, transferees or purchasers of the secured Indebtedness held by any Secured Noteholder) be permitted to credit bid for the Purchased Assets as all or part of any competing bid for the Purchased Assets at any Auction at which the Stalking Horse Bidder is bidding pursuant to the Stalking Horse Agreement. *See* Bidding Procedures Order ¶ 7.</td></tr>
<tr><td>**Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O)</td><td>This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). *See* Bidding Procedures Order ¶ 31.</td></tr>
<tr><td>**No-Shop or No-Solicitation Provisions**<br>Local Rule 6004-1(c)(i)(C)(1)</td><td>The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids upon entry of the Bidding Procedures Order. The Sale contemplated by this Motion, the Bidding Procedures, and the Bidding Procedures Order calls for a fair and open bidding and auction process.</td></tr>
</table>

| | |
|---|---|
| **Break-Up Fee and Expense Reimbursement** Local Rule 6004-1(c)(i)(C)(2) | The Bidding Procedures Order approves and authorizes the Break-Up Fee and Expense Reimbursement for the Stalking Horse Bidder pursuant to the amounts and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures.  *See* Bidding Procedures Order ¶ 16. |
| **Initial Overbid and Bidding Increments** Local Rule 6004-1(c)(i)(C)(3) | The Bidding Procedures, as approved and incorporated into the Bidding Procedures Order, provide for an initial overbid protection of $500,000 over and above the aggregate of the Purchase Price and the Stalking Horse Protections.  The minimum increments thereafter shall be $250,000.  *See* Bidding Procedures at pgs. 3, 6. |
| **Treatment of Break-Up Fee and Expense Reimbursement at Auction** Local Rule 6004-1(c)(i)(C)(4) | For the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors shall give effect to the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors.  *See* Bidding Procedures at pg. 15. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors may, in consultation with the Consultation Parties, extend the Bid Deadline, provided any such extension is not inconsistent with the Stalking Horse Agreement and related sale milestones set forth therein.  *See* Bidding Procedures at pg. 4-5.  The Debtors, in consultation with the Consultation Parties, may modify, employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, *provided* that such rules (i) are not materially inconsistent with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, (ii) do not purport to abrogate or modify the Stalking Horse Agreement or Stalking Horse Protections and (iii) are disclosed to each Qualified Bidder attending the Auction.  *See* Bidding Procedures at pg. 6. |
| **Closing with Alternative Back-Up Bidders** Local Rule 6004-1(c)(i)(E) | The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid or collection of Qualified Bids, as determined by the Debtors at the time of the Auction, in consultation with the Consultation Parties, will be required to serve as a back-up bidder (each, a "**Back-Up Bidder**") and keep its bid open and irrevocable until the earlier to occur of (i) thirty (30) days after the Sale Hearing and (ii) closing on the Successful Bid(s) with the Successful Bidder(s); provided, however, the Stalking Horse Bidder is not required to serve as the Back-Up Bidder unless it chooses to participate in the Auction and bids against the proposed Alternative Transaction.  If the Successful Bidder(s) fail(s) to consummate the Sale, the Debtors will be authorized to consummate the Sale with the Back-Up Bidder(s) without further order of the Bankruptcy Court.  *See* Bidding Procedures at pg. 6-7. |

## B.      Key Dates and Deadlines

23.      The Debtors propose the following key dates and deadlines for the sale process,

certain of which dates and deadlines may be subject to extension in accordance with the Bidding

Procedures, to the extent not inconsistent with the Stalking Horse Agreement and the related sale milestones set forth therein:[11]

| On or before June 4, 2018 | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
|---|---|
| June 27, 2018 at 4:00 p.m. (prevailing Eastern Time) | Sale Objection Deadline |
| June 29, 2018 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| July 3, 2018 at 5:00 p.m. (prevailing Eastern Time) | Deadline for Debtors to notify Potential Bidders of their status as Qualified Bidders |
| July 10, 2018 at 10:00 a.m. (prevailing Eastern Time) | Auction to be held at the offices of Richard, Layton & Finger, P.A. (if necessary) |
| July 11, 2018 | Target date for the Debtors to file with the Court the Notice of Auction Results |
| July 13, 2018 | Proposed date of the Sale Hearing to consider approval of Sale and entry of Sale Order |
| On or after July 27, 2018 | Closing Date (Unless Successful Bidder agrees to waive the 14-day stay of Sale Order) |

## C.    Noticing Procedures

24.    The Bidding Procedures provide the following "**Noticing Procedures**":

a.  **Sale Notice and Publication.** Within two (2) Business Days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail upon: (i) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Brya M. Keilson, brya.keilson@usdoj.gov; (ii) counsel to the Committee, if any; (iii) counsel to the Prepetition Noteholders and DIP Note Purchasers, (a) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: My Chi To, mcto@debevoise.com, and Daniel E. Stroik, destroik@debevoise.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neill, joneill@pszjlaw.com; (iv) counsel to the Collateral Agent and DIP Notes Agent, (a) Holland & Knight LLP, 131 South Dearborn Street, 30th Floor, Chicago, Illinois 60603, Attn: Joshua Spencer, joshua.spencer@khlaw.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neil,

---

[11] The Debtors, in consultation with the Consultation Parties, reserve the right to change the proposed sale-related deadlines at any time prior to the Bidding Procedures Hearing *provided, however,* that any modified dates shall not provide parties with any lesser notice or time than the dates set forth in the entered Bidding Procedures Order.

RLF1 19331738V.1

joneill@pszjlaw.com; (v) counsel to the ABL Administrative Agent and ABL DIP Agent, (a) Riemer Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts, 02108, Attn: Donald E. Rothman, drothman@riemerlaw.com, Lon M. Singer, lsinger@riemerlaw.com, Jaime Rachel Koff, jkoff@riemerlaw.com, and Jeremy Levesque, jlevesque@riemerlaw.com, and (b) Ashby & Geddes, P.A., 500 Delaware Ave., 8th Floor, Wilmington, Delaware 19801, Attn: Gregory A. Taylor, GTaylor@ashbygeddes.com; (vi) counsel to the Stalking Horse Bidder, (a) Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn:  William Weintraub, wweintraub@goodwinlaw.com, (b) Goodwin Procter LLP, 100 Northern Avenue, Boston, Massachusetts 02210, Attn: Jon Herzog, jherzog@goodwinlaw.com and Joseph F. Bernardi, Jr., jbernardi@goodwinlaw.com, and (c) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899, Attn:  David Fournier, fournierd@pepperlaw.com and Evelyn Meltzer, meltzere@pepperlaw.com; (vii) the Interested Parties identified by Houlihan and any other entity known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months; (viii) all counterparties to any Contracts or Leases, whether executory or not; (ix) all parties with Encumbrances on or against any of the Sellers' assets; (x) all affected federal, state and local governmental regulatory and taxing authorities, including the Internal Revenue Service; (xi) all known holders of claims against and equity interests in the Debtors; (xii) the Debtors' insurance carriers, (xiii) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002 (the "**2002 List**"); and (xiv) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrix (collectively, the "**Sale Notice Parties**").  As soon as practicable thereafter, but in any event no later than seven (7) business days after entry of the Bidding Procedure Order, the Debtors will publish the Sale Notice, with such modifications as may be appropriate for purposes of publication, once in the National Edition of USA Today.

b. <u>**Notice of Determination of Qualified Bids**</u>. The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as a Qualified Bid and will notify Potential Bidders whether they have been selected as Qualified Bidders by no later than **July 3, 2018 at 5:00 p.m. (prevailing Eastern Time)**.

i. At least one (1) business day prior to the Auction, the Debtors will provide all Qualified Bidders (including the Stalking Horse Bidder) with copies of each Qualified Bid made for the Assets and identify to them the Qualified Bid that the Debtors, in consultation with the Consultation Parties, believe is the highest or otherwise best offer for the Assets.

22

       c.     **Notice of Hearing if Auction Not Held**. With respect to the Assets, if no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will not conduct the Auction for the Assets and will file with the Court, serve on the Sale Notice Parties and cause to be published on the Debtors' case information website (located at https://cases.primeclerk.com/rockport) (the "**Case Information Website**") a notice (i) indicating that the Auction for the Assets has been canceled, (ii) indicating that the Stalking Horse Bidder is the Successful Bidder with respect to the Assets and (iii) setting forth the date and time of the Sale Hearing.

       d.     **Notice of Auction Results**.  If an Auction is held, promptly following the selection of the Successful Bid(s) and Back-up Bid(s), if any, the Debtors shall file a notice of the Successful Bid(s) and Back-up Bid(s), if any (the "**Notice of Auction Results**"), with the Court and cause the Notice of Auction Results to be published on the Case Information Website.

25.    The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, the dates and deadlines identified in paragraph 23 above.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**ASSUMPTION AND ASSIGNMENT PROCEDURES**

26.    In connection with the Sale, the Debtors anticipate that they will assume and assign to the Successful Bidder (or its designated assignee(s)) certain of the Contracts and Leases set forth on the schedule of assumed contracts (the "**Purchased Contracts Schedule**") attached to the Successful Bidder's asset purchase agreement (such asset purchase agreement, whether it be the Stalking Horse Bidder's Stalking Horse Agreement or other Successful Bidder's Competing Purchase Agreement, the "**Asset Purchase Agreement**"), as it may be modified or supplemented from time to time as permitted under the Asset Purchase Agreement, pursuant to Section 365(b) of the Bankruptcy Code.  Accordingly, the Debtors hereby seek approval of the proposed Assumption and Assignment Procedures set forth below, which are designed to, among

RLF1 19331738V.1

other things, (a) outline the process by which the Debtors will serve notice to all Counterparties regarding the proposed assumption and assignment, related Cure Costs, if any, and information regarding the Stalking Horse Bidder's or such other Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Contracts and Leases. Specifically, the Assumption and Assignment Procedures are as follows:

    a.    **Contracts List**.  Within three (3) Business Days after entry of the Bidding Procedures Order, the Debtors shall file with the Bankruptcy Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice that specifies (i) each of the Contracts and Leases that may be assumed and assigned in connection with the Sale, including the name of each Counterparty and (ii) the proposed Cure Cost with respect to each Contract and Lease (the "**Contracts List**").  The Potential Assumption and Assignment Notice shall also be served on each Counterparty listed on the Contracts List via first class mail.

    b.    **Assumption and Assignment Objections**.

        i.    Objection Deadlines.  Any Counterparty may object to the proposed assumption or assignment of its Contract or Lease, the Debtors' proposed Cure Costs, if any, or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance (an "**Assumption and Assignment Objection**").  All Assumption and Assignment Objections (other than to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance)[12] must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs Counterparty believes are required to cure defaults under the relevant Contract or Lease, (D) be filed by no later than **June 28, 2018, at 4:00 p.m. (prevailing Eastern Time)** and (E) be served on (1) proposed counsel for the Debtors: Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, collins@rlf.com, and Michael J. Merchant, merchant@rlf.com,

---

[12]  Objections as to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance may be raised in at the Sale Hearing accordance with paragraph 26(d) below.

(2) counsel to the Prepetition Noteholders and DIP Note Purchasers, (a) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: My Chi To, mcto@debevoise.com, and Daniel E. Stroik, destroik@debevoise.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neill, joneill@pszjlaw.com; (3) counsel to the Collateral Agent and DIP Notes Agent, (a) Holland & Knight LLP, 131 South Dearborn Street, 30th Floor, Chicago, Illinois 60603, Attn: Joshua Spencer, joshua.spencer@khlaw.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neil, joneill@pszjlaw.com, (4) counsel to the ABL Administrative Agent and ABL DIP Agent, (a) Riemer Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts, 02108, Attn: Donald E. Rothman, drothman@riemerlaw.com, Lon M. Singer, lsinger@riemerlaw.com, Jaime Rachel Koff, jkoff@riemerlaw.com, and Jeremy Levesque, jlevesque@riemerlaw.com, and (b) Ashby & Geddes, P.A., 500 Delaware Ave., 8th Floor, Wilmington, Delaware 19801, Attn: Gregory A. Taylor, GTaylor@ashbygeddes.com; (5) counsel to the Stalking Horse Bidder, (a) Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: William Weintraub, wweintraub@goodwinlaw.com, (b) Goodwin Procter LLP, 100 Northern Avenue, Boston, Massachusetts 02210, Attn: Jon Herzog, jherzog@goodwinlaw.com and Joseph F. Bernardi, Jr., jbernardi@goodwinlaw.com, and (c) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899, Attn: David Fournier, fournierd@pepperlaw.com and Evelyn Meltzer, meltzere@pepperlaw.com; (6) counsel to the Committee, if any, and (7) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Brya M. Keilson, brya.keilson@usdoj.gov (collectively, the "**Assumption and Assignment Objection Notice Parties**").

ii.   Resolution of Assumption and Assignment Objections.   If a Counterparty files a timely Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors, in consultation with the Successful Bidder, shall determine in their discretion and with notice to the objecting Counterparty (subject to the Bankruptcy Court's calendar).

RLF1 19331738V.1

iii. <u>Failure to File Timely Assumption and Assignment Objection</u>.  If a Counterparty fails to file with the Bankruptcy Court and serve on the Assumption and Assignment Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Contract or Lease, and notwithstanding anything to the contrary in the Contract or Lease, or any other document, the Cure Costs set forth in the Potential Assumption and Assignment Notice or the Supplemental Assumption and Assignment Notice (as defined below) shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Section 365(b) of the Bankruptcy Code arising out of or related to the Contract or Lease in connection with the assumption and assignment thereof, whether known or unknown, due or to become due, accrued, absolute, contingent or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract or Lease against the Debtors, the Successful Bidder or the property of any of them.

c. **Modification of Purchased Contracts Schedule**.

i. Unless otherwise provided in the Successful Bidder's Asset Purchase Agreement, at any time until two (2) days prior to the Closing Date, the Successful Bidder may elect to amend the Purchased Contracts Schedule.  Any Contract or Lease that remains on the Purchased Contracts Schedule as of the Closing Date, shall be assumed by the Debtors and assigned to the Successful Bidder as part of the Sale, subject to the resolution of any Assumption and Assignment Objection with respect to such Contract or Lease.  All such Contracts and Leases that are not on the Purchased Contracts Schedule shall be deemed "Excluded Contracts" under the Asset Purchase Agreement.

ii. In the event that any Contract or Lease is added to the Contracts List or previously-stated Cure Costs are modified, in accordance with the Successful Bidder's Asset Purchase Agreement or the Assumption and Assignment Procedures set forth in the Bidding Procedures Order, the Debtors will promptly serve a supplemental assumption and assignment notice, by overnight mail and, if known, e-mail, on the applicable Counterparty (each, a "**Supplemental Assumption and Assignment Notice**").  Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Contract or Lease as is required to be included in the Potential Assumption and Assignment Notice.

iii.   Any Counterparty listed on a Supplemental Assumption and Assignment Notice whose Contract or Lease is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Contract or Lease, the Debtors' proposed Cure Costs, if any, or the ability of the Successful Bidder to provide adequate assurance of future performance (a "**Supplemental Assumption and Assignment Objection**").    All Supplemental Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes is required to cure defaults under the relevant Contract or Lease, (D) be filed by no later than **ten (10) calendar days from the date of service of such Supplemental Assumption and Assignment Notice** and (E) be served on the Assumption and Assignment Objection Notice Parties.    Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

iv.   Upon objection by the non-debtor Contract counterparty to the Cure Costs asserted by the Debtors with regard to any Contract (such contract, a "**Disputed Contract**"), the Debtors, with the consent of the Successful Bidder, shall either settle the objection of such party or shall litigate such objection under such procedures as the Bankruptcy Court shall approve and proscribe.    In no event shall any the Debtors settle a Cure Costs objection with regard to any Purchased Contract without the express written consent of the Successful Bidder (with an email consent being sufficient).    In the event that a dispute regarding the Cure Costs with respect to a Contract has not been resolved as of the Closing Date, the Debtors and the Successful Bidder shall nonetheless remain obligated to consummate the Transactions.    Upon entry of an Order determining any Cure Costs regarding any Disputed Contract after the Closing (the "**Disputed Contract Order**"), the Successful Bidder shall have the option to designate the Disputed Contract as an Excluded Contract, in which case, for the avoidance of doubt, Successful Bidder shall not assume the Disputed Contract and shall not be responsible for the associated Cure Costs with such Disputed Contract; provided, however, that if Successful Bidder does not designate such Disputed Contract as an Excluded Contract within fifteen (15) days after the date of the Disputed Contract Order, such Disputed Contract shall automatically be deemed to be a Purchased Contract for all purposes under the Successful Bidder's Asset Purchase Agreement.    Any Cure Costs associated with any Purchased Contract or any Disputed Contract which becomes a Purchased Contract shall be paid in accordance

RLF1 19331738V.1

with the terms of the Successful Bidder's Asset Purchase Agreement.

d.    **Post-Auction Objection**.  If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors shall serve the Notice of Auction Results on each Counterparty that received a Potential Assumption and Assignment Notice and any Supplemental Assumption and Assignment Notice as soon as practicable following the conclusion of the Auction.  The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

e.    **Reservation of Rights**.  The inclusion of a Contract or Lease, or Cure Cost with respect thereto on a Potential Assumption and Assignment Notice, the Contracts List or a Supplemental Assumption and Assignment Notice shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder(s) or any other party in interest that such Contract or Lease is an executory contract or unexpired lease of the Debtors within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims and causes of action with respect to each Contract and Lease listed on the Potential Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice and Contracts List.  The Debtors' inclusion of any Contract or Lease on the Potential Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice and Contracts List shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.

## APPROVAL OF THE RELIEF REQUESTED IS WARRANTED AND IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ECONOMIC STAKEHOLDERS

**A.    The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved**

27.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental

goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

28.     The Bidding Procedures provide for an orderly and appropriately competitive process through which interested parties may submit offers to purchase the Assets.  Given the time constraints, and in light of the extensive prepetition marketing process, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.  Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale.  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors, their estates and all parties in interest.

**B.      The Break-Up Fee and Expense Reimbursement Have Sound Business Purposes and Should Be Approved**

29.     As noted above, the Stalking Horse Agreement provides for a Break-Up Fee in an amount equal to 3% of the Base Cash Amount (*i.e.*, $4,500,000) and an Expense Reimbursement of up to $2,000,000.  Such amount is only payable if the conditions set forth in the Stalking Horse Agreement, including Sections 4.6(a) and 8.1 thereof, are satisfied.  The Debtors believe that the Stalking Horse Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  In addition, the Debtors believe that the presence of the Stalking

Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors and all other parties in interest.

30.     Approval of the Stalking Horse Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.   Courts have identified at least two instances in which bid protections may benefit the estate.   First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537.   Second, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

31.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

    a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

    b.     whether the fee hampers, rather than encourages, bidding;

    c.     the reasonableness of the break-up fee relative to the purchase price;

    d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.  the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.  the correlation of the fee to a maximum value of the debtor's estate;

g.  the support of the principal secured creditors and creditors' committees of the break-up fee;

h.  the benefits of the safeguards to the debtor's estate; and

i.  the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

32.    While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Stalking Horse Protections.  In particular, the Stalking Horse Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Agreement–a clear benefit to the Debtors' estates.  Moreover, there has been no showing of any self-dealing or manipulation of any kind in the negotiation of the Stalking Horse Protections.  Rather, the Stalking Horse Protections were the result of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder (an unaffiliated third-party to the Debtors).  Further, the Stalking Horse Bidder would not agree to act as a "stalking horse" without the Stalking Horse Protections given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Stalking Horse Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the Purchase Price.

31

Therefore, without the benefit of the bid of the Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

33.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 659.  The Debtors do not believe that the Stalking Horse Protections will stifle bidding.  To the contrary, the Debtors believe that, should the Auction be held, such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders". *Id.* at 662.

34.     Here, the bid of the Stalking Horse Bidder serves all three functions.  *First*, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Stalking Horse Protections.  *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder.  *Third*, the bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse Agreement (as a basis for the form Competing Purchase Agreement) and the schedules thereto, in making their bid.  In sum, if all or a portion of the Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, the Sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

35.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.  'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible'".  *Id.*

36.     Here, the Break-Up Fee is an amount equal to 3% of the Base Cash Amount, which amount is $4,500,000.  When considered together with the Expense Reimbursement of up to $2,000,000, the approximately $6,500,000 combined total or 4.3% of the Base Cash Amount is consistent with the range of bid protections typically paid in sale transactions that have been recently approved by this Court.  *See, e.g.*, Order Authorizing and Approving Bidding Procedures, *In re The Weinstein Company Holdings LLC*, 18-10601 (MFW) (Bankr. D. Del. Apr. 6, 2018), ECF No. 190 (approving break-up fee and expense reimbursement equal to 5% of the purchase price); Order Authorizing and Approving Bidding Procedures, *In re ATopTech, Inc.*, (No. 17-10111-MFW) (Bankr. D. Del. Apr. 21, 2017), ECF No. 234 (approving break-up fee and expense reimbursement equal to 5% of the purchase price); Order Approving and Establishing Bidding and Sale Procedures, *In re Phoenix Brands LLC*, (No. 16-11242-BLS) (Bankr. D. Del. June 8, 2016), ECF No. 136 (approving break-up fee and expense reimbursement equal to 5.3% of the purchase price); Order Approving Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, *In re American Hospice Management Holdings, LLC*, (No. 16-10670-LSS) (Bankr. D. Del. Apr. 7, 2016), ECF No. 75 (approving break-up fee and expense reimbursement equal to 5% of the purchase price); Order Establishing Bidding Procedures Related to the Sale of Substantially All of the Debtors' Assets, *In re F-Squared Investment Management LLC*, (No. 15-11469-LSS) (Bankr. D. Del. July 28, 2015), ECF No. 75 (approving break-up fee and expense reimbursement equal to 10% of the purchase price).  In light of the

foregoing and given the size of the Base Cash Amount, the Debtors believe that the amount of the Stalking Horse Protections is appropriate.

37.     Further, the Debtors believe that the Stalking Horse Protections are appropriate notwithstanding the inclusion of the limited no shop provision in the Stalking Horse Agreement. First, the Debtors' entry into the Stalking Horse Agreement is the result of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder.  As part and parcel to that agreement, the Debtors agreed to pause the active solicitation of the Assets for a finite period of time (*i.e.*, the earlier of (x) twenty-five (25) days after the Petition Date, or (ii) the entry of the Bidding Procedures Order) in order for the Debtors to enter bankruptcy with little distraction and with the Stalking Horse Bidder in place as the "stalking horse" for the Purchased Assets.  Due to the limited nature of this provision and the Debtors' substantial prepetition efforts to shop the Assets, the Debtors submit that this provision of the Stalking Horse Agreement is appropriate under the circumstances and has minimal impact on the Debtors' ability to market the Assets.

38.     Primarily, the effect of such a narrow provision (if any) will be mooted upon the earlier of (i) twenty-five (25) days from the Petition Date or (ii) entry of the Bidding Procedures Order.  The hold on the Debtors' solicitation of bids for the Assets is only for the time period between execution of the Stalking Horse Agreement and the earlier of (i) twenty-five (25) days from the Petition Date or (ii) entry of the Bidding Procedures Order.  *See* Stalking Horse Agreement § 7.1(b).   During this period, however, the Debtors may provide all information provided to the Stalking Horse Bidder to those twelve (12) or less parties who entered into confidentiality agreements and provided either a written or oral indication of interest to the Debtors consistent with Section 7.1(b) of the Stalking Horse Agreement and engage in

34

discussions with such parties with respect to such information (but may not engage in negotiations for or knowingly encourage an acquisition proposal with such parties). *See id.* Upon entry of the Bidding Procedures Order, the Debtors and their advisors will proceed with the Bidding Procedures as outlined above, which contemplate a robust, fair and equitable auction process. Therefore, the Debtors do not believe that the limited no-shop provision, which merely provides that the Debtors cannot negotiate the terms of an alternative transaction for a limited period of time, and does not preclude the Debtors from providing diligence information to potential bidders, will chill potential bidders from preparing bids for the Assets. Regardless, whatever chill the no-shop provision may have on bidding will be removed shortly after the commencement of these Chapter 11 Cases and, the Debtors submit, will have no effect on the robust post-Petition Date bidding process outlined in the Bidding Procedures.

39.     Moreover, as stated above and in the First Day Declaration, the Debtors and their advisors have shopped the Assets for several months. The (current) result of this already-robust sale process is the Stalking Horse Agreement, which provides the highest and best offer for the Debtors' Assets so far and which the Debtors executed in exercise of their reasoned business judgment. Considering the Debtors' solicitation process will be paused for a relatively short period of time in relation to the entirety of the sale process, the Debtors submit that the limited no shop is appropriate under circumstances and the Court should approve the Stalking Horse Protections.

**C.     The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code**

40.     Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Although Section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

41.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:   (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. at 656.

**1.**     ***The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale***

42.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070-71; *In re Food Barn Stores, Inc.*,

107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

43.     As set forth above, a strong business justification exists for the sale of all or a portion of the Assets as described herein.   An orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.

> **2.      *The Noticing Procedures Are Reasonable and Appropriate***

44.     The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate and timely notice of, among other things, the proposed Sale, the Bidding Procedures, the Auction and the Sale Hearing.

> **3.      *The Proposed Sale Will Produce a Fair and Reasonable Purchase Price for the Assets***

45.     As set forth above, the Debtors believe that the proposed sale process will produce a fair and reasonable purchase price for the Assets.   The Stalking Horse Bid is an offer to purchase the Assets for a price that the Debtors, with the advice of the Debtors' advisors, already have determined to be fair and reasonable.   Given the extensive prepetition marketing process and that the Stalking Horse Bid will serve as a floor for Qualified Bids for the Assets, the Debtors are confident that the post-petition sale process will culminate in the Debtors obtaining the highest or otherwise best offer for such assets.

> **4.      *The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code***

46.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Section

363(b) is later reversed or modified on appeal.  Specifically, Section 363(m) of the Bankruptcy

Code states the following:

> The reversal or modification on appeal of an authorization under [Section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "policy of not only

affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to

those orders and judgments upon which third parties rely."  *In re Abbotts Dairies*, 788 F.2d at

147; *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)

. . . provides that good faith transfers of property will not be affected by the reversal or

modification on appeal of an unstayed order, whether or not the transferee knew of the pendency

of the appeal.").

47.    While the Bankruptcy Code does not define "good faith," the Third Circuit has

held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *In re*

*Abbotts Diaries*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection

with the sale must usually amount to fraud, collusion between the purchaser and other bidders or

the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Perona*

*Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305

(Bankr. W.D. Pa. 1989).

48.    In other words, a party would have to show fraud or collusion between the buyer

and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith.  *See*

*Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d

269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith

status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting *In re Rock Indus. Mach Corp.*, 572 F. 2d 1195, 1998 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

49.   The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code. The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith and through extensive arm's-length negotiations. Indeed, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and in the sale process generally. In addition, Houlihan was an independent investment banker retained by the Debtors for the purpose of exploring strategic alternatives, marketing the Debtors' businesses and soliciting bids since December 2017. Accordingly, to the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under Section 363(m) of the Bankruptcy Code.

50.   Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets. Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a

finding that any Successful Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by Section 363(m) of the Bankruptcy Code.

51.     Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**D.     The Assets Should Be Sold Sale Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code**

52.     In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests and other encumbrances, in accordance with Section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if any one of the following conditions is satisfied:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");

RLF1 19331738V.1

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

53.     Section 363(f) of the Bankruptcy Code is supplemented by Section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]".  11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

54.     The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Assets free and clear of all liens, claims, interests and encumbrances will satisfy one or more of the requirements under Section 363(f) of the Bankruptcy Code.

55.     Moreover, the Debtors will send the Sale Notice to any other purported prepetition lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein). Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances, in accordance with Section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests and encumbrances attaching to the

proceeds thereof in the same order of relative priority, with the same validity, force and effect as prior to such.

56.     The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses.   Such a provision ensures that the Successful Bidder (including the Stalking Horse Bidder) is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor.   Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code Section 363 sale takes free and clear from successor liability relating to the debtor's business.   *See, e.g., In re TWA,* 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal. Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573, 585-86 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler* (*In re Insilco Techs., Inc.*), 351 B.R. 313, 321-22 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *In re General Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009), *aff'd sub nom., In re Motors Liquidation Corp.,* 428 B.R. 43 (S.D.N.Y. 2010) & 430 B.R. 65 (S.D.N.Y. 2010) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[*I*]*n personam* claims, including any potential successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

57.     The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear

**E.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

58.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

59.     Any assumption of the Contracts or Leases is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is necessary to the Debtors' ability to obtain the best value for the Assets.  The assumption and assignment of Contracts and

Leases is a critical component of the Stalking Horse Agreement.  Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Contracts and Leases is an exercise of sound business judgment and, therefore, should be approved.

60.    The consummation of any Sale involving the assignment of a Contract or Lease will be contingent upon the Debtors' compliance with the applicable requirements of Section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts and Leases to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1). The Debtors' assumption and assignment of the Contracts and Leases will be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable Sale or any later applicable date of assumption and assignment of such Contract or Lease.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on such Potential Assumption and Assignment Notice.  Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the Sale Hearing.

61.    Pursuant to Section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction".  *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus.,*

*Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").   Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned.   *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

62.    As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Contracts and Leases that it wishes for the Debtors to assume and assign.   Each affected Counterparty will have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.   To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness and ability of the Successful Bidder to perform under the Contracts and Leases that it wishes for the Debtors to assume and assign.   Moreover, such adequate assurance of future performance information can be obtained from counsel to the Debtors upon request.

63.    In addition, to facilitate the assumption and assignment of the Purchased Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or

limiting assignment of such Contract or Lease, to be unenforceable and prohibited pursuant to Section 365(f) of the Bankruptcy Code.[13]

## WAIVER OF STAY

64.     The Debtors respectfully request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 6006(d).  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that "an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. B. 6006(d).

65.     As described above, the Debtors believe that any Sale should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtors respectfully request that any Sale Order approving the sale of the Assets and the assumption and assignment of the Purchased Contracts be effective immediately upon entry of such order and that the Court waive the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

66.     The Sale Notice will be served following approval of the Bidding Procedures Order on the parties identified in paragraph 24 of this Motion.  A complete copy of this Motion

---

[13] Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1). Section 365(f)(3) of the Bankruptcy Code further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

will be served on:  (i) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Brya M. Keilson, brya.keilson@usdoj.gov; (ii) the Debtors' thirty (30) largest unsecured creditors, as identified in their Chapter 11 petitions; (iii) counsel to the Prepetition Noteholders and DIP Note Purchasers, (a) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: My Chi To, mcto@debevoise.com, and Daniel E. Stroik, destroik@debevoise.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn:  Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neill, joneill@pszjlaw.com; (iv) counsel to the Collateral Agent and DIP Notes Agent, (a) Holland & Knight LLP, 131 South Dearborn Street, 30th Floor, Chicago, Illinois 60603, Attn: Joshua Spencer, joshua.spencer@khlaw.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neil, joneill@pszjlaw.com (v) counsel to the ABL Administrative Agent and ABL DIP Agent, (a) Riemer Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts, 02108, Attn: Donald E. Rothman, drothman@riemerlaw.com, Lon M. Singer, lsinger@riemerlaw.com, Jaime Rachel Koff, jkoff@riemerlaw.com, and Jeremy Levesque, jlevesque@riemerlaw.com, and (b) Ashby & Geddes, P.A., 500 Delaware Ave., 8th Floor, Wilmington, Delaware 19801, Attn: Gregory A. Taylor, GTaylor@ashbygeddes.com; (vi) counsel to the Stalking Horse Bidder, (a) Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn:  William Weintraub, wweintraub@goodwinlaw.com, (b) Goodwin Procter LLP, 100 Northern Avenue, Boston, Massachusetts 02210, Attn: Jon Herzog, jherzog@goodwinlaw.com and Joseph F. Bernardi, Jr., jbernardi@goodwinlaw.com, and (c) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899,

Attn:        David        Fournier,        fournierd@pepperlaw.com        and        Evelyn        Meltzer,
meltzere@pepperlaw.com; (vii) the Internal Revenue Service; (viii) all applicable state and local
taxing authorities, (ix) the Office of the United States Attorney for the District of Delaware; (x)
the United States Attorney General/Antitrust Division of the Department of Justice; (xi) the other
officers of the attorneys general for the states in which the Debtors operate; (xii) each of the
Debtors' landlords; (xiii) the one hundred and ten (110) Interested Parties identified by Houlihan
and any other entity known to have expressed an interest in a transaction with respect to the
Assets during the past nine (9) months; (xiv) all parties asserting a security interest in the assets
of the Debtors to the extent reasonably known to the Debtors; and (xv) the 2002 List.  A copy of
this Motion and any order approving it will also be made available on the Debtors' case
information website located at *http://www.cases.primeclerk.com/rockport*.   The Debtors submit
that, under the circumstances, no other or further notice is required.

<u>**NO PRIOR REQUEST**</u>

67.     The Debtors have not previously sought the relief requested herein from the
Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:    May 14, 2018
          Wilmington, Delaware

*/s/ Mark D. Collins*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Megan E. Kenney (No. 6426)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Fax:  302-651-7701
Email: collins@rlf.com
         merchant@rlf.com
         steele@rlf.com
         schlauch@rlf.com
         kenney@rlf.com

*Proposed Counsel to the Debtors*

RLF1 19331738V.1