**Exhibit 1**

**Blackline of Revised Combined Plan and Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| THE RELAY SHOE COMPANY, LLC, *et al.,* | ) | Case No. 18-11145 (LSS) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors.[1] | ) |  |
|  | ) |  |
|  | ) |  |

### REVISED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION


Dated: ~~October~~ December 1~~6~~7, 2018
        Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Email: collins@rlf.com
        merchant@rlf.com
        steele@rlf.com
        schlauch@rlf.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective Employer Identification Numbers are: Relay Blocker, LLC (f/k/a Rockport Blocker, LLC) (5097), The Relay Group Holdings, LLC (f/k/a The Rockport Group Holdings, LLC) (3025), Relay 1-P Holdings, LLC (f/k/a TRG 1-P Holdings, LLC) (4756), Relay Intermediate Holdings, LLC (f/k/a TRG Intermediate Holdings, LLC) (8931), Relay Class D, LLC (f/k/a TRG Class D, LLC) (4757), The Relay Group, LLC (f/k/a The Rockport Group, LLC) (5559), The Relay Company, LLC (f/k/a The Rockport Company, LLC) (5456), Drydock Footwear, LLC (7708), DD Management Services LLC (8274), and Relay Opco Canada ULC (f/k/a Rockport Canada ULC) (3548). The debtors' mailing address is 1220 Washington Street, West Newton, Massachusetts 02465.

I.      INTRODUCTION ........................................................................................................3

II.     DEFINITIONS AND CONSTRUCTION OF TERMS ...............................................4

        A.      Definitions ........................................................................................................4

        B.      Interpretation; Application of Definitions and Rules of Construction .......~~25~~26

III.    BACKGROUND .......................................................................................................~~25~~26

        A.      General Background ...................................................................................~~25~~26

                1.      The Debtors' Business .....................................................................~~25~~26

                2.      The Debtors' Organizational Structure and Pre-Closing
                        Reorganization ................................................................................~~27~~28

                3.      The 2015 and 2017 Transactions ....................................................~~27~~28

        B.      The Debtors' Prepetition Capital Structure ............................................~~27~~29

                1.      Prepetition ABL Facility .................................................................~~28~~29

                2.      Prepetition Notes Facility ................................................................~~29~~30

                3.      Prepetition Subordinated Notes .....................................................~~29~~30

                4.      Trade Debt .......................................................................................~~30~~31

        C.      Events Precipitating the Chapter 11 Filing ............................................~~30~~31

        D.      Prepetition Marketing Efforts .................................................................~~31~~33

        E.      The Chapter 11 Cases ...............................................................................~~32~~33

                1.      First Day Orders ..............................................................................~~32~~33

                2.      Canadian Proceeding ......................................................................~~35~~36

                3.      Appointment of Creditors' Committee ............................................~~35~~36

                4.      Employment of Professionals and Advisors ...................................~~35~~37

                5.      Schedules, Section 341(a) Meeting of Creditors, and Bar Dates .....~~36~~37

                6.      Postpetition Financing .....................................................................~~36~~37

                7.      Key Employee Incentive Plan and Key Employee Retention Plan ..~~39~~40

                8.      Rejection of Executory Contracts and Unexpired Leases ...............~~39~~40

                9.      Sale of Substantially All of the Debtors' Assets ..............................~~40~~41

                10.     Allocation of Sale Proceeds .............................................................~~43~~44

IV.     CONFIRMATION AND VOTING ..........................................................................~~45~~47

        A.      Confirmation Procedures .........................................................................~~45~~47

                1.      Plan Confirmation Hearing .............................................................~~45~~47

                2.      Requirements for Confirmation ......................................................~~46~~48

                3.      Cram Down .......................................................................................~~47~~48

                4.      Best Interests of Creditors Test ......................................................~~48~~50

                5.      Feasibility ........................................................................................~~49~~50

|  | 6. | Classification of Claims and Interests | 49<u>51</u> |
|  | 7. | Impaired Claims or Interests | 49<u>51</u> |
|  | 8. | Eligibility to Vote on this Combined Plan and Disclosure Statement | 50<u>51</u> |
|  | 9. | Procedure/Voting Deadlines | 50<u>51</u> |
|  | 10. | Releases | 53<u>54</u> |
|  | 11. | Acceptance of this Combined Plan and Disclosure Statement | 54<u>56</u> |

**V.** **TREATMENT OF UNCLASSIFIED CLAIMS** ... 55<u>56</u>

A. General Administrative Expense Claims ... 55<u>56</u>

1. U.S. General Administrative Expense Claims ... 55<u>56</u>

2. Rockport Canada General Administrative Expense Claims ... 55<u>56</u>

3. Treatment of Allowed Administrative Expense Claims and Deadline to File Administrative Expense Claims ... 55<u>57</u>

4. Treatment of Allowed Professional Fee Administrative Expense Claims and Deadline to File Professional Fee Administrative Claims ... 56<u>57</u>

B. Priority Tax Claims ... 57<u>58</u>

C. Statutory Fees ... 58<u>59</u>

**VI.** **CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES** ... 58<u>59</u>

**VII.** **TREATMENT OF CLAIMS AND INTERESTS** ... 60

A. Treatment of Claims and Interests against U.S. Debtors ... 60

1. Other Secured Claims against U.S. Debtors (Class 1(a)) ... 60

2. Prepetition Note Secured Claims against U.S. Debtors (Class 2) ... 60<u>61</u>

3. Other Priority Claims against U.S. Debtors (Class 3(a)) ... 61<u>62</u>

4. General Unsecured Claims against U.S. Debtors (Class 4(a)) ... 61<u>62</u>

5. Intercompany Claims against U.S. Debtors (Class 5(a)) ... 62<u>63</u>

6. Equity Interests in U.S. Debtors (Class 6(a)) ... 63<u>64</u>

B. Treatment of Claims and Interests against Rockport Canada ... 63<u>64</u>

1. Other Secured Claims against Rockport Canada (Class 1(b)) ... 63<u>64</u>

2. Other Priority Claims against Rockport Canada (Class 3(b)) ... 64<u>65</u>

3. General Unsecured Claims against Rockport Canada (Class 4(b)) ... 64<u>65</u>

4. Intercompany Claims against Rockport Canada (Class 5(b)) ... 65<u>66</u>

5. Equity Interests in Rockport Canada (Class 6(b)) ... 65<u>66</u>

C. Modification of Treatment of Claims and Interests ... 66<u>67</u>

ii

VIII.    PROVISIONS REGARDING THE LIQUIDATING TRUST ................................ 66 67

    A.    Appointment of the Liquidating Trustee ............................................ 66 67

    B.    Creation of Liquidating Trust ............................................................ 66 67

    C.    Beneficiaries of Liquidating Trust .................................................... 67 68

    D.    Vesting and Transfer of Assets to the Liquidating Trust .................... 67 68

    E.    Funding of the Liquidating Trust ...................................................... 67 68

    F.    Distributions from the Liquidating Trust .......................................... 68 69

    G.    Certain Powers and Duties of the Liquidating Trust and Liquidating
        Trustee .............................................................................................. 68 69

        1.    General Powers of the Liquidating Trustee ............................. 68 69

        2.    Books and Records ................................................................. 69 70

        3.    Investments of Cash ............................................................... 69 71

        4.    Costs and Expenses of Administration of the Liquidating Trust .... 70 71

        5.    Reporting ............................................................................... 70 71

    H.    United States Federal Income Tax Treatment of the Liquidating Trust
        for the Liquidating Trust Assets ........................................................ 70 71

    I.    Term of Liquidating Trust ................................................................. 71 72

    J.    Limitation of Liability of the Liquidating Trustee ............................. 71 72

IX.    PROVISIONS REGARDING THE ROCKPORT CANADA PLAN
ADMINISTRATOR ............................................................................................ 71 73

    A.    Appointment of the Rockport Canada Plan Administrator ................. 71 73

    B.    The Rockport Canada Plan Administrator Agreement ...................... 72 73

    C.    Vesting of the Rockport Canada Litigation Claims and Rockport Canada
        Litigation Proceeds .......................................................................... 72 73

    D.    Rights, Powers and Duties of Rockport Canada and the Rockport Canada
        Plan Administrator ........................................................................... 72 73

    E.    Compensation of the Rockport Canada Plan Administrator ............... 73 75

    F.    Limitation of Liability of the Rockport Canada Plan Administrator .... 73 75

X.    ADDITIONAL MEANS FOR IMPLEMENTATION .......................................... 74 76

    A.    Substantive Consolidation of the U.S. Debtors ................................. 74 76

        1.    The Basis for Substantive Consolidation ................................ 74 76

        2.    Impracticality of Separate Entity Plans ................................... 75 77

        3.    Basis for Substantive Consolidation ....................................... 75 77

        4.    The Effect of Substantive Consolidation ................................. 76 78

    B.    Preservation of Right to Conduct Investigations .............................. 77 79

    C.    Prosecution and Resolution of U.S. Litigation Claims ...................... 77 79

D.      Prosecution and Resolution of Rockport Canada Litigation Claims ............ 7980

E.      Effectuating Documents and Further Transactions ................................... 7980

F.      Authority to Act ........................................................................................ 7981

G.      Cancellation of Documents ........................................................................ 79

H.      Termination of Debtors' Plans .................................................................. 7981

I.      Corporate Action; Effectuating Documents; Further Transactions .......... 7981

J.      Release of Liens ......................................................................................... 8082

K.      Exemption from Securities Laws ............................................................... 8082

L.      Exemption from Certain Taxes and Fees .................................................. 8082

M.      Privileges as to Certain Causes of Action ............................................... 8183

N.      Preservation of Causes of Action .............................................................. 8183

O.      Insurance Policies ...................................................................................... 8284

        1.      Chubb Insurance Policies .............................................................. 84

P.      Filing of Monthly and Quarterly Reports and Payment of Statutory Fees 8286

Q.      Closing of the Chapter 11 Cases and the Canadian Proceeding ............... 8387

XI.     PROVISIONS GOVERNING DISTRIBUTIONS UNDER
        THIS COMBINED PLAN AND DISCLOSURE STATEMENT ........................... 8387

A.      Distribution Record Date; Transferability ................................................ 8387

B.      Method of Payment .................................................................................... 8387

C.      Claims Administration Responsibilities .................................................... 8387

D.      Claims Objection Deadline ........................................................................ 84

E.      No Distribution Pending Allowance .......................................................... 8488

F.      Reserve of Cash Distributions ................................................................... 84

G.      Distribution After Allowance .................................................................... 8488

H.      Delivery of Distributions ........................................................................... 8588

I.      Unclaimed Distributions ............................................................................ 8589

J.      Set-Off ........................................................................................................ 8689

K.      Postpetition Interest ................................................................................... 8690

L.      Distributions After Effective Date ............................................................. 8690

M.      Distributions Free and Clear ...................................................................... 8690

N.      Allocation of Distributions Between Principal and Interest ...................... 8690

O.      De-Minimis Distribution and Donation ..................................................... 8690

P.      Prepayment ................................................................................................. 8790

XII.    EXECUTORY CONTRACTS ............................................................................... 8791

A.      Rejection of Executory Contracts .............................................................. 8791

iv

      B.     Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Under this Combined Plan and Disclosure Statement ............... **87****91**

**XIII.**   **INJUNCTION, EXCULPATION AND RELEASES** ....................................... **87****91**

      A.     **Injunction to Protect Estate Assets** ...................................... **87****91**

      **B.**     **Discharge** ......................................................................................... **92**

      ~~B~~C.    **Term of Injunctions or Stays** ................................................ **88****92**

      ~~C~~D.    **Injunction Against Interference with Plan** ......................... **88****92**

      ~~D~~E.    **Exculpation** ............................................................................... **88****92**

      ~~E~~F.    **Releases** .......................................................................................... **89****3**

           1.     **Debtor Releases** ......................................................... **89****3**

           2.     **Releases by Holders of Claims** ................................ **90****94**

           3.     **Waiver of Statutory Limitations on Releases** ........ **91****95**

      ~~F~~G.    **Necessity and Approval of Releases and Injunctions** .................................. **92****95**

**XIV.**   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**............................................................................................ **92****96**

      A.     **General** ........................................................................................ **92****96**

      B.     **Consequences to the Debtors** ................................................ **93****96**

           1.     **Cancellation of Debt** ................................................. **93****96**

           2.     **Transfer of Assets to Liquidating Trust** ............................. **93****97**

      C.     **Consequences to Holders of Claims and Equity Interests** ........................... **93****97**

           1.     **Realization and Recognition of Gain or Loss, In General** ............. **93****97**

           2.     **Allocation of Consideration to Interest** ................. **94****98**

      D.     **Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests**................................................................................................ **95****98**

           1.     **Classification of the Liquidating Trust** ............................... **95****98**

           2.     **General Tax Reporting by the Liquidating Trust and Beneficiaries**.............................................................................. **95****99**

      E.     **Tax Treatments of Holders of Warrants** ................................... **97****100**

      F.     **Withholding on Distributions, and Information Reporting**.................... **97****101**

**XV.**    **CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE**............................................ **98****102**

      A.     **Conditions Precedent to Confirmation** ....................................... **98****102**

      B.     **Conditions Precedent to the Effective Date** ................................ **98****102**

      C.     **Establishing the Effective Date** ..................................................... **99****103**

      D.     **Effect of Failure of Conditions**...................................................... **99****103**

      E.     **Waiver of Conditions to Confirmation and Effective Date**......................... **100****3**

v

**XVI.    RETENTION OF JURISDICTION** ........................................................**100**~~3~~

**XVII.   MISCELLANEOUS PROVISIONS** ..........................................................**102**~~5~~

    **A.    Amendment or Modification of this Combined Plan and Disclosure Statement** ...................................................................................**102**~~5~~

    **B.    Severability** .....................................................................................**102**~~6~~

    **C.    Revocation or Withdrawal of this Combined Plan and Disclosure Statement** ...................................................................................**102**~~6~~

    **D.    Binding Effect** ................................................................................**103**~~6~~

    **E.    Notices** .............................................................................................**103**~~6~~

    **F.    Governing Law** ..............................................................................**104**~~8~~

    **G.    Withholding and Reporting Requirements** ...............................**104**~~8~~

    **H.    Headings** ..........................................................................................**104**~~8~~

    **I.    Exhibits/Schedules** ........................................................................**104**~~9~~

    **J.    Filing of Additional Documents** ..................................................**104**~~9~~

    **K.    No Admissions** ...............................................................................**105**~~2~~

    **L.    Successors and Assigns** ................................................................**105**~~2~~

    **M.    Reservation of Rights** ....................................................................**105**~~2~~

    **N.    Inconsistency** ..................................................................................**105**~~2~~

    **O.    Dissolution of the U.S. Debtors** ..................................................**110**~~5~~

    **P.    Dissolution of the Creditors' Committee** ...................................**110**6

**XVIII.  RISKS AND OTHER CONSIDERATIONS** ...........................................**110**6

    **A.    Bankruptcy Considerations** .........................................................**110**6

    **B.    No Duty to Update Disclosures** ...................................................~~107~~**111**

    **C.    Alternatives to Confirmation and Consummation of the Plan** ................~~107~~**111**

       **1.    Alternate Plan** ....................................................................~~107~~**111**

       **2.    Chapter 7 Liquidation** .....................................................~~107~~**111**

**XIX.    RECOMMENDATION AND CONCLUSION** ..........................................~~107~~**112**

**Each Holder of a Claim against the Debtors entitled to vote to accept or reject the Plan should read this Combined Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Combined Plan and Disclosure Statement may be made except under the terms hereof and Section 1125 of the Bankruptcy Code. If you are entitled to vote to approve the Plan, you are receiving a Ballot with your notice of this Combined Plan and Disclosure Statement. The Debtors urge you to vote to accept the Plan.**

**This Combined Plan and Disclosure Statement has been prepared in accordance with Sections 1125 and 1129 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3017, and Local Rule 3017-2, and not in accordance with federal or state securities law or other applicable non-bankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against, or Interests in, the Debtors should evaluate this Combined Plan and Disclosure Statement in light of the purpose for which it was prepared. This Combined Plan and Disclosure Statement shall not be construed to be advice on the tax, securities, or other legal effects of this Combined Plan and Disclosure Statement as to Holders of Claims against or Interests in the Debtors.**

**There has been no independent audit of the financial information contained in this Combined Plan and Disclosure Statement except as expressly indicated herein. This Combined Plan and Disclosure Statement was compiled from information obtained from numerous sources believed to be accurate to the best of the Debtors' knowledge, information, and belief. This Combined Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Plan and Disclosure Statement. Neither this Combined Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell, or the solicitation of an offer to buy, securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**This Combined Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.**

**Any projected recoveries to Creditors set forth in this Combined Plan and Disclosure Statement are based upon the analyses performed by the Debtors and their advisors. Although the Debtors and their advisors have made every effort to verify the accuracy of the information presented herein, the Debtors and their advisors cannot make any representations or warranties regarding the accuracy of the information.**

Nothing herein shall be deemed or construed as an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party.  The statements contained herein are made as of the date hereof, unless another time is specified.  The delivery of this Combined Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

It is the opinion of the Debtors that the treatment of Creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the Debtors.  Accordingly, the Debtors believe that confirmation of the Plan is in the best interests of Creditors, and the Debtors recommend that Creditors support and vote to accept the Plan.

RLF1 20492054 80v.1

# I.    INTRODUCTION

The Rockport Company, LLC (now known as The Relay Shoe Company, LLC) ("**Rockport**")[2], together with its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), propose this Combined Plan and Disclosure Statement under Sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.  While the Debtors are the proponents of this Combined Plan and Disclosure Statement within the meaning of Section 1129 of the Bankruptcy Code, this Combined Plan and Disclosure Statement, as may be amended from time to time, is the culmination of extensive negotiations between the Debtors, the Prepetition Noteholders, and other key constituents of the Debtors' Estates, resulting in this liquidating chapter 11 plan for the Debtors and the remaining Assets of the Estates.  ~~Moreover,~~ While the Plan is consistent with the terms of the Final DIP Order Supplement (as defined herein and described in Section III.E.6 of the Plan) as agreed to by the Debtors, the Prepetition Noteholders, the DIP Note Purchasers, and the Creditors' Committee, the Prepetition Noteholders have consented to the additional use of their cash collateral (above and beyond the amount agreed to in connection with the Final DIP Order Supplement) to fund the payment of U.S. Priority Tax Claims, Other Priority Claims against the U.S. Debtors and U.S. Administrative Expense Claims and to cover certain additional expenses of the Liquidating Trust in the manner set forth herein. Pursuant to the Final DIP Order Supplement, the Creditors' Committee agreed to support a plan that is consistent with the terms of the Final DIP Supplement, which shall provide for broad releases in favor of the Prepetition Noteholders and related parties in any capacity.  The Debtors support this Combined Plan and Disclosure Statement and encourage the Holders of impaired Claims entitled to vote hereunder to vote to accept this Combined Plan and Disclosure Statement.

This Combined Plan and Disclosure Statement contemplates the creation of a Liquidating Trust from which, under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, Distributions shall be made for the benefit of Holders of Allowed Claims against the U.S. Debtors.

The Combined Plan and Disclosure Statement also contemplates the establishment of the Rockport Canada Fund from which, under the terms of this Combined Plan and Disclosure Statement and the Rockport Canada Plan Administrator Agreement, Distributions shall be made for the benefit of Holders of Allowed Claims against Rockport Canada.

Subject to the restrictions on modifications set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in Section XVII.A of this Combined Plan and Disclosure Statement, the Debtors expressly reserve the right, in accordance with Section XVII.A below, to alter, amend, or modify this Combined

---

[2] Pursuant to Section 8.17 of the Asset Purchase Agreement, the Debtors were required to change the names of certain of the Debtors to remove any reference of "Rockport."  Accordingly, on August 8, 2018, the Debtors filed the necessary paperwork with the Secretary of State for the State of Delaware or other relevant governmental agency to effectuate the name change.  The new name for each applicable Debtor is set forth in in the caption to this Plan and further discussed in Section III.E.9 below.  To avoid confusion for Holders of Claims and Equity Interests reviewing the Plan, all applicable Debtors will be referred to by their former names.

Plan and Disclosure Statement, including the Plan Supplements, one or more times before substantial Consummation thereof.

## II.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    <u>Definitions</u>

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**<u>ABL Administrative Agent</u>**" means Citizens, as administrative agent and collateral agent for the ABL Lenders.

2.    "**<u>ABL Lenders</u>**" means the lenders that were party from time to time to the Prepetition ABL Credit Agreement.

3.    "**<u>ABL Secured Parties</u>**" means, collectively, the ABL Lenders and the ABL Administrative Agent.

4.    "**<u>Acquired Assets</u>**" means all Assets transferred, conveyed, sold, and assigned to the Purchaser under and in connection with the consummation of the Sale under the Sale Documents, which are set forth in more detail in the Asset Purchase Agreement.

5.    "**<u>Acquired Companies</u>**" means Rockport Japan K.K., The Rockport Company Korea, LTD, Rockport Hong Kong Limited, Dongguan Rockport Consulting Service Co, Ltd, Calzados Rockport S.L., The Rockport Company, Portugal, Unipessoal Lda, The Rockport Company B.V., Rockport (Europe) B.V., Relay Technical Services Private Limited, Rockport International Limited, and Rockport UK.

6.    "**<u>Additional Prepetition Notes</u>**" means those certain Senior Secured Notes Due 2022 issued in the aggregate principal amount of $40,573,966.05 pursuant to the Prepetition Note Purchase Agreement.

7.    "**<u>Adidas</u>**" means adidas AG.

8.    "<u>Adidas Parties</u>" means Adidas, Reebok, adidas (UK) Ltd., adidas Benelux BV, adidas Espana S.A.U., adidas Portugal, Artigos de Desporto, S.A., adidas Sverige AB, adidas Korea LLC, adidas Japan, K.K., and adidas International Trading, B.V.

9.    "**<u>Adidas Settlement Agreement</u>**" means that certain Settlement Agreement and Releases, dated July 25, 2018, entered into by the Rockport Parties, the Adidas Parties and the Noteholder Parties.

10.    "**<u>Adidas Settlement Motion</u>**" means the *Motion of Debtors for Entry of an Order Authorizing and Approving the Settlement Agreement By and Between the Rockport Parties, the Adidas Parties and the Noteholder Parties* [Docket No. 402].

11.    **"Administrative Expense Claim"** means any Claim constituting an actual, necessary cost or expense of administering the Chapter 11 Cases under Sections 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) any fees or charges assessed against the Estates under Section 1930 of chapter 123 of title 28 of the United States Code, and (c) all Claims arising under Section 503(b)(9) of the Bankruptcy Code.

12.    **"Administrative Expense Claim Bar Date"** means the deadline, which is thirty (30) days from the Effective Date, for Holders of Administrative Expense Claims accruing for the period from the Petition Date through the Effective Date to file a request with the Bankruptcy Court for payment of such Administrative Expense Claim in the manner indicated in Section V herein.

13.    **"Allowed"** means, with respect to Claims: (a) any Claim, proof of which was ~~timely~~ Filed (or for which Claim, under this Combined Plan and Disclosure Statement, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a proof of Claim is not or shall not be required to be Filed); (b) any Claim which has been or hereafter is listed by the Debtors in the Schedules as liquidated, and not otherwise amended, in amount and not disputed or contingent and for which no proof of Claim has been Filed; or (c) any Claim expressly allowed under this Combined Plan and Disclosure Statement or a Final Order of the Bankruptcy Court; provided that any Claim described in clauses (a) and (b) shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period fixed by this Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such objection is interposed and the Claim or any portion thereof is subsequently Allowed by a Final Order; provided, further, that Claims Allowed solely for purposes of voting on this Combined Plan and Disclosure Statement under an Order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder.  An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim under the provisions of the Bankruptcy Code and applicable law.  Moreover, any portion of a Claim that is released or waived during the Chapter 11 Cases is not an Allowed Claim.  Unless otherwise specified in this Combined Plan and Disclosure Statement, in Section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Combined Plan and Disclosure Statement, include interest on such Claim accruing from and after the Petition Date.

14.    **"Assets"** means all tangible and intangible assets of every kind and nature of the Debtors and the Estates within the meaning of Section 541 of the Bankruptcy Code.

15.    **"Asset Purchase Agreement"** means that certain Asset Purchase Agreement, dated as of May 13, 2018, by and among CB Marathon Opco, LLC, as Purchaser, and the Debtors and Rockport Canada Holdings, as sellers, approved by the Bankruptcy Court on July 18, 2018, as amended, modified or supplemented from time to time.

16.    **"Attune"** means attune Consulting USA, Inc.

17.    **"Attune Litigation Claims"** means any and all Causes of Action against Attune, which shall be assigned, transferred and vest with the Liquidating Trust upon the Effective Date in accordance with the terms of the Plan.

18.    **"Avoidance Actions"** means all rights to avoid transfers or distributions and recover any such avoided transfers or distributions for the benefit of the Estates under Chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code Sections 502(d), 510, 541, 542, 544, 545, 547, 548, 549, 550, 551, and 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not demand has been made or litigation has been commenced as of the Effective Date.

19.    **"Ballot"** means the ballot on which each Holder of a Claim entitled to vote on the acceptance or rejection of this Combined Plan and Disclosure Statement casts such vote.

20.    **"Balloting Agent"** means Prime Clerk.

21.    **"BAMS Reserves Stipulation"** means that Stipulation Regarding Application of Reserve [Docket No. ___], between the Debtors, on the one hand, and Bank of America N.A., Banc of America Merchant Services, LLC, Bank of America Merchant Services Canada Corp. and First Data Services, LLC , on the other hand (collectively, "BAMS"), relating to the return of the Reserve (as defined therein) established to provide credit protection with respect to chargebacks, adjustments, fees and other charges that may become due from Rockport to BAMS from time to time pursuant to the terms of certain merchant services agreements.

22.    **"BAMS Reserves Holdback"** means the Remaining Reserves, as such term is defined in the BAMS Reserves Stipulation.

23.    ~~21.~~**"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

24.    ~~22.~~**"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

25.    ~~23.~~**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code, as amended from time to time.

26.    ~~24.~~**"Beneficiary"** means any Holder of an Allowed General Unsecured Claim against the U.S. Debtors in Class 4(a) that may, or that is entitled to, receive a Distribution from the Liquidating Trust under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

27.   25.**"Berkshire"** means Berkshire Partners LLC.

28.   26.**"Bid Deadline"** means June 29, 2018 at 5:00 p.m. (prevailing Eastern time).

29.   27.**"Bid Procedures Motion"** means the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief; and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interest and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 24].

30.   28.**"Bid Procedures Order"** means the *Order (A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief* [Docket No. 146].

31.   29.**"BLG"** means Borden Ladner Gervais LLP.

32.   30.**"Blocker"** means Rockport Blocker, LLC (now known as Relay Blocker, LLC), a Delaware limited liability company.

33.   31.**"Business Day"** means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

34.   32.**"Canadian Court"** means the Ontario Superior Court of Justice (Commercial List).

35.   33.**"Canadian Proceeding"** means the recognition proceeding commenced by Blocker as foreign representative of the Debtors, pursuant to Part IV of the CCAA, to, among other things, recognize the jointly administered Chapter 11 Cases as a "foreign main proceeding."

36.   34.**"Cash"** means legal tender of the United States of America and equivalents thereof.

37.   35.**"Cash Management Stipulation"** means that certain *Stipulation Modifying Final Cash Management Order to Permit Intercompany Transfers between Rockport Canada ULC and The Rockport Company, LLC* dated July 18, 2018 between the Debtors, the Information Officer and the DIP Note Purchasers.

38. 36. **"Causes of Action"** means all claims, actions (including the Avoidance Actions), causes of action, choses in action, suits, refunds, turnovers, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or any of the Estates against any Person, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, and any and all commercial tort claims against any Person, arising from or relating to any act or omission or other event occurring at any time prior to (and including) the Effective Date; and subject, however, to any releases provided in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Sale Order, the Adidas Settlement Agreement, or any other Final Order of the Bankruptcy Court.

39. 37. **"CCAA"** means the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended.

40. 38. **"Chapter 11 Cases"** means the Chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers: 18-11145 (LSS), 18-11146 (LSS), 18-11147 (LSS), 18-11148 (LSS), 18-11149 (LSS), 18-11150 (LSS), 18-11151 (LSS), 18-11152 (LSS), 18-11153 (LSS) and 18-11154 (LSS), which Chapter 11 Cases are jointly administered under case number 18-11145 (LSS).

41. **"Chubb Companies"** means Federal Insurance Company, Great Northern Insurance Company, Pacific Indemnity Company, ACE American Insurance Company and each of their affiliates and successors. For the avoidance of doubt, each of the Chubb Companies is an Insurer.

42. **"Chubb Insurance Policies"** means all Insurance Policies for or to which a Chubb Company is an Insurer.

43. 39. **"Citizens"** means Citizens Business Capital.

44. 40. **"Claim"** has the meaning set forth in Section 101(5) of the Bankruptcy Code.

45. 41. **"Claims Agent"** means Prime Clerk.

46. 42. **"Claims Objection Deadline"** means the date that is one hundred and eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court, as may be extended pursuant to the terms of this Combined Plan and Disclosure Statement.

47. 43. **"Class"** means any group of substantially similar Claims or Interests classified by this Combined Plan and Disclosure Statement under Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

48. 44.**"Closing Date"** means August 2, 2018, the closing date of the Sale.

49. 45.**"Collateral Agent"** means Cortland as collateral agent pursuant to the Prepetition Note Purchase Agreement.

50. 46.**"Combined Plan and Disclosure Statement"** or "**Plan**" means this combined disclosure statement and Chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time through and including the Effective Date; *provided that* any such modifications are reasonably acceptable to the Prepetition Noteholders.

51. 47.**"Company"** means Rockport and its subsidiaries and affiliates.

52. 48.**"Consummation"** or **"Consummate"** means the occurrence of or to achieve the Effective Date.

53. 49.**"Cortland"** means Cortland Capital Market Services LLC.

54. 50.**"CRA"** means the Canada Revenue Agency.

55. 51.**"Creditor"** means any Person that is the Holder of a Claim against any of the Debtors.

56. 52.**"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on May 23, 2018 [Docket No. 96], as may be amended from time to time.

57. 53.**"Cure Notices"** means all notices to counterparties to Executory Contracts, including the notices filed by the Debtors on June 8, 2018 [Docket No. 176], June 20, 2018 [Docket No. 278], July 3, 2018 [Docket No. 335] and August 7, 2018 [Docket No. 438] and including all amendments and supplements thereto and any additional such notices that may be Filed and served from time to time.

58. 54.**"DD Management"** means DD Management Services, LLC, a Massachusetts limited liability company.

59. 55.**"Debtor Releases"** means the releases by the Debtors set forth in Section XIII.E of this Plan.

60. 56.**"Debtors"** means Blocker, Rockport Holdings, TRG 1-P, TRG Intermediate, TRG Class D, Rockport Group, Rockport, Drydock, DD Management, and Rockport Canada.

61. 57.**"Debtors in Possession"** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases under Sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

62. 58. **"DIP ABL Agent"** means Citizens, as administrative agent and collateral agent, and including any of its affiliates, for the DIP ABL Lenders.

63. 59. **"DIP ABL Credit Agreement"** means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of May 17, 2018, as amended from time to time, by and among, the DIP ABL Loan Parties, the DIP ABL Agent and the DIP ABL Lenders.

64. 60. **"DIP ABL Facility"** means the senior secured revolving postpetition financing and financial accommodations made available pursuant to the DIP ABL Credit Agreement and other related or ancillary documents.

65. 61. **"DIP ABL Guarantors"** means, collectively, Rockport Canada Holdings, TRG Class D, Drydock and DD Management.

66. 62. **"DIP ABL Lenders"** means Citizens and HSBC Bank USA, National Association with any other lenders party to the DIP ABL Credit Agreement.

67. 63. **"DIP ABL Loan Parties"** means, collectively, Rockport, Rockport Group, Rockport Canada and the DIP ABL Guarantors.

68. 64. **"DIP Facilities"** means, collectively, the DIP ABL Facility and the DIP Note Facility.

69. 65. **"DIP Lenders"** means, collectively, the DIP Note Purchasers and the DIP ABL Lenders.

70. 66. **"DIP Motion"** means, collectively, the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 15].

71. 67. **"DIP Note Agent"** means Cortland, as collateral agent for the DIP Note Purchasers.

72. 68. **"DIP Note Borrowers"** means Rockport and Rockport Group.

73. 69. **"DIP Note Facility"** means the senior secured postpetition financing and financial accommodations made available pursuant to the DIP Note Purchase Agreement and other related or ancillary documents.

74. 70. **"DIP Note Guarantors"** means, collectively, Blocker, Rockport Group, TRG 1-P, TRG Intermediate, TRG Class D, Drydock and DD Management.

75. 71. **"DIP Note Parties"** means, collectively, the DIP Note Borrowers and the DIP Note Guarantors.

10

76. ~~72.~~**"DIP Note Purchase Agreement"** means that certain Debtor-in-Possession Note Purchase and Security Agreement, dated as of May 17, 2018, as amended from time to time, by and among the DIP Note Parties, the DIP Note Agent and the DIP Note Purchasers.

77. ~~73.~~**"DIP Note Purchasers"** means the purchasers party to the DIP Note Purchase Agreement from time to time.

78. ~~74.~~**"DIP Order"** means any of, or collectively, (i) the Interim DIP Order; and (ii) the Final DIP Order, each as modified, amended and/or supplemented from time to time.

79. ~~75.~~**"Directors and Officers"** means the current and former directors and officers of the Debtors.

80. ~~76.~~**"Disputed"** means, with respect to any Claim or any portion thereof, (A) any Claim that (i) is, or hereafter may be listed on the Schedules as disputed, contingent, or unliquidated for which no proof of claim in a liquidated and non-contingent amount has been filed; (ii) is evidenced by a proof of Claim that, on its face, is contingent or unliquidated; or ~~(iii) is evidenced by a proof of Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated or disputed; or (iv)~~ is objected to in whole or in part or subject to a request for estimation prior to the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or resolved; and (B) any Claim that is not an Allowed Claim or a disallowed Claim in whole or in part by settlement or Final Order.

81. ~~77.~~**"Distribution"** means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, or Beneficiaries, as applicable, under this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and/or the Rockport Canada Plan Administrator Agreement.

82. ~~78.~~**"Distribution Date"** means the date or dates determined by the (i) Liquidating Trustee in accordance with the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement upon which the Liquidating Trustee shall make Distributions to holders of Allowed Claims against the U.S. Debtors entitled to receive Distributions under the Plan and (ii) the Rockport Canada Plan Administrator in accordance with the terms of this Combined Plan and Disclosure Statement and the Rockport Canada Plan Administrator Agreement upon which the Rockport Canada Plan Administrator shall make Distributions to holders of Allowed Claims against Rockport Canada entitled to receive Distributions under the Plan.

83. ~~79.~~**"Distribution Record Date"** means the record date for purposes of making Distributions under the Plan, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement on account of Allowed Claims, which date or dates shall be set forth in the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement.

84. ~~80.~~**"Drydock"** means Drydock Footwear, LLC, a Delaware limited liability company.

85.    81.**"Effective Date"** means the date on which the conditions specified in Section XV.B of this Combined Plan and Disclosure Statement have been satisfied or waived and the transactions contemplated hereunder have been substantially consummated.

86.    82.**"Employee Benefit Plans"** means The Rockport Company LLC 401(k) Savings and Retirement Plan.

87.    83.**"Entity"** means an entity as defined in Section 101(15) of the Bankruptcy Code.

88.    84.**"Equity Interest"** means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests.

89.    85.**"Equity Security"** means an "equity security" as defined in Section 101(16) of the Bankruptcy Code.

90.    86.**"Estates"** means the estates of the Debtors created upon the commencement of the Chapter 11 Cases, including all of the Debtors' Assets.

91.    87.**"Exculpated Parties"** means, as of the Petition Date through the date of Consummation of the Plan, the Debtors, the Information Officer, the Creditors' Committee and members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), the Debtors' Professionals, and each of their respective Related Persons to the extent such Related Persons serve as fiduciaries of the Estates, as well as the Debtors' current directors and officers as of the Petition Date through the date of the Consummation of the Plan.

92.    88.**"Executory Contract"** means any executory contract or unexpired lease as of the Petition Date between any Debtor and any other Person or Persons.

93.    89.**"Expeditors"** means Expeditors International of Washington, Inc. and its subsidiaries and affiliates.

94.    90.**"Expeditors Agreement"** means that certain Master Warehouse and Logistics Service Agreement, dated as of August 1, 2016, including all statement of works related thereto, as amended, supplemented, restated or otherwise modified from time to time.

95.    91.**"Expeditors Litigation Claims"** means any and all Causes of Action against Expeditors, which shall be assigned, transferred and vest with the Liquidating Trust upon the Effective Date in accordance with the terms of the Plan.

96.    92.**"File"**, **"Filed"**, or **"Filing"** means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases or any other related proceedings.

97.    93.**"Final Cash Management Order"** means the *Final Order (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief* [Docket No. 210].

98. 94. **"Final DIP Order"** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 320].

99. 95. **"Final DIP Order Supplement"** means that certain Final DIP Order Supplement attached as Exhibit A to the Final DIP Order [Docket No. 320].

100. 96. **"Final Order"** means an Order of the Bankruptcy Court, or the Canadian Court, as applicable, or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order shall not cause such order not to be a Final Order.

101. 97. **"First Day Declaration"** means the *Declaration of Paul Kosturos in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 14].

102. 98. **"First Day Motions"** has the meaning set forth in Section III.E of this Combined Plan and Disclosure Statement.

103. 99. **"General Administrative Expense Claim"** means any Administrative Expense Claim and any Professional Fee Administrative Claim.

104. 100. **"General Bar Date"** means August 30, 2018, as established in the General Bar Date Order.

105. 101. **"General Bar Date Order"** means that certain order of the Bankruptcy Court dated as of July 25, 2018 [Docket No. 405], establishing, among other things, (a) August 30, 2018 as the general bar date for filing proofs of Claim in the Chapter 11 Cases, and (b) November 12, 2018 as the deadline for all Governmental Units (as such term is defined in Section 101(27) of the Bankruptcy Code) for filing proofs of Claim in the Chapter 11 Cases, subject in each case to only those exceptions permitted thereby.

106. 102. **"General Unsecured Claim"** means any Claim against the Debtors that arose or is deemed or determined by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) a Secured Claim, (ii) an Administrative Expense Claim, (iii) a Professional Fee Administrative Claim, (iv) a Statutory Fee Claim, (v) a Priority Tax Claim, (vi) an Other Priority Claim or any other Claim entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, or (vii) any Claim that constitutes an Interest.  For the avoidance of doubt, General Unsecured Claims shall include (a) Rejection Damages Claims and (b) any deficiency claims, including any Prepetition Note Deficiency Claims, subject to the terms of the Plan, including, but not limited to, the Threshold Distribution Amount.

107.    103.**"Governmental Unit"** has the meaning set forth in Section 101(27) of the Bankruptcy Code.

108.    104.**"Governmental Unit Bar Date"** means November 12, 2018 at 5:00 p.m. (prevailing Eastern Time), the deadline for Governmental Units to file a proof of Claim against any of the Debtors for a Claim that arose prior to the Petition Date.

109.    105.**"Holder"** means the legal or beneficial holder of any Claim or Interest.

110.    106.**"Houlihan"** means Houlihan Lokey Capital, Inc.

111.    107.**"Independent Directors"** means William Allen, Matthew Sheahan and Michael LeRoy.

112.    108.**"Information Officer"** means Richter Advisory Group Inc., in its capacity as the Canadian Court-appointed information officer in the Canadian Proceeding.

113.    109.**"Initial Prepetition Notes"** means those certain Senior Secured Notes Due 2022 issued in the original principal amount of $130 million pursuant to the Prepetition Note Purchase Agreement.

114.    110.**"Insurance Policies"** means all insurance policies that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

115.    **"Insurer"** means any company or other entity that issued an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

116.    111.**"Intercompany Claims"** means (i) any account reflecting intercompany book entries by one Debtor with respect to another Debtor, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against another Debtor, in each case accruing before or after the Petition Date through the Effective Date, including, but not limited to, any Claim for reimbursement, payment as guarantor or surety, or any Claim for contribution or expenses that was allocable between the Debtors.

117.    112.**"Intercompany Transactions"** means certain transactions between and among the Debtors as well as with certain of their former foreign affiliates.

118.    113.**"Intercreditor Agreement"** means the Intercreditor Agreement, dated as of July 31, 2015, among the ABL Administrative Agent, the Collateral Agent and the Prepetition Noteholders party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date.

119.    114.**"Interest"** means any equity or membership interest in any Debtor.

120.    115.**"Interim DIP Order"** means *the Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 60]

121.    116.**"IRC"** means the Internal Revenue Code of 1986, as amended.

122.    117.**"IRS"** means the Internal Revenue Service.

123.    118.**"Key Employee Incentive Plan"** means the key employee incentive plan authorized by the *Order Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan* [Docket No. 233].

124.    119.**"Key Employee Retention Plan"** means the key employee retention plan authorized by the *Order Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan* [Docket No. 233].

125.    120.**"Lien"** means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or surrender right, or other encumbrance of any kind, including any "lien" as defined in Section 101(37) of the Bankruptcy Code.

126.    121.**"Liquidating Trust"** means the trust established on the Effective Date as described in Section VIII of this Combined Plan and Disclosure Statement and in accordance with the Liquidating Trust Agreement.

127.    122.**"Liquidating Trust Advisors"** means any firm(s) or individual(s) retained by the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement to serve as legal counsel for the Liquidating Trust or to provide other professional services for the Liquidating Trust in connection with the performance of the Liquidating Trustee's duties and responsibilities under this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

128.    123.**"Liquidating Trust Agreement"** means the trust agreement, in form and substance reasonably acceptable to the Debtors, the Prepetition Noteholders, the Creditors' Committee and the Liquidating Trustee as of the Effective Date, establishing the Liquidating Trust described in Section VIII of this Combined Plan and Disclosure Statement, and which shall be filed in draft form as part of the Plan Supplement.

129.    124.**"Liquidating Trust Assets"** means (i) any and all U.S. Litigation Claims and U.S. Litigation Proceeds; (ii) any unused portion of the Wind-Down Reserve, excluding any unused portion of the Pre-Closing Expense Reserve Amountthe Post-Effective Date Trust Reserve; (iii) the benefits, rights, interests and proceeds of any Insurance Policies with respect to the U.S. Debtors only to the extent payable to the U.S. Debtors in accordance with the terms of the Insurance Policies; and (iv) any and all other Assets belonging to the U.S. Debtors' Estates, including any Cash and other Assets that are not Acquired Assets remaining in the U.S. Debtors' Estates on the Effective Date.  For the avoidance of doubt, while the Pre-

closing Expense Reserve Amount and Professional Fee Escrow shall be received and the Pre-Effective Date Professional Fee Reserve, the Pre-Effective Date SAP Claims Reserve and Sale Escrow Amounts shall be transferred to the Liquidating Trust on the Effective Date to be administered by the Liquidating TrusteeTrust in accordance with the terms of this Plan, they the Sale Order or other applicable documents but shall not constitute be considered Liquidating Trust Assets under the Plan.  Any unused portion of the Pre-Closing Expense Reserve Amount or Pre-Effective Date Professional Fee Escrow Reserve or the Pre-Effective Date SAP Claims Reserve following the payment of all eClaims for which such funds are intended shall be available for distribution to the Holders of Allowed Prepetition Note Secured Claims and shall not be available for distribution to the Holders of General Unsecured Claims.

130.    **"Liquidating Trust Class 4 Distributable Assets"** means the remaining amount of the Post-Effective Date Trust Reserve and/or the U.S. Litigation Proceeds following the payment of all Liquidating Trust Operating Expenses available for distribution to the Holders of Allowed Class 4 General Unsecured Claims against the U.S. Debtors.

131.    125.**"Liquidating Trustee"** means the Person or Persons selected by, the Creditors' Committee, in consultation with the Debtors and the Prepetition Noteholders, and appointed to administer the Liquidating Trust, which shall be disclosed in the Plan Supplement, with such rights, duties, and obligations as set forth in this Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement.

132.    126.**"Liquidating Trust Operating Expenses"** means the overhead and other operational expenses of the Liquidating Trust including, but not limited to, (i) reasonable compensation for the Liquidating Trustee and members of the Trust Oversight Committee (which expenses shall not include professional fees of such members) in accordance with the Liquidating Trust Agreement, (ii) costs and expenses incurred by the Liquidating Trustee in administering the Liquidating Trust, (iii) Statutory Fees incurred after the Effective Date to the U.S. Trustee, and (iv) any fees and expenses payable to the Liquidating Trust Advisors.

133.    127.**"Local Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as amended from time to time.

134.    128.**"Management Agreement"** means that certain Management Agreement, dated as of July 31, 2015, entered into by Rockport and Adidas.

135.    129.**"New Balance"** means New Balance Holdings, Inc.

136.    130.**"New Money Notes"** means notes issued pursuant to the DIP Note Purchase Agreement.

137.    131.**"North American Retail Assets"** means the Debtors' retail assets comprised of a total of 27 stores in the United States and 33 stores in Canada, including related inventory.

138.    132.**"Note Priority Collateral"** shall have the meaning set forth in the Prepetition Note Purchase Agreement.

139.   133."**Noteholder Parties**" means Crescent Mezzanine Partners VI, L.P., Crescent Mezzanine Partners VIC, L.P., Crescent Mezzanine Partners VIB (Cayman), L.P., CM6B Rockport Equity, Inc., CM6C Rockport Equity, Inc., Corporate Capital Trust, Inc., Oregon Public Employees Retirement Fund, NYLCAP Mezzanine Partners III, LP, NYLCAP Mezzanine Partners III Parallel Fund, LP, NYLCAP mezzanine Partners III 2012 Co-Invest, LP, and NYLCAP Mezzanine Partners II 2012 Co-Invest ECI Blocker F, LP.

140.   134."**Order**" means an order, opinion, or judgment of the Bankruptcy Court as entered on the docket.

141.   135."**Other General Unsecured Claim**" means a General Unsecured Claim against the U.S. Debtors that is not a Prepetition Note Deficiency Claim.

142.   136."**Other Priority Claim**" means any Claim accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, that is not otherwise a Priority Tax Claim, a Statutory Fee Claim, an Administrative Expense Claim, or a Professional Fee Administrative Claim.

143.   137."**Other U.S. Litigation Proceeds**" means all U.S. Litigation Proceeds other than U.S. Avoidance Action Litigation Proceeds; (except for U.S. Litigation Proceeds on account of Avoidance Actions under Section 549 of the Bankruptcy Code which shall constitute Other U.S. Litigation Proceeds).

144.   138."**Owned Real Property**" means all real property and all of the Debtors' right, title and interest in real property owned, in whole or in part, directly or indirectly by the Debtors, together with all buildings, fixtures and improvements located thereon, and all easements, rights of way, servitudes, tenements, appurtenances, privileges and other rights with respect thereto.

145.   139."**Other Secured Claim**" means any Secured Claim that is not otherwise a Prepetition Note Claim.

146.   140."**Permitted Rockport Canada Intercompany Transactions**" means following the Petition Date, Rockport Canada's transfer of funds to Rockport on account of (i) merchandise purchased postpetition from Rockport as necessary for Rockport Canada's ongoing operations and (ii) postpetition back-office services provided by Rockport.

147.   141."**Person**" means an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association or organization, a governmental unit or any agency or subdivision thereof or any other entity.

148.   142."**Petition Date**" means May 14, 2018, the date on which the Debtors commenced these Chapter 11 Cases.

149.   143."**Plan Confirmation Date**" means the date on which the Bankruptcy Court enters the Plan Confirmation Order.

150.   144. **"Plan Confirmation Hearing"** means the hearing to be held by the Bankruptcy Court to consider approval and confirmation of this Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

151.   145. **"Plan Confirmation Order"** means an Order entered by the Bankruptcy Court approving and confirming this Combined Plan and Disclosure Statement on a final basis under Sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.

152.   146. **"Plan Documents"** means this Combined Plan and Disclosure Statement, the Plan Supplements, and all of the exhibits and schedules attached to any of the foregoing.

153.   147. **"Plan Proponents"** means the Debtors as the proponents of the Combined Plan and Disclosure Statement.

154.   148. **"Plan Supplement"** means the appendix of schedules and exhibits to be Filed at least ten (10) days before the Plan Confirmation Hearing containing, among other things, the Liquidating Trust Agreement as may be amended, modified, and/or supplemented; each of which shall be in form and substance reasonably acceptable to the Prepetition Noteholders and the Creditors' Committee.

155.   149. **"Post-Closing Adjustments"** means certain closing adjustments and reconciliations owed by Rockport to Adidas pursuant to the Management Agreement.

156.   150. **"Pre-Closing Expense "Post-Effective Date Reserve Amount" Trust Reserve"** means a cash reserve established on the Effective Date to cover unpaid budgeted Administrative Expense Claims incurred prior to the Closing Date of the Sale to be established by the Debtors on or prior to the Effective Date in the amount of $485,000, which may be used by the Liquidating Trustee, subject to the terms of the Liquidating Trust Agreement, to pay any Liquidating Trust Operating Expenses and/or to make a distribution to the Holders of Class 4 General Unsecured Claims against the U.S. Debtors in accordance with the Plan.

157.   **"Pre-Effective Date Professional Fee Reserve"** means a reserve to be established by the Debtors on or prior to the Effective Date in the amount of $5,550,000, which, absent the consent of the Prepetition Noteholders, shall be used solely to pay any unpaid and Allowed U.S. Professional Fee Administrative Claims (including any amounts relating to the preparation and filing of tax returns for the U.S. Debtors for tax periods preceding the Effective Date) incurred through the Effective Date in accordance with the Plan.   The Pre-Effective Date Professional Fee Reserve shall not be a Liquidating Trust Asset.  Any unused portion of the Pre-Effective Date Professional Fee Reserve following the payment of all unpaid and Allowed U.S. Professional Fee Administrative Claims incurred through the Effective Date shall be available for distribution to the Holders of Allowed Prepetition Note Secured Claims and shall not be available for distribution to the Holders of Class 4 General Unsecured Claims against the U.S. Debtors.

158.   **"Pre-Effective Date SAP Claims Reserve"** means a reserve to be established by the Debtors on or prior to the Effective Date in the amount of $1,775,000, which, absent the consent of the Prepetition Noteholders, shall be used solely to pay any unpaid and

Allowed (i) Other Secured Claims against the U.S. Debtors, (ii) U.S. General Administrative Claims incurred through the Effective Date, (iii) U.S. Priority Tax Claims, (iv) Other Priority Claims against the U.S. Debtors in accordance with the Plan, and (v) any unpaid Statutory Fees relating to the period from the Petition Date through the Effective Date and any Statutory Fees associated with the initial distribution by the Debtors or the Liquidating Trustee, as the case may be, to the Holders of Allowed Prepetition Note Secured Claims against the U.S. Debtors in accordance with the Plan.  The Pre-Effective Date SAP Claims Reserve shall not be a Liquidating Trust Asset.  Any unused portion of the Pre-Effective Date SAP Claims Reserve following the payment of all unpaid and Allowed Other Secured Claims against the U.S. Debtors, the U.S. General Administrative Claims incurred through the Effective Date, U.S. Priority Tax Claims, Other Priority Claims or the Statutory Fees against the U.S. Debtors shall be available for distribution to the Holders of Allowed Prepetition Note Secured Claims referenced above and shall not be available for distribution to the Holders of Class 4 General Unsecured Claims against the U.S. Debtors.

159.    151.**"Prepetition ABL Credit Agreement"** means, collectively, that certain Revolving Credit Agreement, dated as of July 31, 2015 among Rockport, Rockport Group, Rockport Canada, TRG Class D, the Subsidiaries (as defined therein) of Rockport Group from time to time, the ABL Lenders, and Citizens, as ABL Administrative Agent, as amended, supplemented, restated or otherwise modified from time to time.

160.    152.**"Prepetition Credit Facilities"** means the Prepetition Notes Facility and the Prepetition ABL Facility.

161.    153.**"Prepetition Note Claims"** means the Claims held by the Prepetition Noteholders.

162.    154.**"Prepetition Note Deficiency Claims"** means Unsecured Deficiency Claims held by the Prepetition Noteholders.  For the avoidance of doubt, Prepetition Note Deficiency Claims are General Unsecured Claims against the U.S. Debtors.

163.    155.**"Prepetition Note Purchase Agreement"** means that certain Note Purchase Agreement, dated as of July 31, 2015, among Rockport, Rockport Group, TRG Class D, the Subsidiaries (as defined therein) of the Rockport Group from time to time, Cortland, the Collateral Agent and the Prepetition Noteholders.

164.    156.**"Prepetition Note Secured Claims"** means, collectively, all Prepetition Note Claims that are Secured Claims.

165.    157.**"Prepetition Notes"** means the Initial Prepetition Notes and the Additional Prepetition Notes.

166.    158.**"Prepetition Noteholders"** means the purchasers of the Prepetition Notes pursuant to the Prepetition Note Purchase Agreement.

167.    159.**"Prepetition Secured Parties"** means, collectively, the Prepetition Noteholders, the Collateral Agent, the ABL Secured Parties and the ABL Administrative Agent.

168.    160.**"Prime Clerk"** means Prime Clerk LLC.

169.    161.**"Priority Tax Claim"** means a Claim that is entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

170.    162.**"Privilege"** means the attorney client privilege, work product protections or other immunities (including without limitation those related to common interests or joint defenses with other parties), or protections from disclosure of any kind held by the Debtors or their Estates.

171.    163.**"Professional"** means any professional Person employed by the Debtors or the Creditors' Committee in the Chapter 11 Cases under Section 327, 363, or 1103 of the Bankruptcy Code or otherwise under an Order of the Bankruptcy Court.

172.    164.**"Professional Fee Administrative Claim"** means a Claim for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under Sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, including Claims of any Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

165.**"Professional Fee Escrow"** means an account to be funded by the Debtors on or prior to the Effective Date in an amount equal to the aggregate amount of (i) any and all budgeted and unpaid U.S. Professional Fee Administrative Claims incurred through the Closing Date and (ii) any additional amounts authorized by the Prepetition Noteholders on account of unbudgeted and unpaid U.S. Professional Fee Administrative Claims incurred through the Closing Date, which shall be held by the Liquidating Trust and used to pay such claims in accordance with the Plan.

173.    166.**"Pro Rata"** means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

174.    167.**"Purchaser"** means CB Marathon Opco, LLC in its capacity as purchaser under the Asset Purchase Agreement.

175.    168.**"Qualified Bid"** means an offer, solicitation or proposal submitted in connection with the Sale satisfying the conditions set forth in the Bid Procedures Order.

176.    169.**"Reebok"** means Reebok International Ltd.

177.    170.**"Rejection Damages Claim"** means a Claim for damages arising out of the rejection of an Executory Contract.

178.    171.**"Related Persons"** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former (i) shareholders, (ii) equity holders, (iii) affiliates (whether by operation of law or otherwise), (iv) subsidiaries, (v) principals, (vi) employees, (vii) agents, (viii) officers, (ix) directors, (x) managers, (xi) trustees, (xii) partners,

(xiii) members, (xiv) professionals, (xv) representatives, (xvi) advisors, (xvii) attorneys, (xviii) financial advisors, (xix) accountants, (xx) investment bankers, and (xxi) consultants, and (xxii) any Person claiming by or through any of the foregoing.

179.    172. **"Released Parties"** means the Debtors, Prepetition Secured Parties, the Creditors' Committee, the Information Officer, and the DIP Lenders, in each case in their capacities as such, and each of their respective Related Persons for claims by or through the person they are related to.

180.    173. **"Releasing Parties"** means (i) the Released Parties excluding the Debtors (excluding any Holder of a Prepetition Note Claim in Class 2 who votes to reject the Plan and opts out of the Third-Party Release and any investor in the Oregon Pension Fund), (ii) each Holder of a Claim who is conclusively deemed to have accepted the Plan and does not timely object to the releases provided in the Plan upon payment of such Holder's claim in full, (iii) each Holder of a Claim who votes to accept the Plan, (iv) each Holder of a Claim who votes to reject the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release, (v) each Holder of a Claim who abstains from voting on the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release, and (vi) with respect to the foregoing clauses (i) though (v), each of such Person's Related Persons (excluding any investor in the Oregon Pension Fund), in each case in their capacity as such, for claims by or through the person they are related to. Notwithstanding anything to the contrary herein, Releasing Parties shall not include any Holder of a Claim who is entitled to vote on the Plan, but such ballot was returned to the Balloting Agent as undeliverable.

181.    174. **"Revolving Priority Collateral"** shall have the meaning set forth in the Prepetition ABL Credit Agreement.

182.    175. **"Rockport"** means The Rockport Company, LLC (now known as The Relay Shoe Company, LLC), a Delaware limited liability company.

183.    176. **"Rockport Canada"** means Rockport Canada ULC (now known as Relay Opco Canada ULC), a British Columbia unlimited liability company.

184.    177. **"Rockport Canada Administrative Expense Claim"** means an Administrative Expense Claim against Rockport Canada.

185.    178. **"Rockport Canada Cash"** means $6,007,000.

186.    179. **"Rockport Canada Fund"** means the fund established under this Plan to make Distributions on account of Allowed Claims against Rockport Canada and funded with (i) the Rockport Canada Cash, (ii) Rockport Canada Litigation Proceeds and (iii) the proceeds of any Insurance Policies with respect to Rockport Canada.

187.    180. **"Rockport Canada General Administrative Claims"** means any Rockport Canada Administrative Claim and any Rockport Canada Professional Fee Administrative Claim.

188.    "**Rockport Canada Holdings**" means Rockport Canada Ltd., an England and Wales limited company.

189.    182.**"Rockport Canada Litigation Claims"** means any and all Causes of Action (except Causes of Action that constitute Acquired Assets and any claims or Causes of Action against Released Parties), related to Rockport Canada or a creditor of Rockport Canada which shall be assigned, transferred, and vest in Rockport Canada upon the Effective Date in accordance with the terms of the Plan.

190.    183.**"Rockport Canada Litigation Proceeds"** means the net proceeds of the Rockport Canada Litigation Claims.

191.    184.**"Rockport Canada Plan Administrator"** means the Person or Persons selected by Rockport Canada and appointed to administer the Rockport Canada Fund, which shall be disclosed in the Plan Supplement, with such rights, duties and obligations as set forth in this Combined Plan and Disclosure Statement and in the Rockport Canada Plan Administrator Agreement.

192.    185.**"Rockport Canada Plan Administrator Agreement"** means the plan administrator agreement, in the form and substance reasonably acceptable to the Debtors and the Rockport Canada Plan Administrator as of the Effective Date, specifying the rights, duties and responsibilities of, and to be performed by, the Rockport Canada Plan Administrator under the Combined Plan and Disclosure Statement.

193.    186.**"Rockport Canada Plan Administrator Professionals"** means agents, financial advisors, attorneys, consultants, independent contracts, representatives and other professionals of the Rockport Canada Plan Administrator and Rockport Canada (in each case, solely in their capacities as such).

194.    187.**"Rockport Canada Priority Tax Claim"** means a Priority Tax Claim against Rockport Canada.

195.    188.**"Rockport Canada Professional Fee Administrative Claims"** means Professional Fee Administrative Claims against Rockport Canada, including but not limited to, the Professional Fee Administrative Claims of BLG.

196.    189.**"Rockport Group"** means The Rockport Group, LLC (now known as The Relay Group, LLC), a Delaware limited liability company.

197.    190.**"Rockport Holdings"** means The Rockport Group Holdings, LLC (now known as The Relay Group Holdings, LLC), a Delaware limited liability company.

198.    191.**"Rockport Parties"** means The Rockport Group, LLC, The Rockport Group Holdings, LLC,  TRG 1-P Holdings, LLC, TRG Intermediate Holdings, LLC, TRG Class D, LLC, The Rockport Company, LLC, Drydock Footwear, LLC, DD Management Services LLC, Rockport Canada ULC, Rockport Canada Holdings, Ltd., Rockport Japan K.K., The Rockport Company Korea, Ltd, Rockport Hong Kong Limited, Dongguan Rockport Consulting Service Co., Ltd., Calzados Rockport S.L., The Rockport Company, Portugal, Unipessoal LDA,

The Rockport Company B.V., Rockport (Europe) B.V., Relay Technical Services Private Limited, Rockport International Limited, Rockport UK Holdings Ltd., Rockport Canada Holdings, Ltd., and The Rockport Company Japan K.K.

199.    192. **"Rockport Plaintiffs"** means The Rockport Group, LLC, The Rockport Group Holdings, LLC, TRG 1-P Holdings, LLC, TRG Intermediate Holdings, LLC, TRG Class D, LLC, The Rockport Company, LLC, Drydock Footwear, LLC, DD Management Services LLC, Rockport Canada ULC, Rockport Japan K.K., The Rockport Company Korea, Ltd, Rockport Hong Kong Limited, Dongguan Rockport Consulting Service Co;, Ltd., Calzados Rockport S.L., The Rockport Company, Portugal, Unipessoal LDA, The Rockport Company B.V., Rockport (Europe) B.V., Relay Technical Services Private Limited, Rockport International Limited, Rockport UK Holdings Ltd.

200.    193. **"Rockport UK"** means Rockport UK Holdings, Ltd. (now known as Relay UK Holdings, Ltd.), a United Kingdom limited company.

201.    194. **"Sale"** means the sale of substantially all of the Debtors' Assets as set forth in, and in accordance with, the Sale Documents, which was consummated on the Closing Date.

202.    195. **"Sale Documents"** means the Asset Purchase Agreement, the Sale Order, and all documents, instruments, and agreements executed and delivered in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement.

203.    **"Sale Escrow Amounts"** means the escrowed funds in the aggregate amount of $558,212.03 that were set aside in connection with the closing of the Sale, consisting of (i) $572,607.75 relating to a cure dispute with Expeditors; (ii) $7,500.00 relating to secured ad valorem property taxes asserted by the Local Texas Taxing Authorities (as defined in the Sale Order); and (iii) $8,104.28 relating to a cure dispute with Oracle America, Inc.

204.    196. **"Sale Motion"** means the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief; and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 24].

205.    197. **"Sale Order"** means the *Order (A) Approving and Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 387].

206.    198. **"Schedules"** mean the schedules of assets and liabilities, schedules of executory contracts, schedules of co-debtors and statements of financial affairs filed by the

Debtors pursuant to Section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

207. ~~199.~~**"Secured Claim"** means a Claim that is secured (a) by a Lien that is valid, perfected, and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of an Order, or (b) as a result of rights of setoff under Section 553 of the Bankruptcy Code, but in any event only to the extent of the value determined in accordance with Section 506(a) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in such property (unless an election has been made under Section 1111(b) of the Bankruptcy Code on or prior to the Plan Confirmation Date) or to the extent of an amount subject to such setoff, as applicable.

208. ~~200.~~**"Securities Act"** means the Securities Act of 1933, as amended.

209. ~~201.~~**"Statutory Fees"** means any and all fees payable to the U.S. Trustee under Section 1930 of Title 28 of the United States Code and any interest thereupon.

210. ~~202.~~**"Stores"** means the Debtors' North American retail locations.

211. ~~203.~~**"Store Closing Sales Motion"** means the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Conduct Store Closing Sales at Their North American Retail Locations and (B) Pay Store Closing Bonuses to Employees at the Closing Stores and (II) Granting Related Relief* [Docket No. 47].

212. ~~204.~~**"Store Closing Sales Order"** means the *Order (I) Authorizing the Debtors to (A) Conduct Store Closing Sales at Their North American Retail Locations and (B) Pay Store Closing Bonuses to Employees at the Closing Stores and (II) Granting Related Relief* [Docket No. 234].

213. ~~205.~~**"Successful Bidder"** shall have the meaning set forth in the Bid Procedures Order.

214. ~~206.~~**"Third-Party Release"** means the releases set forth in Section XIII.E of this Plan.

215. ~~207.~~**"Threshold Distribution Amount"** means $2,000,000 as set forth in the Final DIP Order Supplement.

216. ~~208.~~**"TRG 1-P"** means TRG 1-P Holdings, LLC (now known as Relay 1-P Holdings, LLC), a Delaware limited liability company.

217. ~~209.~~**"TRG Class D"** means TRG Class D, LLC (now known as Relay TRG Class D, LLC), a Delaware limited liability company.

218. ~~210.~~**"TRG Intermediate"** means TRG Intermediate Holdings, LLC (now known as Relay TRG Intermediate Holdings, LLC), a Delaware limited liability company.

219. 211.**"Trust Oversight Committee"** means the committee formed on the Effective Date to be selected by the Creditors' Committee, the composition of such must be reasonably acceptable to the Debtors and the Prepetition Noteholders and identified in the Plan Supplement for the purposes set forth in the Liquidating Trust Agreement.

220. 212.**"Unclaimed Distribution"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

221. 213.**"Unclaimed Distribution Deadline"** means, in each instance, the date that is one hundred and twenty (120) days from the date the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, makes a Distribution.

222. 214.**"Unsecured Deficiency Claim"** means, with respect to a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, the amount by which such Claim exceeds the value of the Claim holder's interest in such Estate's interest in such property or the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to Section 553 of the Bankruptcy Code.

223. 215.**"U.S. Administrative Expense Claim"** means an Administrative Expense Claim against the U.S. Debtors.

224. 216.**"U.S. Avoidance Action Litigation Proceeds"** means all U.S. Litigation Proceeds received on account of Avoidance Actions and commercial tort U.S. Litigation Claims, excluding U.S. Litigation Proceeds on account of Avoidance Actions under Section 549 of the Bankruptcy Code.

225. 217.**"U.S. Debtors"** means Blocker, Rockport Holdings, TRG 1-P, TRG Intermediate, TRG Class D, Rockport Group, Rockport, Drydock and DD Management.

226. 218.**"U.S. General Administrative Claims"** means any U.S. Administrative Claim and any U.S. Professional Fee Administrative Claim.

227. 219.**"U.S. Litigation Claims"** means any and all Causes of Action (except Causes of Action that constitute Acquired Assets and any claims or Causes of Action against Released Parties), related to any U.S. Debtor or a creditor of a U.S. Debtor which shall be assigned, transferred, and vest in Liquidating Trust upon the Effective Date in accordance with the terms of the Plan. For the avoidance of doubt, the Expeditors Litigation Claims and Attune Litigation Claims shall be deemed and constitute U.S. Litigation Claims and shall not constitute Rockport Canada Litigation Claims under the terms of this Plan.

228. 220.**"U.S. Litigation Proceeds"** means the net proceeds of the U.S. Litigation Claims.

229. 221.**"U.S. Priority Tax Claim"** means a Priority Tax Claim against the U.S. Debtors.

230.    222.**"U.S. Professional Fee Administrative Claims"** means Professional Fee Administrative Claims of the U.S. Debtors.

231.    223.**"U.S. Trustee"** means the Office of the United States Trustee for the District of Delaware.

232.    224.**"Vote Tabulation Procedures"** shall have the meaning set forth in Section IV.A of this Combined Plan and Disclosure Statement.

233.    225.**"Voting Deadline"** means November 519, 2018 at 5:00 p.m. as described in Section IV.A of this Combined Plan and Disclosure Statement.

234.    226.**"Warrant Agreement"** means the Warrant to Purchase Common Units of CB Marathon Holdings, LLC ("**CB Marathon Holdings**") executed by and between CB Marathon Holdings and Blocker, pursuant to which the Warrants were issued by CB Marathon Holdings to Blocker upon the Closing Date.

235.    227.**"Warrants"** means the warrants issued by CB Marathon Holdings and delivered to Blocker upon the Closing Date to purchase Five Million Five Hundred Forty Two Thousand One Hundred Five (5,542,105) (the "**Warrant Units**") duly authorized and validly issued Common Units (as defined in the Amended and Restated Limited Liability Company Agreement of CB Marathon Holdings, as amended from time to time (the "**CB Marathon Holdings LLC Agreement**"), at an initial purchase price per Warrant Unit equal to $2.50 (the "**Warrant Price**").

228.**"Wind-Down Reserve"** means the reserve that shall be established on the Effective Date with the remaining balance of the Wind-Down Reserve Amount and shall be used to pay, inter alia, (i) U.S. Professional Fee Administrative Claims and other U.S. Administrative Expense Claims incurred by the U.S. Debtors after the Closing Date, (ii) any unbudgeted U.S. Professional Fee Administrative Claims incurred through the Closing Date that the Prepetition Noteholders have not authorized to be paid from the Professional Fee Escrow, (iii) U.S. Administrative Expense Claims against the U.S. Debtors incurred prior to the Closing Date but not covered by the Pre-Closing Expense Reserve Amount and (iv) any U.S. Priority Tax Claims and Other Priority Claims against the U.S. Debtors. Following the satisfaction of these senior Claims in full, the Wind-Down Reserve may be used to make distributions to the Holders of Class 4(a) General Unsecured Claims against the U.S. Debtors in accordance with the terms of the Plan.

236.    229.**"Wind-Down Reserve Amount"** means $2,500,000.

**B.    Interpretation; Application of Definitions and Rules of Construction**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in this Combined Plan and Disclosure Statement are to the respective section in, article of, Schedule to, or Exhibit to this Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder,"

and other words of similar import refer to this Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in this Combined Plan and Disclosure Statement.  The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction of this Combined Plan and Disclosure Statement.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  The headings in this Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Plan and Disclosure Statement.  Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise requires.  Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Combined Plan and Disclosure Statement unless otherwise set forth herein or provided by the Bankruptcy Court.

### III.    BACKGROUND

On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code initiating these Chapter 11 Cases.  Following the Petition Date, the Debtors remained in possession of their Assets and managed their businesses as Debtors in Possession under Sections 1107 and 1108 of the Bankruptcy Code.

### A.    General Background

Below is a summary of the Debtors' business, organizational structure, and the events leading to the Debtors' Chapter 11 filings.  In addition, below is a summary of certain of the key events in these Chapter 11 Cases.[3]

### 1.    The Debtors' Business

Founded in 1971 and headquartered in West Newton, Massachusetts, the Debtors were a leading global designer, distributor, and retailer of comfort footwear in more than fifty markets worldwide.  The Debtors offered a wide array of men's and women's casual and dress style shoes, boots, and sandals, under their namesake Rockport brand and their owned Aravon and Dunham brands.  The Debtors' Rockport brand was recognized as a global leader in lightweight, technology-infused comfort footwear for all occasions.  The Debtors also offered premium footwear for comfort-conscious customers through their women's-oriented Aravon and outdoor-inspired Dunham brands.

The Debtors' business in the United States was operated by Rockport, and the Debtors' Canadian business was operated by Debtor Rockport Canada.  Rockport Canada is a wholly-owned subsidiary of Rockport.  All material decisions regarding Rockport Canada and its operations were made by Rockport personnel in the United States and substantially all of its books and records are located in the United States.  As a result of these and other factors, the

---

[3] Further information regarding such matters can be found in the First Day Declaration, which is incorporated by reference herein.  Copies of the First Day Declaration and all other filings in the Chapter 11 Cases can be obtained and viewed free of charge at the following web address: https://cases.primeclerk.com/rockport.

Debtors believe that the center of main interest for Rockport Canada is in the United States. Accordingly, on May 16, 2018, the Debtors commenced an ancillary proceeding under Part IV of the Companies' Creditors Arrangement Act (Canada) in Toronto, Ontario, Canada before the Canadian Court.

Prior to the Sale, the Debtors operated a global, multi-channel business, organized by brand, geography and customer type, consisting of the following segments:

i.   **Wholesale Business**.  The Debtors were a leading supplier of men's and women's footwear to well-known retailers across a variety of wholesale formats, including department stores, family retail outlets, internet retailers, and independently-owned retailers. The Debtors' wholesale business accounted for approximately 57% of all global sales.  In North America, the Debtors' Rockport-branded products were sold through two primary wholesale channels:  (a) key accounts (department stores, family retail outlets, and internet retailers); and (b) specialty accounts (independently-owned retailers).    International sales of the Debtors' Rockport-branded products were led by dedicated personnel in each location.  The Debtors' Aravon- and Dunham-branded products were sold only through department stores, internet retailers, and independently-owned retailers.[4]

ii.  **Direct North American Retail Store Business**.  The Debtors operated eight (8) full-price and nineteen (19) outlet stores in the United States and fourteen (14) full-price and nineteen (19) outlet stores in Canada.

iii. **Direct eCommerce Business**.  The Debtors sold their footwear products directly through their websites (http://www.rockport.com and http://www.rockport.ca).

iv.  **International Business**.  The Debtors used a distributor model to leverage their global brand in foreign markets without having to establish local operations.  Prior to the Sale, the Debtors were partnered with twenty-two (22) distributors worldwide to sell their products in thirty-five countries, including China, Indonesia, Egypt, South Africa, Mexico, and Peru.  In addition to this distributor model, certain of the Debtors' former non-debtor foreign affiliates operated approximately 121 retail stores around the world.

**2.    The  Debtors'  Organizational  Structure  and  Pre-Closing Reorganization**

---

[4] The Debtors' Dunham brand was sold in the United States and Canada.  The Debtors' Aravon brand was sold only in the United States.

The Debtors in these Chapter 11 Cases are Blocker, Rockport Holdings, TRG 1-P, TRG Intermediate, TRG Class D, Rockport Group, Rockport, Drydock, DD Management and Rockport Canada. Blocker, is the ultimate parent of each of the other Debtors. As set forth above, Rockport operated the Debtors' U.S. business and Rockport Canada operated the Debtors' Canadian business. All of the Debtors are Delaware limited liability companies except DD Management and Rockport Canada. DD Management is a Massachusetts limited liability company and Rockport Canada is a British Columbia unlimited liability company. A detailed organizational chart depicting the ownership structure of the Debtors and their former non-Debtor foreign affiliates prior to the Sale is attached hereto as **Exhibit A**.

In connection with the Sale and as provided for in the Asset Purchase Agreement, prior to the Closing Date, non-Debtor Rockport UK sold its interests in non-Debtor Rockport Canada Holdings to Rockport. As a result, on the date hereof, Rockport Canada Holdings is a wholly owned subsidiary of Rockport. In addition, pursuant to the Sale, the stock of the Acquired Companies was indirectly acquired by the Purchaser. A detailed organizational chart depicting the ownership structure of the Debtors as of the date hereof is attached hereto as **Exhibit B**.

### 3.    The 2015 and 2017 Transactions

In 2015, Reebok, a subsidiary of Adidas, engaged in a sale transaction (the "**2015 Transaction**") with Berkshire and New Balance. Pursuant to the 2015 Transaction, Reebok sold its Rockport division to the Rockport Group, an entity formed by Berkshire and New Balance, and New Balance contributed its owned brands, Cobb Hill, Aravon, and Dunham, to the Rockport Group.

In late 2017, Berkshire and New Balance sold 100% of their interests in the Debtors to the Prepetition Noteholders (the "**2017 Transaction**"). In connection with the closing of the 2017 Transaction, in December 2017, the Prepetition Noteholders appointed the Independent Directors of Blocker.

### B.    **The Debtors' Prepetition Capital Structure**

In connection with the 2015 Transaction, certain of the Debtors entered into the Prepetition ABL Credit Agreement, the Prepetition Notes Agreement, and the Prepetition Subordinated Notes. As of the Petition Date, the Debtors had total outstanding liabilities and other obligations of approximately $287 million, comprised of approximately:

- $57 million outstanding under the Prepetition ABL Facility;

- $188.3 million outstanding under the Prepetition Notes Facility;

- $11.9 million outstanding under the Prepetition Subordinated Notes; and

- $29.6 million outstanding in trade debt.

A detailed discussion of the Debtors' capital structure as of the Petition Date, including their various debt obligations is set forth below.

1.    **Prepetition ABL Facility**

As of the Petition Date, the Debtors had outstanding secured debt to various lenders pursuant to the Prepetition ABL Credit Agreement.  The Prepetition ABL Credit Agreement provided for, among other things, up to $60,000,000.00 in aggregate principal amount of revolving loan commitments, including letter of credit and swingline loan commitments, with a sublimit for letters of credit of $10,000,000.00 (collectively, the "**Prepetition ABL Facility**").

As of the Petition Date, the aggregate outstanding amount owed by the Debtors under the Prepetition ABL Facility was not less than $53,425,436.95, plus $3,550,000.00 of issued and outstanding letters of credit (collectively, together with any costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition ABL Facility, and further including all "Obligations" as described in the Prepetition ABL Facility, including all obligations with respect to cash management services and bank products, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "**Prepetition ABL Obligations**").  The Debtors, including Rockport Canada, are jointly and severally liable for the Prepetition ABL Obligations, and such obligations are secured by a first priority lien on the Revolving Priority Collateral and a second priority lien on the Note Priority Collateral, subject to the terms of the Intercreditor Agreement.  The Revolving Priority Collateral includes substantially all of the assets of Rockport Canada, including without limitation, all accounts, goods, inventory, and all proceeds of Rockport Canada's assets.

Prior to the Petition Date, the Prepetition ABL Facility was used to fund the Debtors' daily operations.  As such, the Debtors made daily requests to the ABL Administrative Agent to transfer available funds under the Prepetition ABL Facility into the Debtors' primary operating account held by Rockport.  Rockport would then use such funds to fund the Debtors' global enterprise, including the Debtors' operations in Canada.  Although Rockport Canada did not borrow any monies directly under the Prepetition ABL Facility, its assets were included in the facility's borrowing base and funds received under that facility were used to, among other things, purchase merchandise sold by Rockport Canada, pay wages, salaries and benefits of the Debtors' corporate employees and other general expenses of the Debtors' enterprise.  Rockport Canada's indirect access to the funding provided to the other Debtors under the Prepetition ABL Facility was critical to its ability to operate as a going concern prior to the Petition Date.

On August 3, 2018, the amounts outstanding under the Prepetition ABL Facility were paid in full from the proceeds of the Sale of the Debtors' Assets to the Purchaser.

2.    **Prepetition Notes Facility**

Prior to the Petition Date, certain of the Debtors issued the Initial Prepetition Notes to the Prepetition Noteholders pursuant to the Prepetition Note Purchase Agreement.  In addition, due to certain liquidity constraints following the issuance of the Initial Prepetition Notes, prior to the Petition Date, certain of the Debtors issued the Additional Prepetition Notes to the Prepetition Noteholders (together with the Initial Prepetition Notes, collectively, the "**Prepetition Notes Facility**") pursuant to the Prepetition Note Purchase Agreement.  The Additional Prepetition Notes are senior in right of payment to the Initial Prepetition Notes.

As of the Petition Date, the aggregate outstanding amount owed by the Debtors in respect of the Prepetition Notes was not less than $188,253,357.91 (collectively, together with any costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Notes Facility, and further including all "Obligations" as described in the Prepetition Notes Facility, including all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "**Prepetition Note Obligations**"). The Prepetition Note Obligations are secured by a first priority lien on the Note Priority Collateral, and a second priority lien on the Revolving Priority Collateral, subject to the terms of the Intercreditor Agreement.

Proceeds from the Initial Prepetition Notes were used to finance a portion of the 2015 Transaction, and proceeds from the Additional Prepetition Notes were used to provide the Debtors with additional liquidity and to fund day-to-day operations.  Prior to the Petition Date, from time to time the Debtors would request that the Prepetition Noteholders purchase Additional Prepetition Notes.  In response to such requests, the Prepetition Noteholders would then transfer available funds under the Prepetition Notes Facility into bank accounts operated by the Debtors.

### 3.    Prepetition Subordinated Notes

As of the Petition Date, the Rockport Group had approximately $11.9 million in contingent obligations under certain promissory notes (the "**Prepetition Subordinated Notes**") issued to Reebok:

- that certain Unsecured Subordinated Promissory Note, dated as of July 31, 2015;

- that certain Unsecured Subordinated Contingent Promissory Note – Tranche A, dated as of July 31, 2015; and

- that certain Unsecured Subordinated Contingent Promissory Note – Tranche B, dated as of July 31, 2015.

The Prepetition Subordinated Notes are unsecured and subordinated to the Prepetition Credit Facilities pursuant to that certain Subordination Agreement, dated as of July 31, 2015, among the Rockport Group, Rockport, each of the other Loan Parties (as defined therein) from time to time, the ABL Administrative Agent, the Prepetition Noteholders, and Reebok.

### 4.    Trade Debt

In the ordinary course of business, the Debtors sourced their inventory, merchandise, and other materials related to their on-going operations from third-party manufacturers located outside of the United States–primarily (but not exclusively) in mainland China, but also in Vietnam, India, and Brazil.  As of the Petition Date, Debtors estimate that they owed approximately $29.6 million in trade debt.  Approximately, $29.6 million of prepetition trade debt has been paid during these Chapter 11 Cases either pursuant to the relief requested by

the First Day Motions approved by the Bankruptcy Court or through payment of cure claims upon consummation of the Sale.

### C.        Events Precipitating the Chapter 11 Filing

Over the last three years, the Debtors faced economic headwinds and operational challenges that significantly and adversely impacted the operating performance of the Debtors' footwear business, including:

- *A costly and time consuming separation from the Adidas Networks.* Separation of the Debtors' operations from the Adidas global logistics and information technology networks (the "**Adidas Networks**") was not completed until November 2017, and proved to be more complex, took meaningfully longer, and was significantly more expensive than planned. In addition, the Debtors encountered operational challenges during the initial development of their own logistics network that negatively impacted revenue. Ultimately, significant operational challenges and one-time costs associated with the Debtors' separation from the Adidas Networks contributed to the Debtors' tightening liquidity during the two-year transition period.

- *Disruptive and costly supply chain interruption.* In October 2016, the Debtors experienced factory delivery delays due to the closure of three factories by certain of their foreign vendors. As a result, production of the Debtors' women's footwear program was relocated to other factories utilized by the Debtors for production of their remaining footwear programs. The reallocation of factory resources disrupted the Debtors' supply chain and resulted in significant shipment delays across multiple product lines shortly before the Fall 2017 season. In response to this disruption, the Debtors were forced to rely on more expensive expedited shipping methods in order to meet seasonal demands and minimize the delayed arrival of products to their customers.

- *Contract dispute with Expeditors and notice of default.* As explained above, the Debtors rely on warehouse and logistic providers to fulfill their distribution and warehousing needs in various locations throughout the world. To service the Debtors' operations in the United States and Canada, Expeditors operates distribution warehouse facilities in Rancho Cucamonga, California and Brampton, Canada. The parties' relationship is governed by the Expeditors Agreement, between Rockport and Expeditors. Since execution of the Expeditors Agreement, the parties' relationship has deteriorated, due largely to disputes over rates charged by Expeditors. On March 23, 2018, Expeditors sent a notice (the "**Default Notice**") alleging that Rockport was in material breach of the Expeditors Agreement for failure to pay certain charges disputed by Rockport. Pursuant to the Default Notice, Expeditors indicated that it would terminate the Expeditors Agreement unless Rockport cured its alleged breach by paying the disputed amounts on or before May 7, 2018. In order to ensure product delivery to the Debtors'

customers and avoid irreparable harm to the Debtors as a result of the potential termination of the Expeditors Agreement, on May 4, 2018, the Debtors paid the disputed amounts under duress and protest (subject to the right of clawback in the future) and thereby cured this disputed default avoiding imminent disruption to their supply chain.[5]

- *A number of stores acquired in the 2015 Transaction performed below expectations in a competitive retail market.* Over the last several years the Debtors faced a highly promotional and competitive retail environment, underscored by a shift in customer preference for online shopping. In this unfavorable retail environment, many of the stores acquired by the Debtors in the 2015 Transaction (the "**Acquired Stores**") performed below expectations. Moreover, the Acquired Stores were significantly impacted by the supply-chain disruption experienced by the Debtors in October 2016. The unfavorable performance of the Acquired Stores made it difficult for the Debtors to maintain sufficient liquidity and to operate their business outside of Chapter 11.

Given the Debtors' tight liquidity position in the lead up to these Chapter 11 Cases, the Debtors approached the ABL Administrative Agent and the Prepetition Noteholders on several occasions seeking amendments to the Prepetition ABL Credit Agreement and Prepetition Note Purchase Agreement to, among other things, obtain additional financing.

### D.    Prepetition Marketing Efforts

In December 2017, the Debtors retained Houlihan–an investment banker with expertise in mergers and acquisitions, recapitalization, and financial restructuring–to explore a potential sale of the Debtors' Assets. As part of this effort, Houlihan began facilitating a robust marketing process for the potential purchase of all, or certain of, the Assets and contacted one hundred and ten (110) potential strategic and financial acquirers (collectively, the "**Interested Parties**") to garner interest in pursuing such transaction. Approximately sixty (60) Interested Parties executed a non-disclosure agreement and thereafter received a confidential information memorandum and access to an initial set of diligence materials in the dataroom. Ten (10) interested parties submitted an initial, non-binding indication of interest, seven (7) of which were granted access to a dataroom and six (6) of which met with senior management of Rockport.

As a result of this marketing process, the Debtors received four (4) bids (collectively, the "**Bids**") from Interested Parties to acquire all or substantially all of the Debtors' Assets. After reviewing and carefully considering the Bids received from the four (4) Interested

---

[5] Expeditors disputes the Debtors' narrative set forth herein. The Debtors and Expeditors agree that no statements of fact or legal contentions in this Combined Plan and Disclosure Statement shall have any effect on the merits of the respective claims, causes of action, choses in action, suits, refunds, turnovers, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, crossclaims, objections or defenses, based in law or equity, including under the Bankruptcy Code, of the Debtors, the Liquidation Trust, or Expeditors against one or more of each other.

Parties, the Debtors determined, in consultation with their advisors, that Purchaser had submitted the highest or otherwise best offer, pursuant to which the Purchaser agreed to acquire substantially all of the Assets (other than the Debtors' North American Retail Assets)[6] for a purchase price of (i) $150 million in cash subject to certain working capital adjustments plus certain additional amounts if the Purchaser acquired any of the North American Retail Assets; (ii) a warrant to purchase up to 5% of common equity of the indirect parent of the Purchaser once the indirect parent of the Purchaser receives a return equal to 2.5 times its initial equity investment as of the Closing Date; and (iii) the assumption of certain liabilities (collectively, the "**Stalking Horse Bid**").

Thereafter, the Debtors, in consultation with their advisors, determined to pursue the Stalking Horse Bid for the Assets, subject to definitive documentation. To this end, after good faith, arm's-length negotiations between the parties and in consultation with their advisors and key stakeholders, the Debtors and the Purchaser entered into the Asset Purchase Agreement, pursuant to which the Purchaser agreed to acquire the Purchased Assets (as defined in the Asset Purchase Agreement), subject to higher or otherwise better offers.

### E. The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during these Chapter 11 Cases.

#### 1. First Day Orders

On the Petition Date, in addition to the voluntary petitions for relief Filed by the Debtors, the Debtors Filed a number of motions and applications (collectively, the "**First Day Motions**") seeking certain "first day" relief. A summary of the relief sought and obtained under the First Day Motions is set forth below:

- **Joint Administration Motion**. Following consideration of the *Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 2], the Bankruptcy Court entered an Order [Docket No. 48] authorizing the joint administration of the Chapter 11 Cases for procedural purposes only.

- **Application to Retain Prime Clerk**. Following consideration of the *Application of Debtors For Entry of an Order Appointing Prime Clerk LLC as Claims and Noticing Agent* Nunc Pro Tunc *to the Petition Date* [Docket No. 3], the Bankruptcy Court entered an Order [Docket No. 49] authorizing the Debtors to retain Prime Clerk as Claims Agent in the Chapter 11 Cases.

---

[6] As further described below, pursuant to the Asset Purchase Agreement, the Debtors agreed to allow the Purchaser twenty-five (25) days following the Petition Date to determine whether to acquire any of the Debtors' North American Retail Assets (the "**No Liquidation Period**"). Following the No Liquidation Period, the Purchaser elected not to acquire any of the North American Retail Assets.

- **Foreign Representative Motion**.  Following consideration of the *Motion to Authorize Rockport Blocker, LLC to Act as Foreign Representative to the Debtors* [Docket No. 4], the Bankruptcy Court entered an Order [Docket No. 50] authorizing the Blocker to act as the foreign representative of the Debtors in any foreign country, including Canada.

- **Automatic Stay Motion**.  Following consideration of the *Motion of Debtors for an Order Enforcing the Protections of Sections 362, 365, 525, and 541(C) of the Bankruptcy Code Pursuant to Section 105 of the Bankruptcy Code* [Docket No. 5], the Bankruptcy Court entered an Order [Docket No. 51] enforcing the protections provided to the Debtors by the automatic stay to aid in the administration of the Chapter 11 Cases and to alleviate any confusion regarding the effects on the Chapter 11 Cases on the Debtors' business operations.

- **Utilities Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies Adequately Assured of Future Performance and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance* [Docket No. 6], the Bankruptcy Court entered interim and final Orders [Docket Nos. 52 and 215] authorizing and approving the provision of adequate assurance of payment to the Debtors' utility service providers under Section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of their utility services from those utility companies.

- **Tax Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Taxes, Governmental Assessments and Fees and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 7], the Bankruptcy Court entered interim and final Orders [Docket Nos. 53 and 214] authorizing the Debtors to, among other things, pay prepetition taxes in the ordinary course of their business.

- **Shippers and Warehousemen Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Pay (A) Certain Prepetition Claims of Shippers and Warehousemen and (B) Import Charges and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 8] and its supplement [Docket No. 153], the Bankruptcy Court entered interim and final Orders [Docket Nos. 54 and 236] authorizing the Debtors to, among other things, (a) pay prepetition claims of shippers and warehousemen in the ordinary course of their business and (b) satisfy prepetition custom duties imposed on shipments of goods from foreign suppliers.

- **Customer Programs Motion**.  Following consideration of the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Maintain Customer Programs and (B) Pay and Honor Related Prepetition Obligations, and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 9], the Bankruptcy Court entered an Order [Docket No. 55] authorizing the Debtors to continue to honor prepetition obligations owed to customers arising under customer-related programs, practices and maintain, renew, replace, implement, modify or terminate any such customer programs, as the Debtors deem appropriate in their business judgment and in the ordinary course of business.

- **Critical and Foreign Vendors Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Claims of Critical and Foreign Vendors in the Ordinary Course of Business and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 10], the Bankruptcy Court entered interim and final Orders [Docket Nos. 56 and 213] authorizing the Debtors to, among other things, pay prepetition claims of certain critical domestic and foreign vendors in the ordinary course of their business.

- **Employee Wages/Benefits Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Pay Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Independent Contractors and Temporary Workers and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 11], the Bankruptcy Court entered interim and final Orders [Docket Nos. 57 and 212] authorizing the Debtors to, among other things, pay and honor certain prepetition employee obligations, including prepetition payroll obligations, reimbursable expenses, and benefit plan obligations.

- **Insurance Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue and Renew Their (A) Insurance Programs and Premium Financing and (B) Surety Bond Program and to Pay All Obligations with Respect Thereto, (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 12], the Bankruptcy Court entered interim and final Orders [Docket Nos. 58 and 211] authorizing the Debtors to, among other things, pay any outstanding obligations under the Debtors' existing Insurance Policies and renew, revise, extend, supplement, change, or enter into new Insurance Policies.

- **Cash Management Motion**.  Following consideration of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Continued*

36

*Use of the Debtors' Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief* [Docket No. 13], the Bankruptcy Court entered interim and final Orders [Docket Nos. 59 and 210] that, among other things, (i) authorized the Debtors to continue to use their current cash management system, existing bank accounts, and business forms, including authorizing the Debtors to open and close certain bank accounts; (ii) continue intercompany transfers and, to the extent applicable, grant administrative expense priority status to postpetition Intercompany Claims held by a Debtor against one or more of the other Debtors.

### 2. Canadian Proceeding

On May 16, 2018, Blocker, as foreign representative of itself and the other Debtors, obtained an order from the Canadian Court, recognizing the Chapter 11 Cases as a "foreign main proceeding" under the CCAA and granting certain related relief. The Canadian Court also granted a second order (the "**Supplemental Recognition Order**"), granting additional relief, including recognition of certain of the orders entered by the Bankruptcy Court with respect to the First Day Motions. Subsequently, the Canadian Court recognized a number of further orders made by the Bankruptcy Court in the Chapter 11 Cases, including the Final DIP Order, the Bid Procedures Order, the Sale Order and the General Bar Date Order.

### 3. Appointment of Creditors' Committee

On May 23, 2018, the U.S. Trustee formed the Creditors' Committee [Docket No. 96], consisting of (i) Earth, Inc.; (ii) Hemisphere Design & Manufacturing LLC; and (iii) Simon Property Group, LP. On June 29, 2018 the Bankruptcy Court authorized the retention of the following advisors to the Creditors' Committee: Cooley LLP [Docket No. 313] and Whiteford, Taylor & Preston LLC [Docket No. 314] as co-counsel and Province, Inc. as financial advisor [Docket No. 315].

### 4. Employment of Professionals and Advisors

On June 12, 2018, the Bankruptcy Court authorized the Debtors to retain (a) Richards, Layton & Finger, P.A. as their bankruptcy counsel in connection with these Chapter 11 Cases [Docket No. 220], (b) Prime Clerk as administrative advisor for the Debtors *nunc pro tunc* to the Petition Date [Docket No. 222], (c) BLG as special counsel for the Debtors *nunc pro tunc* to the Petition Date [Docket No. 221], and (d) HYPERAMS, LLC as liquidation consultant for the Debtors *nunc pro tunc* to May 25, 2018 [Docket No. 226].

On June 13, 2018, the Bankruptcy Court authorized the Debtors to retain Alvarez & Marsal North America, LLC to provide the Debtors with an Interim Chief Financial Officer and Interim Chief Operating Officer (and certain additional personnel) *nunc pro tunc* to the Petition Date [Docket No. 235].

On July 5, 2018, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, the Bankruptcy Court authorized the Debtors to retain Houlihan, as financial advisor and investment banker *nunc pro tunc* to the Petition Date [Docket No. 338].

On July 13, 2018, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, the Bankruptcy Court authorized the Debtors to retain Deloitte Tax LLP as tax services provider *nunc pro tunc* to May 21, 2018 [Docket No. 373].

**5.     Schedules, Section 341(a) Meeting of Creditors, and Bar Dates**

On June 18, 2018, the Debtors Filed their Schedules.  On June 21, 2018, the U.S. Trustee conducted the meeting of creditors in these Chapter 11 Cases under Section 341(a) of the Bankruptcy Code.  On June 29, 2018, the Debtors filed certain amendments to their Schedules.

On July 25, 2018, the Bankruptcy Court entered the General Bar Date Order [Docket No. 405] establishing (a) August 30, 2018 at 5:00 p.m. (prevailing Eastern Time) as the General Bar Date, and (b) November 12, 2018 at 5:00 p.m. (prevailing Eastern Time) as the Governmental Unit Bar Date.

**6.     Postpetition Financing**

a.     Interim DIP Order

In order to have sufficient Cash to operate their businesses while in bankruptcy, the Debtors sought approval to obtain postpetition financing through the DIP Motion.  The DIP Motion sought authorization for the Debtors to, among other things, access the DIP ABL Facility (as set forth in the DIP ABL Credit Agreement) and the DIP Note Facility (as set forth in the DIP Note Purchase Agreement).

As set forth above, the Debtors, including Rockport Canada, are jointly and severally liable for the Prepetition ABL Obligations.  Prior to the Petition Date, in order to properly apportion the joint and several liability with regards to the Prepetition ABL Obligations among Rockport Canada, on the one hand, and the remaining Debtors, on the other hand, the Debtors, the ABL Lender, the Prepetition Noteholders and the Information Officer, initiated discussions over the fair and equitable allocation of the Debtors' liability under the Prepetition ABL Facility as between Rockport Canada, on the one hand, and the remaining Debtors, on the other hand.

On May 15, 2018, the Bankruptcy Court entered the Interim DIP Order authorizing entry into the DIP Facilities on an interim basis.  With regards to the outstanding allocation issue noted above, the Interim DIP Order provided that, prior to a final hearing on the relief requested in the DIP Motion, the Debtors, the ABL Lenders and the Prepetition Noteholders shall determine and agree upon an appropriate allocation of the DIP ABL Obligations (as defined in the Interim DIP Order) (the "**Proposed ABL Liability Allocation**") as between Rockport Canada and the U.S. Debtors.  Further, the Interim DIP Order provided that the Proposed ABL Liability Allocation was to be heard by the Bankruptcy Court as part of the final hearing on the relief requested by the DIP Motion.  The current status of the Proposed ABL Liability Allocation issue is discussed below.

38

b.    Creditors' Committee Objection and Final DIP Order Supplement

The Debtors received two objections to the final relief requested in the DIP Motion.    First, the Debtors received an objection [Docket No. 166] from the Creditors' Committee objecting to, among other things, the fees and expenses associated with the DIP Note Facility and the roll-up of $40 million of the Prepetition Notes.  Prior to the final hearing on the DIP Motion, the Debtors, the Creditors' Committee and DIP Note Purchasers resolved the Creditors' Committee objection and memorialized such resolution in the Final DIP Order Supplement that was approved in connection with the Final DIP Order.  The Final DIP Order Supplement provided, among other things, that (1) following consummation of the Sale, a wind-down reserve (the "**Wind-Down Reserve**") would be established in the amount of $2.5 million to fund certain expenses associated with the winding down of the Chapter 11 Cases and consummation of this Plan; (2) any plan of liquidation would establish a Liquidating Trust for the benefit of General Unsecured Creditors vested with the Liquidating Trust Assets;  (3) the budget for the Creditors' Committee Professionals prior to the Closing Date would be increased to $750,000; (4) the Prepetition Noteholders would waive a distribution under the Liquidating Trust on account of any deficiency claim provided that the aggregate distributions by the Liquidating Trust to General Unsecured Creditors is less than the Threshold Distribution Amount ($2,000,000); (5)  the Creditors' Committee would agree to support the allocation of 18.4% of the Prepetition ABL Obligations to Rockport Canada; and (5) the Creditors' Committee would agree to support a plan that included broad releases in favor of the Prepetition Noteholders and related parties.

While the Prepetition Noteholders did honor their commitments under the Final DIP Order Supplement, the amount of the Wind-Down Reserve, which was based on the parties' best estimates at the time, proved insufficient to cover the actual amount of U.S. Professional Fee Claims, U.S. General Administrative Claims, U.S. Priority Tax Claims and Other Priority Claims against the U.S. Debtors asserted in the Chapter 11 Cases.  Accordingly, following a series of good faith negotiations, the Prepetition Noteholders have consented to the additional use of their cash collateral in the manner reflected in this Plan.  Absent the Prepetition Noteholders' consent to this additional funding, the Debtors would be unable to confirm the Plan, there would be no prospect of a recovery to the Holders of Allowed Class 4 General Unsecured Creditors against the U.S. Debtors and the U.S. Debtors would likely have had no choice but to convert their Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

c.    Proposed ABL Liability Allocation Dispute and Final DIP Order

The Debtors also received an objection [Docket No. 165] to the final relief requested in the DIP Motion from the Information Officer.  The Information Officer objected to, among other things, the Proposed ABL Liability Allocation of 18.4% of the Prepetition ABL Obligations to Rockport Canada (as had been agreed to the Debtors, the Creditors' Committee and the DIP Note Purchasers in connection with the Final DIP Order Supplement).  On June 13, 2018, the Bankruptcy Court held a hearing to consider the Final DIP Order, including the Proposed ABL Liability Allocation.  Following testimony from the Debtors in support of the Proposed ABL Liability Allocation, the Bankruptcy Court took the matter under advisement.  On June 18, 2018, the Bankruptcy Court held a continued hearing regarding the Final DIP Order.  At the continued hearing, the Bankruptcy Court declined to resolve the Proposed ABL Liability

39

Allocation at that time. Accordingly, after further discussions between the parties and in light of the Bankruptcy Court's ruling, the Debtors, the DIP ABL Lenders, the DIP Note Purchasers and the Information Officer agreed to a form of Final DIP Order that provided, among other things, that (i) the Bankruptcy Court's determination of the Proposed ABL Liability Allocation was a condition precedent to the issuance of any additional New Money Notes (unless otherwise agreed to by the DIP Note Purchasers) and (ii) expressly reserved the Information Officer's rights with respect to the Proposed ABL Liability Allocation, the allocation of the proceeds of any sale of the Debtors' assets among the Debtors, the allocation of the costs of the Debtors' Chapter 11 Cases among the Debtors, and the treatment of claims against Rockport Canada.

On June 29, 2018, the Bankruptcy Court entered the Final DIP Order, authorizing and approving on a final basis *, inter alia*, the Debtors' entry into and performance under the DIP Facilities and the granting of certain liens and adequate protection in connection therewith, all as more fully set forth in such Final DIP Order. Under the Final DIP Order, the Debtors were authorized to obtain postpetition secured DIP financing in an aggregate amount of up to $80 million consisting of (i) up to a $60 million DIP ABL Facility and (ii) up to a $20 million new money DIP Note Facility.

d.    Cash Management Stipulation

As set forth above, on June 12, 2018, the Bankruptcy Court entered the Final Cash Management Order granting the relief requested in the Cash Management Motion on a final basis. Pursuant to the Final Cash Management Order, postpetition Intercompany Transactions as between Rockport and Rockport Canada are limited solely to the Permitted Rockport Canada Intercompany Transactions. In addition, as set forth above, pursuant to the Final DIP Order, a condition precedent to the issuance of any additional New Money Notes (unless otherwise agreed in writing by the DIP Note Purchasers in their sole discretion) was the resolution of the Proposed ABL Liability Allocation in a final order by the Court.

As of July 13, 2018, the bank accounts operated by Rockport Canada held cash balances of more than $8.2 million (CAD); however, Rockport Canada was not permitted to transfer such funds to Rockport in accordance with the restrictions on Intercompany Transactions set forth in the Final Cash Management Order. As a result, the Debtors had limited unrestricted cash with which to operate as a going concern.

Accordingly, following discussions between the Debtors, the DIP Note Purchasers and the Information Officer, the parties agreed to modify the Final Cash Management Order to permit the Debtors to access certain funds held by Rockport Canada in order to alleviate the Debtors' liquidity constraints. On July 18, 2018, the Debtors, the DIP Note Purchasers and the Information Officer entered into the Cash Management Stipulation that (i) directed Rockport Canada to immediately transfer $4.5 million (USD) to Rockport for the purpose of repaying the certain obligations under the DIP ABL Facility (the "**Initial Rockport Canada Intercompany Transfer**"), thereby freeing up availability thereunder; (ii) accorded the Initial Rockport Canada Intercompany Transfer and any subsequent transfers agreed to by the parties (collectively, the "**Rockport Canada Intercompany Transfers**") superpriority administrative expense priority under Section 507(b) of the Bankruptcy Code; (iii) directed Rockport to refund such Rockport Canada Intercompany Transfers as required by Rockport Canada to satisfy its operational and

Chapter 11 expenses to the extent Rockport Canada experienced a shortfall in funding; and (iv) included a waiver of the DIP Note Purchasers of the condition precedent, as described in paragraph 39 of the Final DIP Order, that the Proposed ABL Liability Allocation be determined by a Final Order prior to the issuance of any additional New Money Notes.  On July 18, 2018, the Court entered an order [Docket No. 386] approving the Cash Management Stipulation.

On August 3, 2018, the amounts outstanding under the DIP Facilities were paid in full from the proceeds of the Sale of the Debtors' Assets to the Purchaser.

### 7. Key Employee Incentive Plan and Key Employee Retention Plan

On June 13, 2018, the Bankruptcy Court approved the Debtors' Key Employee Incentive Plan and Key Employee Retention Plan [Docket No. 261], authorizing the Debtors (i) to make incentive payments to nine (9) executive employees of the Debtors subject to the consummation of the Sale, with the amount of such payments fluctuating based upon the "Aggregate Gross Consideration" of such Sale, and (ii) to make retention payments in the aggregate amount of $748,313 to twenty (20) non-executive employees of the Debtors that remained employed by the Debtors on the date that is later of (a) the closing date of the Sale, and (ii) the completion of the Store Closing Sales (unless an employee is terminated before such date by the Debtors without cause).  In consideration of the bonus payments under the Key Employee Incentive Plan and the Key Employee Retention Plan, participants were required to waive and release other claims that they may have against the Debtors for any severance payments and/or retentive- or incentive-based bonus amounts.

### 8. Rejection of Executory Contracts and Unexpired Leases

In connection with the 2015 Transaction, Rockport, as sub-lessee, entered into sub-leases for, among others, eight (8) stores with Reebok, as sub-lessor (the "**Vacated Stores**").  On April 16, 2018, Reebok sent notices of termination of the Vacated Stores to the Debtors.  Subsequently, Reebok locked Rockport out of the Vacated Stores.  Out of an abundance of caution, on May 14, 2018, the Debtors filed a motion [Docket No. 38] (the "**Reebok Rejection Motion**") seeking to reject the sub-leases associated with the Vacated Stores *nunc pro tunc* to the Petition Date.  Following the filing of the Reebok Rejection Motion, the Debtors and Reebok entered into a stipulation (the "**Reebok Stipulation**") agreeing, among other things, that Reebok had validly terminated each of the sub-leases with Rockport under applicable law effective as of April 28, 2018, and accordingly, the Debtors' request for authorization to reject such sub-leases was moot.  On June 12, 2018, the Court entered an order [Docket No. 227] approving the Reebok Stipulation.

In connection with the Store Closing Sales (as discussed further below), on July 5, 2018, the Debtors filed a motion [Docket No. 343] (the "**North American Retail Lease Rejection Motion**") seeking authorization to reject the underlying leases and any subleases for each of the Store locations effective as of July 31, 2018 (or such later date as the Debtors unequivocally surrendered possession of the premises to the respective landlord).  On July 25, 2018, the Court entered an order [Docket No. 404] (the "**North American Retail Lease Rejection Order**") granting the relief requested in the North American Retail Lease Rejection Motion.  The Debtors concluded the Store Closing Sales and vacated and surrendered all Stores

prior to July 31, 2018.  Accordingly, pursuant to the North American Retail Lease Rejection Order, all Store leases and subleases were rejected effective July 31, 2018.

In addition, on August 24, 2018, the Debtors filed a motion [Docket No. 471] (the "**Contract Rejection Motion**") seeking authorization to reject certain executory contracts that were not assumed and assigned to the Purchaser in connection with the Sale.  On October 1, 2018, the Court entered an order [Docket No. 527] granting the relief requested in the Contract Rejection Motion.

9.    **Sale of Substantially All of the Debtors' Assets**

a.    Marketing Process and Bid Procedures Order

On May 14, 2018 the Debtors filed the Bid Procedures Motion, which set forth both a proposed schedule and process, including bidding procedures, for the marketing and sale of all or substantially all of the Debtors' Assets to the highest bidder at auction.  Under the Bid Procedures Motion, the Purchaser was named as the "Stalking Horse Bidder" of the Debtors' Assets.  On June 5, 2018, the Court granted the procedural relief requested in the Bid Procedures Motion by entry of the Bid Procedures Order.

As set forth above, the Debtors and Houlihan conducted an extensive marketing process for the sale of substantially all of the Debtors' Assets prior to filing these Chapter 11 Cases.  This marketing process continued following the Petition Date in accordance with the deadlines and procedures approved in the Bid Procedures Order.  No Qualified Bid, other than the "Stalking Horse Bid", was submitted to the Debtors prior to the Bid Deadline.  Accordingly, on July 6, 2018, the Debtors canceled the Auction and filed a notice that the Purchaser was the Successful Bidder.

b.    The Store Closing Sales

At the time that the Debtors entered into the Asset Purchase Agreement with the Purchaser, the Purchaser was still considering whether to purchase any portion of the North American Retail Assets.  Accordingly, pursuant to the Asset Purchase Agreement, the Debtors agreed to allow the Purchaser twenty-five (25) days following the Petition Date to determine whether to acquire any of the Debtors' North American Retail Assets.

As a result of the Debtors' prepetition marketing efforts, the feedback and expressions of interest received from prospective purchasers and the terms of the Asset Purchase Agreement, the Debtors did not expect there to be any significant interest in the North American Retail Assets.  Accordingly, on May 15, 2018, the Debtors filed the Store Closing Sales Motion, seeking authorization from the Bankruptcy Court to (a) conduct store closing sales (the "**Store Closing Sales**") at the Debtors' retail locations in the United States and Canada (the "**Closing Stores**") in the accordance with certain guidelines set forth therein and (b) pay retention and shrink bonuses to non-insider retail employees at the Closing Stores who remained employed at the Closing Stores for the duration of the Store Closing Sales.  On June 13, 2018, the Bankruptcy Court entered the Store Closing Sales Order.

Following the Petition Date, the Purchaser informed the Debtors that it did not intend to acquire any of the Debtors' North American Retail Assets. Accordingly, following entry of the Store Closing Sales Order, the Debtors commenced the wind down of their North American Retail Assets pursuant to the Store Closing Sales. The Store Closings Sales concluded on or before July 31, 2018, thereby stemming the incurrence of any August administrative rent.

c.    <u>The Adidas Sale Objection, Adversary Proceeding and Adidas Settlement Agreement</u>

As stated above, Adidas and Reebok are the former owners of the Debtors' business and sold the business to Berkshire and New Balance in connection with the 2015 Transaction. On June 28, 2018, Adidas and Reebok filed an objection to the Sale [Docket No. 310] (the "**Adidas Sale Objection**"), asserting various objections relating to the potential assumption and assignment of the Management Agreement and other related agreements. As part of the Adidas Sale Objection, Adidas and Reebok also asserted their view that, pursuant to the Management Agreement, all of the Rockport Parties (including the Acquired Companies) were jointly and severally liable for the Post-Closing Adjustments (in an amount not less than $54 million). Under the terms of the Asset Purchase Agreement, the Purchaser was directly or indirectly acquiring the stock of each of the Acquired Companies—meaning that the Acquired Companies would remain subject to any such liabilities (if valid) post-closing.

On June 29, 2018, the Purchaser issued a notice of breach (the "**Notice of Breach**") of the Asset Purchase Agreement based on the allegation of Adidas and Reebok concerning the purported liability of the Acquired Companies for the Post-Closing Adjustments. Specifically, the Purchaser asserted in the Notice of Breach that such assertion would constitute a breach of the representations made in the Asset Purchase Agreement, including, without limitation, the representations set forth in Section 5.5(c) of the Asset Purchase Agreement (which if not cured would constitute an unsatisfied closing condition under Section 10.1(a)(ii) of the Asset Purchase Agreement).

The Debtors disputed that the Acquired Companies had any liability for the Post-Closing Adjustments. Nevertheless, the assertions contained in the Adidas Sale Objection put the Debtors in the unenviable task of having to prove a negative (the absence of liability) in order to close the Sale. Accordingly, on July 10, 2018, the Rockport Plaintiffs initiated an adversary proceeding against Adidas and Reebok (the "**Adidas Adversary Proceeding**") seeking declaratory relief that the Management Agreement imposed liability only on Rockport, and not on its subsidiaries or affiliates. *See Emergency Complaint for Declaratory Judgment Against Adidas AG and Reebok International Ltd.*, Adv. Pro. No. 18-50636 (LSS), [Docket No. 1] (the "**Adidas Complaint**"). Contemporaneously with the filing of the Adidas Complaint, the Rockport Plaintiffs sought expedited adjudication of the Adidas Adversary Proceeding in an effort to address the issue prior to August 13, 2018 (the contemplated outside closing date under the Asset Purchase Agreement).

On July 16, 2018, the Adidas Parties answered the Complaint and filed counterclaims against Rockport Canada Holdings, Ltd, The Rockport Company Japan KK, the Rockport Company Korea Ltd., Calzados Rockport S.L. (ES), The Rockport Company, Portugal Unipessoal, Lda., The Rockport Company, B.V., and Rockport International Limited (UK)

(collectively, the "**Rockport Foreign Subsidiaries**") (i) seeking a declaratory judgment that the Rockport Foreign Subsidiaries are jointly and severally liable with Rockport for the Post-Closing Adjustments, (ii) alleging that the Rockport Foreign Subsidiaries breached their obligations under the Management Agreement and certain related transfer agreements, and (iii) alleging that the Rockport Foreign Subsidiaries were unjustly enriched by failing to perform under the terms of the operative agreements.  *See Defendants' Answer and Counterclaims* [Adv. Pro. Docket No. 18].

On July 17, 2018, the Debtors, Adidas and the Prepetition Noteholders agreed to participate in a judicial mediation (the "**Mediation**") before the Honorable Kevin Gross, United States Bankruptcy Judge on July 19, 2018.  The parties reached a compromise and settlement in connection with the Mediation and entered into the Adidas Settlement Agreement.  Pursuant to the Adidas Settlement Agreement the Parties agreed to, among other things, the following: (i) at closing of the Sale, a $8,000,000 payment to Adidas from Sale proceeds, in full and final satisfaction of all claims of Adidas and Reebok and certain related parties against any one or more of the Rockport Parties arising out of or related to the Master Purchase Agreement, the Management Agreement and related agreements, including relating to the Adidas Post-Closing Adjustments; (ii) certain mutual releases between the parties; and (iii) that the Adidas Parties would agree to support a plan proposed by the Debtors and supported by the DIP Note Purchasers.

On July 24, 2018, the Debtors filed the Adidas Settlement Motion and sought expedited consideration of the relief requested in the Adidas Settlement Motion so that the Debtors could close the Sale as soon as possible.  On July 30, 2018, the Bankruptcy Court entered an order [Docket No. 425] approving the relief requested in the Adidas Settlement Motion, including the Debtors' entry in the Adidas Settlement Agreement.

On August 2, 2018, pursuant to the terms of the Adidas Settlement Agreement, Adidas was paid $8,000,000 from the proceeds of the Sale.

### d.    Sale Order and Sale of Assets to the Purchaser

On July 16, 2018, the Bankruptcy Court held a hearing on the approval of the Asset Purchase Agreement and authorization to close the Sale and, on July 18, 2018, entered the related Sale Order.

The Debtors and the Purchaser consummated the Sale on August 2, 2018.  Having sold substantially all of their Assets, the Debtors seek to wind-down their remaining operations and liquidate their remaining Assets as set forth in this Plan.

### e.    The Debtors' Name Change

Section 8.17 of the Asset Purchase Agreement required the Debtors to cease using the name "Rockport" and any derivations thereof within 10 days of the Closing Date.   In addition, the Asset Purchase Agreement required the Debtors to file a motion with the Court seeking to change the case caption to remove any references to "Rockport" within ten days of the Closing Date.  *See* § 8.17 of the Asset Purchase Agreement.

Accordingly, following the Closing Date, the Debtors filed the necessary documentation in the applicable jurisdictions changing the corporate names of certain of the Debtors to the following:

| Old Company Name | New Company Name |
| --- | --- |
| The Rockport Company, LLC | The Relay Shoe Company, LLC |
| Rockport Blocker, LLC | Relay Blocker, LLC |
| The Rockport Group Holdings, LLC | The Relay Group Holdings, LLC |
| TRG 1-P Holdings, LLC | Relay 1-P Holdings, LLC |
| TRG Intermediate Holdings, LLC | Relay Intermediate Holdings, LLC |
| TRG Class D, LLC | Relay Class D, LLC |
| The Rockport Group, LLC | The Relay Group, LLC |
| Rockport Canada ULC | Relay Opco Canada ULC |

On August 24, 2018, the Court entered an order [Docket No. 466] authorizing the Debtors to change the case caption to reflect the corporate name changes.

### 10. Allocation of Sale Proceeds

The Debtors, the Information Officer and the Prepetition Noteholders have reached an agreement regarding an appropriate allocation of the remaining Sale Proceeds (**the "Sale Proceeds**") as between the U.S. Debtors and Rockport Canada. This agreement is the product of numerous settlement discussions between the parties and their respective advisors. During these discussions, the parties exchanged detailed information regarding the value of Rockport Canada's assets, potential claims against Rockport Canada and projected recoveries for the Holders of Allowed Rockport Canada General Unsecured Claims (and the U.S. Debtors on account of their intercompany claims against Rockport Canada). The Debtors, the Information Officer and the Prepetition Noteholders ultimately arrived at an agreed allocation of the Sale Proceeds as between the U.S. Debtors and Rockport Canada that the Debtors believe is fair, reasonable and in the best interests of the Debtors' estates. The Information Officer has agreed that, as a result of this settlement, it (i) has no objection to, and fully supports, confirmation of the Plan and (ii) will recommend to the Canadian Court that the Confirmation Order (approving this Plan and the settlement) be recognized in the Canadian Proceeding.

The Plan shall constitute a motion by the Debtors, pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, to approve the agreement amongst the Debtors, the Information Officer and the Prepetition Noteholders as to an appropriate allocation of the Sale Proceeds as between the U.S. Debtors and Rockport Canada. The proposed allocation of Sale Proceeds will result in a settlement amount of $6,007,000 (the "**Rockport Canada Allocation Amount**") in Sale Proceeds being allocated to Rockport Canada, which shall constitute the Rockport Canada Cash under the terms of the Plan and be used to fund the Rockport Canada Fund. The methodology for arriving at the agreed Rockport Canada Allocation Amount was detailed and complex and took into consideration (i) the net proceeds available from the Sale after factoring in certain adjustments consistent with the Asset Purchase

Agreement or as deemed reasonable given the overall costs and benefits of consummating the global transaction; (ii) the gross distributable assets at Rockport Canada, which includes the gross proceeds of the Sale attributable to Rockport Canada, the reimbursement of the Initial Rockport Canada Intercompany Transfer and cash on hand at Rockport Canada; (iii) the net distributable proceeds at Rockport Canada after considering Rockport Canada's fair share of the overall process costs incurred in connection with the Chapter 11 Cases (including amounts paid under the Key Employee Incentive Plan and Key Employee Retention Plan, fees paid to the Debtors' professionals, interest and fees under the DIP Facilities and amounts paid in connection with the Adidas Settlement Agreement, Rockport Canada's share of the fees incurred by HyperAMS (allocated based on retail liquidation proceeds) and PTO and salary amounts paid to Rockport Canada retail employees upon conclusion of the Store Closing Sales); (iv) a determination of Rockport Canada's allocable share of the debt under the DIP ABL Facility; (v) an estimation of all administrative and priority claims against Rockport Canada; and (iv) the projected recoveries for the Holders of Allowed Rockport Canada General Unsecured Creditors (including to the U.S. Debtors on account of their allowed intercompany claims against Rockport Canada in the absence of an agreement on the allocation of the Sale Proceeds).

The proposed settlement represents a final settlement as to the allocation of the Sale Proceeds, and the Debtors, the Information Officer and the Prepetition Noteholders have agreed that there will be no reconsideration of or adjustments to the Rockport Canada Allocation Amount. The Rockport Canada Allocation Amount will be used to fund the Rockport Canada Fund and to pay all administrative and priority claims against Rockport Canada, and thereafter to provide a distribution to the Holders of Allowed Rockport Canada General Unsecured Claims. The balance of the Sale Proceeds will be retained by the U.S. Debtors and distributed to creditors of the U.S. Debtors in accordance with the Plan. As part of the overall settlement, Rockport will waive its right to any distributions on account of its Allowed Intercompany Claim against Rockport Canada. Accordingly, the only circumstance under which any portion of the Rockport Canada Allocation Amount would be returned to the U.S. Debtors would be in the event that the Holders of Rockport Canada General Unsecured Claims are paid in full and there is a distribution to Rockport on account of its Equity Interest in Rockport Canada.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the proposed settlement relating to the allocation of the Sale Proceeds between the U.S. Debtors and Rockport Canada pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019(a). Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996); *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'"). In evaluating the reasonableness of a proposed settlement, a court must consider the following four factors: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors. *See Martin*, 91,

F.3d at 393; *Depositor v. Mary M. Holloway Found.*, 36 F.3d 582, 587 (7th Cir. 1994). Settlements should only be rejected if they fall "below the lowest point in the range of reasonableness." *Cossoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

The Debtors believe that payment of the Rockport Canada Allocation Amount to Rockport Canada represents a fair and reasonable settlement of all issues relating to the allocation of the Sale Proceeds between the U.S. Debtors and Rockport Canada. As discussed above, the Rockport Canada Allocation Amount was determined based on a detailed and thoughtful analysis as to the appropriate allocation of value and costs between the Debtors' respective estates. While the majority of the costs associated with these Chapter 11 Cases were incurred in the U.S. by the Debtors and their respective professionals, such costs were incurred in furtherance of a going concern sale for the benefit of the Debtors' global enterprise, in formulating and pursuing confirmation of the Plan for the benefit of all of the Debtors' stakeholders or otherwise in connection with the wind-down of the Debtors' estates. Thus, an equitable result requires that Rockport Canada not only share in the benefit of such efforts, but also bear its proportionate share of the costs necessary in completing such tasks. The Debtors submit that the settlement embodied in the Plan provides for a fair apportionment of the costs as between the U.S. Debtors and Rockport Canada, while also accommodating the differences in the debt structure between their respective estates (thereby resulting in a significantly greater recovery for the Holders of Allowed General Unsecured Creditors of Rockport Canada).

The absence of a settlement would likely result in extensive and costly litigation, both before the Bankruptcy Court and the Canadian Court between the U.S. Debtors and Rockport Canada as to the appropriate allocation of the Sale Proceeds. Moreover, the outcome of such litigation would be extremely uncertain and it is unclear that any more favorable result for either of the estates would outweigh the costs of litigating this issue before the Bankruptcy Court and any subsequent appeals or recognition hearings. Accordingly, the Debtors believe that the proposed allocation of the Sale Proceeds embodied in this Plan should be approved as being fair, reasonable and in the best interests of the Debtors' estates.

## IV.    CONFIRMATION AND VOTING

### A.    Confirmation Procedures

### 1.    Plan Confirmation Hearing

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of this Combined Plan and Disclosure Statement. On October 16, 2018, the Bankruptcy Court entered an order scheduling the Plan Confirmation Hearing for November 28, 2018 at 10:00 a.m. (prevailing Eastern Time),[7] to consider, among other things, final approval of this Combined Plan and Disclosure Statement

---

[7] The Confirmation Hearing was twice adjourned to December 19, 2018 at 10:30 a.m. (prevailing Eastern Time).

under Section 1125 of the Bankruptcy Code and confirmation of this Combined Plan and Disclosure Statement under Section 1129 of the Bankruptcy Code.  Notice of the Plan Confirmation Hearing will be provided to all known Creditors, Holders of Equity Interests, and other parties in interest.

Any objection to confirmation of this Combined Plan and Disclosure Statement must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors, the basis for the objection and the specific grounds of the objection, and must be Filed with the Bankruptcy Court, and served upon the following parties so as to be received no later than November 19, 2018 at 4:00 p.m.  (prevailing Eastern Time): (i) counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 Attn: Mark D. Collins, collins@rlf.com and Michael J. Merchant, merchant@rlf.com, (ii) counsel to the Committee, (a) Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 Attn: Jay Indyke, jindyke@cooley.com and Robert Winning, rwinning@cooley.com, and (b) Whiteford, Taylor & Preston LLC, 405 North King Street, Suite 500, Wilmington, Delaware 19801, Attn: Christopher M. Samis, csamis@wtplaw.com and L. Katherine Good, kgood@wtplaw.com; (iii) counsel to the Prepetition Noteholders and DIP Note Purchasers, (a) Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: My Chi To, mcto@debevoise.com, and Daniel E. Stroik, destroik@debevoise.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn:    Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neill, joneill@pszjlaw.com; (iv) counsel to the Collateral Agent and DIP Notes Agent, (a) Holland & Knight LLP, 131 South Dearborn Street, 30th Floor, Chicago, Illinois 60603, Attn: Joshua Spencer, joshua.spencer@khlaw.com, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and James E. O'Neill, joneill@pszjlaw.com; and (v) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Brya M. Keilson, brya.keilson@usdoj.gov.

Bankruptcy Rule 9014 governs objections to Confirmation of this Combined Plan and Disclosure Statement.  **UNLESS AN OBJECTION TO CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

## 2. Requirements for Confirmation

The Bankruptcy Court will confirm this Plan only if the Plan meets all the applicable requirements of Section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in these Chapter 11 Cases is that this Plan (i) is accepted by each impaired Class of Claims and Interests or, if rejected by an impaired Class, that this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) is feasible.  The Bankruptcy Court must also find, among other things, that:

a.      this Plan has classified Claims and Interests in a permissible manner;

b.      this Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

c.      this Plan has been proposed in good faith.

**3.**      Cram Down

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in Sections 1126(c) and (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 1127 of the Bankruptcy Code or to seek Bankruptcy Court confirmation of the Plan under Section 1129(b) of the Bankruptcy Code (a procedure known as "cram down"), or both.  The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan.  The "cram down" provisions of the Bankruptcy Code are set forth in Section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

•      the plan does not discriminate unfairly with respect to each non-accepting impaired class;

•      the plan is fair and equitable with respect to each non-accepting impaired class; and

•      at least one impaired class has accepted the plan.

These standards ensure that holders of junior interests cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior impaired class of claims or interests unless the claims or interests in that senior impaired class are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  By establishing separate Classes for the Holders of each type of Claim or Equity Interest and by treating each Holder of a Claim or Equity Interest in each Class similarly, the Plan has been structured in order to satisfy the "unfair discrimination" test of Section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured claims or unsecured claims.  In general, Section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule.  This rule requires that the dissenting class be paid in full before a junior class may receive anything under the plan.  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders as follows:

- Secured Creditors.  Either: (1) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (2) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (3) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as described in clauses (1) and (2) above.

- Unsecured Creditors.  Either: (1) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests.  Either: (1) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (2) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

In addition, the Bankruptcy Code requires that a debtor demonstrate that no class senior to a non-accepting impaired class will receive more than payment in full on its claims.  If all of the applicable requirements for confirmation of the Plan are satisfied as set forth in Sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of impaired Claims have failed to accept the Plan under Section 1129(a)(8) of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court confirm the Plan under the "cram down" procedures in accordance with Section 1129(b) of the Bankruptcy Code.  The Debtors believe that this Combined Plan and Disclosure Statement satisfies the "cram down" requirements of the Bankruptcy Code, but there can be no assurance that the Bankruptcy Court will determine that this Combined Plan and Disclosure Statement meets the requirements of Section 1129(b) of the Bankruptcy Code or that at least one impaired class of Claims will vote to accept the Plan, as required for confirmation of a Plan under the "cram down" procedures.

4.    **Best Interests of Creditors Test**

The Bankruptcy Code requires that, with respect to an impaired Class of Claims or Interests, each Holder of an impaired Claim or Interest in such Class either (i) accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such Holder would receive or retain if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on the effective date.

The costs of a Chapter 7 liquidation would necessarily include fees payable to a Chapter 7 trustee, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a Chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code. Other costs of liquidating the Debtors' Estates would include the expenses incurred during the bankruptcy cases and allowed by the Bankruptcy Court in the Chapter 7 cases. The foregoing types of claims, costs, expenses, and fees that may arise in a Chapter 7 liquidation case would be paid in full before payments would be made towards Chapter 11 administrative, priority, and unsecured claims. Without the benefit of settlements and resolutions reached in these Chapter 11 Cases, any recoveries for Holders of Allowed General Unsecured Claims in a Chapter 7 liquidation would be significantly diluted.

Accordingly, the Debtors believe that in a Chapter 7 liquidation, Holders of Claims and Interests would receive less than such Holders would receive under this Combined Plan and Disclosure Statement. There can be no assurance, however, as to values that would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under Section 1129(a)(7) of the Bankruptcy Code.

### 5.  Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan. Under this Combined Plan and Disclosure Statement, the U.S. Litigation Claims are being transferred to the Liquidating Trust for prosecution, liquidation and distribution in accordance with the Liquidating Trust Agreement and the Rockport Canada Litigation Claims vest with Rockport Canada for prosecution, liquidation and distribution in accordance with this Combined Plan and Disclosure Statement. Therefore, as this is a liquidating Plan, the Bankruptcy Court's confirmation of this Combined Plan and Disclosure Statement will not be followed by unanticipated liquidation or the need for any further reorganization.

### 6.  Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires the proponent of this Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that this Combined Plan and Disclosure Statement's classification scheme places substantially similar Claims or Interests in the same Class and, thus, meets the requirements of Section 1122 of the Bankruptcy Code.

### 7. Impaired Claims or Interests

Under Section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "impaired" by this Combined Plan and Disclosure Statement and receiving a Distribution under this Combined Plan and Disclosure Statement may vote to accept or reject this Combined Plan and Disclosure Statement. Under Section 1124 of the Bankruptcy Code, a Class of Claims may be "impaired" if this Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not impaired by this Combined Plan and Disclosure Statement are deemed to accept this Combined Plan and Disclosure Statement and do not have the right to vote on this Combined Plan and Disclosure Statement. The Holders of Claims or Interests in any Class that will not receive any Distribution or retain any property under this Combined Plan and Disclosure Statement are deemed to reject this Combined Plan and Disclosure Statement and do not have the right to vote.

### 8. Eligibility to Vote on this Combined Plan and Disclosure Statement

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 2 and 4 may vote on this Combined Plan and Disclosure Statement. In order to vote on this Combined Plan and Disclosure Statement, you must hold an Allowed Claim in a voting class or be the Holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

### 9. Procedure/Voting Deadlines

In order for your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Balloting Agent at the following address: The Rockport Company, LLC Balloting, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.

The Balloting Agent must RECEIVE original ballots on or before **November 19, 2018 at 5:00 p.m.** (prevailing Eastern Time), the Voting Deadline.

Any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant, and that is cast as an acceptance or rejection of this Combined Plan and Disclosure Statement will be counted and cast as an acceptance or rejection, as the case may be, of this Combined Plan and Disclosure Statement.

Absent the prior agreement of the Debtors, the following tabulation procedures (the "**Vote Tabulation Procedures**") apply for determining whether this Combined Plan and Disclosure Statement has been accepted or rejected by the class in which such Holder holds a Claim or Interest:

a.  Unless otherwise provided in these Vote Tabulation Procedures, a Claim will be deemed temporarily allowed for voting purposes only in an amount equal to (i) the amount of such Claim as set forth in the Debtors' Schedules if no proof of Claim has been timely filed in respect of such Claim (except as provided in

subsection (c) below); or (ii) if a proof of Claim has been timely filed in respect of such Claim, the amount set forth in such proof of Claim (except as provided in subsection (d) below).

b.   Duplicative Claims (i.e., the same Claim against two or more of the Debtors classified in the same plan class) listed in the Debtors' Schedules or in timely-filed Proofs of Claim will be deemed temporarily allowed for voting purposes only in an amount equal to one such Claim and not in an amount equal to the aggregate of such Claims.

c.   If a Claim, for which no proof of Claim has been timely filed, is listed on the Schedules, but is listed as contingent, unliquidated or disputed, either in whole or in part, or if no Claim amount is specified, such Claim shall be disallowed for voting purposes; provided, however, that any undisputed portion, if any, of such Claim will be deemed temporarily allowed for voting purposes, subject to the other Vote Tabulation Procedures; provided, further, however, that such Claim shall be entitled to vote in the amount of $1.00 if the applicable bar date for this Claim has not expired.

d.   If a Claim, for which a proof of Claim has been timely filed, has not been disallowed and is not subject to a pending objection or adversary proceeding as of the Voting Record Date, is marked or otherwise referenced on its face as contingent, unliquidated or disputed, either in whole or in part, or if no Claim amount is specified on such roof of Claim, such Claim shall be temporarily allowed solely for voting purposes in the amount of $1.00, irrespective of how such Claim may or may not be set forth on the Schedules; provided, however, that any liquidated or undisputed portion, if any, of such Claim will be deemed temporarily allowed for voting purposes, subject to the other Vote Tabulation Procedures.

e.   If the Debtors have served an objection or request for estimation as to a Claim on or before November 2, 2018, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and manner as set forth in such objection.

f.   Except as otherwise ordered by the Court, any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion).

g.   Any Ballot that does not indicate an acceptance or rejection of this Combined Plan and Disclosure Statement, or that indicates both an

acceptance and rejection of this Combined Plan and Disclosure Statement, will not be counted.

h.      Any Ballot that is returned indicating acceptance or rejection of this Combined Plan and Disclosure Statement but does not bear an original signature will not be counted.

i.      Any Ballot that is illegible or contains insufficient information to permit the identification of the Creditor will not be counted.

j.      Any Ballot received by the Balloting Agent by facsimile or other electronic communication will not be counted, provided that Ballots submitted through the online voting portal will be counted.

k.      Any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject this Combined Plan and Disclosure Statement will not be counted.

l.      Whenever a Creditor casts more than one Ballot voting the same Claim prior to the Voting Deadline, only the latest-received valid Ballot timely received will be deemed to reflect the voter's intent and, thus, will supersede any prior received Ballots.

m.      If a Creditor casts simultaneous duplicative Ballots that are voted inconsistently, such Ballots will not be counted.

n.      Each Creditor will be deemed to have voted the full amount of its Claim as set forth on the Ballot.

o.      Creditors may not split their vote within a Class; thus, each Creditor will be required to vote all of its Claims within the Class either to accept or reject this Combined Plan and Disclosure Statement.

p.      Ballots partially rejecting and partially accepting this Combined Plan and Disclosure Statement will not be counted.

q.      The method of delivery of Ballots to the Balloting Agent is at the risk of each Creditor, and such delivery will be deemed made only when the original Ballot is actually received by the Balloting Agent.

r.      The Debtors expressly reserve the right to amend the terms of this Combined Plan and Disclosure Statement (subject to compliance with Section 1127 of the Bankruptcy Code). If the Debtors make material changes to the terms of this Combined Plan and Disclosure Statement, the Debtors will disseminate additional

solicitation materials and extend the solicitation period, in each case to the extent required by law or further order of the Court.

s.    If a Ballot is executed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity on behalf of a Creditor, such person will be required to indicate such capacity when signing and, at the Debtors' or Balloting Agent's discretion, must submit proper evidence satisfactory to the Debtors and/or Balloting Agent to so act on behalf of the Creditor.

t.    Any Creditor who has delivered a valid Ballot voting on the Combined Plan and Disclosure Statement may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a).

u.    Subject to any contrary order of the Court, the Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.

v.    Unless waived by the Debtors or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline or within such time as Debtors or the Court determines, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

w.    Neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.

**10.    Releases**

**All Holders of Claims are urged to carefully read the release provisions set forth in Section XII.E of the Plan. The Plan provides that each Holder of a Claim or an Interest that (i) is a Released Party, (ii) is conclusively deemed to have accepted the Plan and does not timely object to the releases provided in the Plan, (iii) votes to accept the Plan, (iv) votes to reject the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release contained in Section XII.E of the Plan, (v) abstains from voting on the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release contained in Section XII.E of the Plan, or (vi) is a Related Person with respect to each of the foregoing clauses (i) through (v), will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged the Released Parties and their Related Persons from any and all Claims and Causes of Action against the Debtors and the Released Persons.**

**The releases provided are critical parts of this Combined Plan and Disclosure Statement and are appropriate under the Third Circuit standard. Such releases**

55

**are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtors, the Estates, and Holders of Claims and Interests; (iii) fair, equitable, and reasonable; and (iv) a bar to all Persons barred as set forth in this Combined Plan and Disclosure Statement from asserting any Claims or Causes of Action released under the Plan in favor of the Released Parties.**

**As a result of the consideration and various concessions provided by the Prepetition Noteholders, the Combined Plan and Disclosure Statement provides for meaningful benefits to the Holders of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims and General Unsecured Claims. The Prepetition Noteholders have agreed to, among other things, (i) allow the Debtors or the Liquidation Trust to satisfy first out of the Prepetition Noteholders collateral all budgeted and Allowed Administrative Expense Claims incurred prior to the Closing Date, (ii) fund the Liquidation Trust with the Wind-Down Reserve; (iii) forego distribution on account of the Prepetition Note Deficiency Claim from Liquidating Trust Assets (other than Other U.S. Litigation Proceeds) until the Distributions to Allowed Other General Unsecured Claims exceed the Threshold Distribution Amount; and (iv) the allocation of Sale Proceeds as between the U.S. Debtors and Rockport Canada, including the resolution of intercompany claims of the U.S. Debtors against Rockport Canada, and the funding of the Rockport Canada Fund. The Debtors submit that these concessions by the Prepetition Noteholders constitute substantial consideration without which confirmation and implementation of this Combined Plan and Disclosure Statement and the benefits contained herein would not be possible. In exchange for this consideration, Section XII.E of the Combined Plan and Disclosure Statement provides the Prepetition Noteholders and their Related Persons, in their capacities as such, with a release of all Causes of Action the Debtors or their Estates may hold against the Prepetition Noteholders. In further consideration, the Combined Plan and Disclosure Statement also provides that Holders of Allowed Class 4 General Unsecured Claims entitled to vote on the acceptance or rejection of the Combined Plan and Disclosure Statement will release the Prepetition Noteholders, and their respective Related Persons, in their capacities as such, from any claims or causes of action such Holders may have against the Prepetition Noteholders, and their Related Persons, in their capacities as such, unless such Holders affirmatively "opt out" of providing such releases on their Ballots. Notwithstanding the proposed releases contained in the Combined Plan and Disclosure Statement, the Debtors are not aware of any Causes of Action against the Prepetition Noteholders or their Related Persons that would provide a net benefit to the Debtors' Estates.**

### 11.    Acceptance of this Combined Plan and Disclosure Statement

As a Creditor, your acceptance of this Combined Plan and Disclosure Statement is important. In order for this Combined Plan and Disclosure Statement to be accepted by an impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept this Combined Plan and Disclosure Statement. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept this Combined Plan and Disclosure Statement. **YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN THE**

**BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

### V.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.    General Administrative Expense Claims

#### 1.    U.S. General Administrative Expense Claims

U.S. General Administrative Expense Claims comprise U.S. Administrative Expense Claims, including but not limited to, all Allowed Claims arising under Section 503(b)(9) of the Bankruptcy Code and U.S. Professional Fee Administrative Claims. ~~Budgeted and~~ Allowed U.S. Professional Fee Administrative Claims incurred through and including the ~~Closing Date~~ Effective Date (including amounts relating to preparation and filing of tax returns for the U.S. Debtors for the tax periods preceding the Effective Date) shall be paid by the Liquidating Trustee from the ~~Professional Fee Escrow, as well as any unbudgeted and Allowed U.S. Professional Fee Administrative Claims incurred through the Closing Date that the Prepetition Noteholders, in their sole discretion, have authorized to be paid from the Professional Fee Escrow~~ Pre-Effective Date Professional Fee Reserve. All other Allowed U.S. General Administrative Expense Claims shall be paid from ~~(i) the Pre-Closing Expense Reserve Amount with respect to U.S. Administrative Expense Claims budgeted and incurred prior to the Closing Date or (ii) the Wind-Down Reserve with respect to all other U.S. General Administrative Expense Claims, including any unbudgeted and Allowed U.S. Professional Fee Administrative Claims incurred through the Closing Date that the Prepetition Noteholders have not authorized to be paid from the Professional Fee Escrow. For the avoidance of doubt, any and all Allowed U.S. Professional Fee Claims incurred after the Closing Date shall be paid from the Wind-Down Reserve~~ the Pre-Effective Date SAP Claims Reserve.

#### 2.    Rockport Canada General Administrative Expense Claims

Rockport Canada General Administrative Expense Claims comprise Rockport Canada Administrative Expense Claims, including, but not limited to, all Allowed Claims arising under Section 503(b)(9) of the Bankruptcy Code against Rockport Canada and Rockport Canada Professional Fee Administrative Claims. All Allowed Rockport Canada Professional Fee Administrative Claims incurred through and including the Closing Date shall be paid in full from amounts currently held by such Professionals in trust on account of funds previously disbursed by Rockport Canada. All other Allowed Rockport Canada General Administrative Expense Claims shall be paid from ~~(i) the Pre-Closing Expense Reserve Amount with respect to Rockport Canada Administrative Expense Claims budgeted and incurred prior to the Closing Date or (ii) the Rockport Canada Fund with respect to all other Rockport Canada General Administrative Expense Claims. Notwithstanding anything to the contrary herein, Rockport Canada General Administrative Expense Claims shall not be paid from the Wind-Down Reserve. For the avoidance of doubt, any and all Allowed Rockport Canada Professional Fee Claims incurred after the Closing Date shall be paid from~~ the Rockport Canada Fund. Further, any and all unpaid postpetition claims of the Information Officer and its professionals shall be Rockport Canada Administrative Expense Claims and shall be paid from the Rockport Canada Fund, with such

claims being deemed allowed on a final basis, without the Information Officer or its professionals being required to file any request or application with the Bankruptcy Court, upon entry of the Confirmation Order in accordance with the Supplemental Order entered by the Ontario Superior Court on May 16, 2018.

     **3.**     **Treatment of Allowed Administrative Expense Claims and Deadline to File Administrative Expense Claims**

     With respect to Allowed Administrative Expense Claims, in full and complete satisfaction of such Claims, payment as soon as reasonably practicable following the date such Administrative Expense Claim becomes an Allowed Claim, with such Administrative Expense Claims being paid in the full amount Allowed in Cash (as determined by agreement, settlement, or Final Order of the Bankruptcy Court), or such other treatment as may be agreed upon by a Holder of any such Allowed Administrative Expense Claim, the Debtors, the Prepetition Noteholders (following the Effective Date with respect to U.S. Administrative Expense Claims incurred prior to the Closing Date), the Creditors' Committee (prior to the Effective Date), the Liquidating Trustee (after the Effective Date with respect to U.S. Administrative Expense Claims) and the Rockport Canada Plan Administrator (following the Effective Date with respect to Rockport Canada Administrative Expense Claims). Allowed U.S. General Administrative Expense Claims shall be paid from the Pre-Effective Date Professional Fee EscrowReserve, the Pre-Closing Expense Reserve Amount or the Wind-Down or the Pre-Effective Date SAP Claims Reserve, as applicableset forth herein. Allowed Rockport Canada General Administrative Expense Claims shall be paid from the amounts currently held by such Professionals in trust (on account of amounts previously disbursed by Rockport Canada) or the Rockport Canada Fund, as applicable. To be eligible to receive Distributions under this Combined Plan and Disclosure Statement on account of an Administrative Expense Claim that is not otherwise expressly Allowed by this Combined Plan and Disclosure Statement, a request for payment of an Administrative Expense Claim must have been or be Filed on or before the Administrative Expense Claim Bar Date; *provided, however*, that Claims arising under Section 503(b)(9) of the Bankruptcy Code shall be and remain subject to the General Bar Date. Any Administrative Expense Claim that is not timely asserted by the Administrative Expense Claim Bar Date or the General Bar Date, as applicable, in accordance herewith and the General Bar Date Order, as applicable, shall be deemed disallowed under this Combined Plan and Disclosure Statement and shall be forever barred against the Debtors, the Estates, the Liquidating Trust, the Rockport Canada Fund or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.

     **4.**     **Treatment of Allowed Professional Fee Administrative Expense Claims and Deadline to File Professional Fee Administrative Claims**

     With respect to Professional Fee Administrative Claims, in full and complete satisfaction of their Claims, payment on the later of (i) the Effective Date, and (ii) the date such Professional Fee Administrative Claim becomes an Allowed Claim by a Final Order of the Bankruptcy Court, to be paid in the full Allowed amount in Cash (as determined by agreement, settlement, or order of the Bankruptcy Court), or such other treatment as may be agreed upon by a Holder of any such Allowed Professional Fee Administrative Claim and the Debtors.

Budgeted and Allowed U.S. Professional Fee Administrative Claims incurred prior to the Closing Date shall be paid in full from the Professional Fee Escrow, as well as any unbudgeted and Allowed U.S. Professional Fee Administrative Claims incurred prior to the Closing Date that the Prepetition Noteholders, in their sole discretion, have authorized to be paid from the Professional Fee Escrow (otherwise such unbudgeted and Allowed U.S. Professional Fee Administrative Claims incurred prior to the Closing Date shall be paid from the Wind-Down Reserve). Allowed U.S. Professional Fee Administrative Claims incurred following the Closing Date shall be paid from the Wind-Down Pre-Effective Date Professional Fee Reserve. All Allowed Rockport Canada Professional Fee Administrative Claims incurred prior to the Closing Date shall be paid in full from amounts currently held by such Professionals in trust on account of funds previously disbursed by Rockport Canada. Allowed Rockport Canada Professional Fee Administrative Claims incurred following the Closing Date shall be paid from the Rockport Canada Fund.

The deadline for submission by all Professionals (including any applications of members of the Creditors' Committee for expense reimbursement) for Bankruptcy Court approval of Professional Fee Administrative Claims shall be thirty (30) days after the Effective Date. Any Professional or other Person or Entity that is required to File and serve a request for approval of a Professional Fee Administrative Claim that fails to File and serve a timely request will be forever barred, estopped, and enjoined from asserting any request for payment of a Professional Fee Administrative Claim or participating in Distributions under the Plan on account thereof.

The Pre-Effective Date Professional Fee Escrow Reserve shall be funded on or before the Effective Date and shall hold an amount based on estimates of each Professional's budgeted and unpaid U.S. Professional Fee Administrative Claims incurred through the Closing Date, plus an amount sufficient to cover any unbudgeted and unpaid U.S. Professional Fee Administrative Claims incurred through the Closing Date that the Prepetition Noteholders have authorized to be paid, in their sole discretion, from the Professional Fee EscrowEffective Date. Upon approval of professional fees consistent with the procedures established by the Bankruptcy Court, the Liquidating Trustee, as applicable, shall release the appropriate amount to the Professionals from the Pre-Effective Date Professional Fee EscrowReserve. Any amounts remaining in the Pre-Effective Date Professional Fee Escrow Reserve following the payment of all budgeted and Allowed U.S. Professional Fee Administrative Claims incurred through the Closing Date, as well as any unbudgeted and unpaid Allowed U.S. Professional Fee Administrative Claims incurred through the Closing Date that the Prepetition Noteholders, in their sole discretion, have authorized to be paid from the Professional Fee Escrow, Effective Date shall be made available for distribution to the Holders of Allowed Prepetition Note Secured Claims and shall not be considered Liquidating Trust Assetsavailable for distributions to Holders of Class 4 General Unsecured Claims against the U.S. Debtors.

Unbudgeted and Allowed U.S. Professional Fee Administrative Claims incurred through the Closing Date that the Prepetition Noteholders have not authorized to be paid from the Professional Fee Escrow and Allowed U.S. Professional Fee Administrative Claims incurred after the Closing Date shall be paid by the Debtors or the Liquidating Trustee, as applicable, from the Wind-Down Reserve upon approval of professional fees consistent with the procedures established by the Bankruptcy Court. All Allowed Rockport Canada Professional Fee

Administrative Claims incurred prior to the Closing Date shall be paid in full from amounts currently held by such Professionals in trust on account of funds previously disbursed by Rockport Canada.  Rockport Canada Professional Fee Administrative Claims incurred following the Closing Date shall be paid by Rockport Canada or the Rockport Canada Plan Administrator, as applicable, from the Rockport Canada Fund upon approval of professional fees consistent with the procedures established by the Bankruptcy Court, this Plan, and the Confirmation Order.

B.      **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim, shall receive in full satisfaction of such Allowed Priority Tax Claim, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, payment in Cash equal to the Allowed amount of such Priority Tax Claim, on the later of (i) the Effective Date and (ii) the first Distribution Date following the date such Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, or such other treatment as may be agreed upon by any such Holder of a Priority Tax Claim, the Debtors, the Prepetition Noteholders, the Creditors' Committee (prior to the Effective Date), the Liquidating Trustee (after the Effective Date with respect to U.S. Priority Tax Claims) and the Rockport Canada Plan Administrator (after the Effective Date with respect to Rockport Canada Priority Tax Claims).  U.S. Priority Tax Claims shall be paid from the ~~Wind Down~~ Pre-Effective Date SAP Claims Reserve.  Rockport Canada Priority Tax Claims shall be paid from the Rockport Canada Fund.  For the avoidance of doubt, any Allowed Rockport Canada Priority Tax Claims, including but not limited to Claims of the CRA, shall be paid from the Rockport Canada Fund. The Liquidating Trustee (with consent of the Prepetition Noteholders) or the Rockport Canada Plan Administrator, as applicable, reserves the right to prepay such Allowed Priority Tax Claim at any time.  On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.

C.      **Statutory Fees**

Statutory Fees from the Petition Date through the Effective Date shall be paid by the Debtors and/or the Liquidating Trustee on the Effective Date.  Statutory Fees relating to any period of time after the Effective Date shall be paid by the Liquidating Trust (with respect to distributions from the Liquidating Trust) or the Rockport Canada Plan Administrator (with respect to distributions from the Rockport Canada Fund).

## VI.      CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

For purposes of voting, confirmation and making Distributions under the Plan, the Plan provides for and is premised upon the substantive consolidation of the U.S. Debtors and their Estates.  Rockport Canada shall not be substantively consolidated with the U.S. Debtors for the purposes of the Plan and any allowed Claims or Interests against Rockport Canada shall be separately classified in a separate subclass herein.  Claims for each of the Debtors – other than Administrative Expense Claims, Professional Fee Administrative Claims, Priority Tax Claims,

and Statutory Fees Claims – are classified for all purposes, including voting, confirmation, and Distribution under this Combined Plan and Disclosure Statement, as follows:

| Class | Type | Status Under Plan | Voting Status | Anticipated Recovery |
|---|---|---|---|---|
| 1(a) | Other Secured Claims against U.S. Debtors | Unimpaired | Deemed to Accept | 100% |
| 1(b) | Other Secured Claims against Rockport Canada | Unimpaired | Deemed to Accept | 100% |
| 2 | Prepetition Note Secured Claims against U.S. Debtors | Impaired | Entitled to Vote | 26% - 28% |
| 3(a) | Other Priority Claims against U.S. Debtors | Unimpaired | Deemed to Accept | 100% |
| 3(b) | Other Priority Claims against Rockport Canada | Unimpaired | Deemed to Accept | 100% |

61

| 4(a) | General Unsecured Claims against U.S. Debtors | Impaired | Entitled to Vote | 0%-2%[7][8] |
| 4(b) | General Unsecured Claims against Rockport Canada | Impaired | Entitled to Vote | 68% -78% |

---

[7][8] The ~~Wind Down Reserve shall be established with~~ initial projections contained in the Disclosure Statement were based on the estimated remaining balance of the Wind-Down Reserve Amount ~~and shall be used to, inter alia, satisfy (i) any Allowed U.S. Professional Fee Administrative Claims and Allowed U.S. Administrative Expense Claims incurred after the Closing Date; (ii) any unbudgeted and Allowed U.S. Professional Fee Administrative Claims incurred through~~ following the ~~Closing Date that the Prepetition Noteholders have not authorized to be paid from the Professional Fee Escrow; (ii) any Allowed U.S. Administrative Expense Claims incurred prior to the Closing Date and not covered by the Pre Closing Expense Reserve Amount; and (iv) any Allowed U.S. Priority Tax Claims and Allowed Other Priority Claims against the U.S. Debtors. These~~ satisfaction of all senior Claims , and any related expenses of the Liquidating Trustee ~~must be satisfied in full prior before any amounts will~~ . The Debtors estimated at the time that $246,000 would be available for distribution to the Holders of Class 4 Allowed General Unsecured Claims ~~of the U.S. Debtors. The Debtors currently estimate that there will be an aggregate amount of $246,000 available for distribution to the Holders of Allowed General Unsecured Claims of~~ against the U.S. Debtors following the payment of all senior Claims ~~to be paid from the Wind Down Reserve~~ . This projected recovery, however, ~~is~~ was dependent ~~upon~~ on the Debtors' estimates as to the aggregate amount of the senior Claims to be paid from the Wind-Down Reserve and was therefore ~~may~~ subject to fluctuate upwards or downwards in the event ~~that~~ such estimates proved to be incorrect.

~~The estimated distribution to Holders of General Unsecured Claims against U.S. Debtors is based on the Debtors' ongoing reconciliation of claims filed to date and good faith estimate of Allowed Claims. The Debtors are working with their advisors to reconcile filed U.S. Administrative and U.S. Priority Claims and intend to object to such Claims, where appropriate, prior to the Confirmation Hearing. As of the date of this Combined Plan and Disclosure Statement, the Debtors note the following regarding the reconciliation of Claims: (i) $2,797,898.41 of Administrative Expense Claims have been filed against the U.S. Debtors and the Debtors estimate that $25,818.75 are Allowed Administrative Expense Claims; (ii) $333,441.28 of Priority Claims have been filed against the U.S. Debtors and the Debtors estimate that $64,485.09 are Allowed Priority Claims; and (iii) $126,028.16 of 503(b)(9) Claims have been filed against the U.S. Debtors and the Debtors estimate that $115,935.74 are Allowed 503(b)(9) Claims. The projected Allowed U.S. Administrative and U.S. Priority Claim amounts are subject to the Debtors' ongoing reconciliation of filed claims and their ability to successfully reduce or expunge such claims, where appropriate, through the claims reconciliation process and therefore may fluctuate upwards or downwards in the event that such estimates prove to be incorrect. To the extent Administrative Expense Claims are significantly higher than the Debtors currently project, the U.S. Debtors may be rendered administratively insolvent. The Debtors believe that the likelihood that the U.S. Debtors are administratively insolvent is quite remote in these cases. If the Debtors believe the U.S. Debtors are administratively insolvent, they may seek, among other things, additional funds from the Prepetition Noteholders to cover such shortfall or convert the cases of the U.S. Debtors to cases under Chapter 7 of the Bankruptcy Code.~~

The amount of the Wind-Down Reserve, however, proved insufficient to cover the actual amount of U.S. Professional Fee Claims, U.S. General Administrative Claims, U.S. Priority Tax Claims and Other Priority Claims against the U.S. Debtors asserted in the Chapter 11 Cases. Accordingly, following a series of good faith negotiations, the Prepetition Noteholders have consented to the additional use of their cash collateral in the manner reflected in the Plan. Pursuant to the terms of the Plan, as revised, the Prepetition Noteholders have agreed to fund a Post-Effective Date Trust Reserve in the amount of $485,000, which, along with any U.S. Litigation Proceeds, can be used to fund a potential distribution to Class 4 Holders of General Unsecured Claims against the U.S. Debtors following the payment of all Liquidating Trust Operating Expenses.

RLF1 2049205480v.1

| 5(a) | Intercompany Claims against U.S. Debtors | Impaired | Deemed to Reject | No Distribution |
| 5(b) | Intercompany Claims against Rockport Canada | Impaired | Deemed to Reject | No Distribution |
| 6(a) | Equity Interests in U.S. Debtors | Impaired | Deemed to Reject | No Distribution |
| 6(b) | Equity Interests in Rockport Canada | Impaired | Deemed to Reject | No Distribution |

## VII.    TREATMENT OF CLAIMS AND INTERESTS

### A.    Treatment of Claims and Interests against U.S. Debtors

#### 1.    Other Secured Claims against U.S. Debtors (Class 1(a))

##### a.    Classification

Class 1(a) consists of all Other Secured Claims, if any, against any U.S. Debtor, secured by such U.S. Debtor's assets.

##### b.    Impairment and Voting

Class 1(a) is unimpaired.  Holders of Allowed Class 1(a) Other Secured Claims against the U.S. Debtors are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under Section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

##### c.    Treatment

Except to the extent that a Holder of an Allowed Other Secured Claim against the U.S. Debtors agrees to less favorable treatment, in settlement, and release of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim against the U.S. Debtors shall receive, on account of its Allowed Other Secured Claim against the U.S. Debtors, one of the following treatments, as determined by the Debtors or the Liquidating Trustee, as soon as reasonably practicable after the Effective Date or such later date on which such Other Secured Claim becoming an Allowed Secured Other Claim: (i) payment in full in Cash from the Pre-Effective Date SAP Claims Reserve; (ii) delivery of the collateral securing any such Allowed Other Secured Claim; and/or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered unimpaired.

#### 2.    Prepetition Note Secured Claims against U.S. Debtors (Class 2)

##### a.    Classification

Class 2 consists of Prepetition Note Secured Claims against the U.S. Debtors.

        b.     <u>Impairment and Voting</u>

Class 2 is impaired.  Holders of Allowed Class 2 Prepetition Note Secured Claims are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

        c.     <u>Treatment</u>

Except to the extent that a Holder of an Allowed Prepetition Note Secured Claim agrees to less favorable treatment, in settlement and release of each Allowed Prepetition Note Secured Claim, each Holder of an Allowed Prepetition Note Secured Claim shall receive on account of its Allowed Prepetition Note Secured Claim on or as soon as practicable after the Effective Date:

(i)    its Pro Rata share of all remaining Cash of the U.S. Debtors (following the funding of the Pre-Effective Date Professional Fee ~~Escrow, Pre-Closing Expense Reserve Amount, the Wind Down~~ Reserve, Pre-Effective Date SAP Claims Reserve, and the Post-Effective Date Reserve and the Rockport Canada Fund); ~~and~~

(ii)    its Pro Rata share of any amounts remaining in the Pre-Effective Date Professional Fee Reserve, or Pre-Effective Date SAP Claims Reserve following the payment of all Claims for which such funds are intended;

(iii)    its Pro Rata share of any portion of the BAMS Reserves Holdback that reverts to the U.S. Debtors;

(iv)    its Pro Rate share of any proceeds from the Expeditors Litigation Claims;

(v)    its Pro Rata share of any Sale Escrow Amounts that revert to the U.S. Debtors; and

(~~ii~~vi)    its Pro Rata share of the Warrants to such Holder of an Allowed Prepetition Secured Note Claim or its designee.

**3.    Other Priority Claims against U.S. Debtors (Class 3(a))**

        a.     <u>Classification</u>

Class 3(a) consists of all Other Priority Claims, if any, against the U.S. Debtors.

        b.     <u>Impairment and Voting</u>

Class 3(a) is unimpaired.  Holders of Allowed Class 3(a) Other Priority Claims against the U.S. Debtors are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under Section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.      Treatment

Except to the extent that a Holder of an Allowed Other Priority Claim against the U.S. Debtors agrees to less favorable treatment, in settlement and release of each Allowed Other Priority Claim against the U.S. Debtors, each Holder of an Allowed Other Priority Claim against the U.S. Debtors shall receive, on account of its Allowed Other Priority Claim against the U.S. Debtors, payment in full in Cash from the ~~Wind-Down~~ Pre-Effective Date SAP Claims Reserve as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

**4.      General Unsecured Claims against U.S. Debtors (Class 4(a))**

a.      Classification

Class 4(a) consists of all General Unsecured Claims against the U.S. Debtors.

b.      Impairment and Voting

Class 4(a) is impaired, and Holders of Allowed General Unsecured Claims against the U.S. Debtors are entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.      Treatment

i.      Allowed Other General Unsecured Claims against U.S. Debtors

Except to the extent that a Holder of an Allowed Other General Unsecured Claim against the U.S. Debtors agrees to a less favorable treatment, and after satisfaction in full of all senior Claims, in settlement and release of each Allowed Other General Unsecured Claim against a U.S. Debtor, each Holder of an Allowed Other General Unsecured Claim against a U.S. Debtor shall receive on account of such Allowed Other General Unsecured Claim against a U.S. Debtor on or as soon as practicable after the Effective Date, a beneficial interest in the Liquidating Trust, which beneficial interest shall entitle such Holder of an Allowed Other General Unsecured Claim to its pro rata share of ~~all~~ the Liquidating Trust Class 4 Distributable Assets.

ii.      Allowed Prepetition Note Deficiency Claims against the U.S. Debtors

Except to the extent that a Holder of an Allowed Prepetition Note Deficiency Claim against the U.S. Debtors agrees to a less favorable treatment, and after satisfaction in full of all senior Claims, in settlement and release of each Allowed Prepetition Note Deficiency Claim against a U.S. Debtor, each Holder of an Allowed Prepetition Note Deficiency Claim against a U.S. Debtor shall receive on account of such Allowed Prepetition Note Deficiency Claim against a U.S. Debtor on or as soon as practicable after the Effective Date, a beneficial interest in the Liquidating Trust, which beneficial interest shall entitle such Holder of an Allowed Prepetition Note Deficiency to receive:

(i)    its Pro Rata share of Other U.S. Litigation Proceeds with all Allowed Other General Unsecured Claims against the U.S. Debtors; and

(ii)    to the extent that the aggregate Distributions by the Liquidating Trust to Allowed Other General Unsecured Claims exceeds the Threshold Distribution Amount, its Pro Rata share of all other Liquidating Trust Class 4 Distributable Assets with all Allowed Other General Unsecured Claims against the U.S. Debtors.

**5.    Intercompany Claims against U.S. Debtors (Class 5(a))**

a.    <u>Classification</u>

Class 5(a) consists of all Intercompany Claims against the U.S. Debtors.

b.    <u>Impairment and Voting</u>

Class 5(a) is impaired, and Holders of Allowed Intercompany Claims against the U.S. Debtors are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>

Holders of Intercompany Claims against the U.S. Debtors in Class 5(a) will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Intercompany Claim will be canceled as of the Effective Date.

**6.    Equity Interests in U.S. Debtors (Class 6(a))**

a.    <u>Classification</u>

Class 6(a) consists of all Equity Interests in the U.S. Debtors.

b.    <u>Impairment and Voting</u>

Class 6(a) is impaired, and Holders of Allowed Equity Interests in the U.S. Debtors are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>

Holders of Equity Interests in the U.S. Debtors in Class 6(a) will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Equity Interests will be canceled as of the Effective Date.

**B.    <u>Treatment of Claims and Interests against Rockport Canada</u>**

**1.    Other Secured Claims against Rockport Canada (Class 1(b))**

a.    <u>Classification</u>

Class 1(b) consists of all Other Secured Claims, if any, against Rockport Canada, secured by Rockport Canada's assets.

b.    <u>Impairment and Voting</u>

Class 1(b) is unimpaired.  Holders of Allowed Class 1(b) Other Secured Claims against Rockport Canada are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under Section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>

Except to the extent that a Holder of an Allowed Other Secured Claim against Rockport Canada agrees to less favorable treatment, in settlement, and release of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, on account of its Allowed Other Secured Claim, one of the following treatments, as determined by the Debtors or the Rockport Canada Plan Administrator, as soon as reasonably practicable after the Effective Date or such later date on which such Other Secured Claim becomes an Allowed Secured Other Claim: (i) payment in full in Cash from the Rockport Canada Fund; (ii) delivery of the collateral securing any such Allowed Other Secured Claim; and/or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered unimpaired.

**2.    Other Priority Claims against Rockport Canada (Class 3(b))**

a.    <u>Classification</u>

Class 3(b) consists of all Other Priority Claims, if any, against Rockport Canada.

b.    <u>Impairment and Voting</u>

Class 3(b) is unimpaired.  Holders of Allowed Class 3(b) Other Priority Claims against Rockport Canada are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under Section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>

Except to the extent that a Holder of an Allowed Other Priority Claim against Rockport Canada agrees to less favorable treatment, in settlement and release of each Allowed Other Priority Claim against Rockport Canada, each Holder of an Allowed Other Priority Claim against Rockport Canada shall receive, on account of its Allowed Other Priority Claim against Rockport Canada, payment in full in Cash from the Rockport Canada Fund as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

**3.    General Unsecured Claims against Rockport Canada (Class 4(b))**

RLF1 20492205480v.1

a.    <u>Classification</u>

Class 4(b) consists of all General Unsecured Claims against Rockport Canada.

b.    <u>Impairment and Voting</u>

Class 4(b) is impaired, and Holders of Allowed General Unsecured Claims against Rockport Canada are entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>

Except to the extent that a Holder of an Allowed General Unsecured Claim against Rockport Canada agrees to a less favorable treatment, and after satisfaction in full of all senior Claims, in settlement and release of each Allowed General Unsecured Claim against Rockport Canada, each Holder of an Allowed General Unsecured Claim against Rockport Canada shall receive on account of such Allowed General Unsecured Claim against Rockport Canada its Pro Rata share of the Rockport Canada Fund up to the full amount of such Allowed General Unsecured Claim.

**4.    Intercompany Claims against Rockport Canada (Class 5(b))**

a.    <u>Classification</u>

Class 5(b) consists of all Intercompany Claims against Rockport Canada.

b.    <u>Impairment and Voting</u>

Class 5(b) is impaired, and Holders of Allowed Intercompany Claims against Rockport Canada are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>

Provided that the Court approves the proposed allocation of the Sale Proceeds set forth herein, Holders of Intercompany Claims against Rockport Canada in Class 5(b) will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Intercompany Claim will be canceled as of the Effective Date.

**5.    Equity Interests in Rockport Canada (Class 6(b))**

a.    <u>Classification</u>

Class 6(b) consists of all Equity Interests in Rockport Canada.

b.    <u>Impairment and Voting</u>

Class 6(b) is impaired, and Holders of Allowed Equity Interests in Rockport Canada are not entitled to accept or to reject this Combined Plan and Disclosure

Statement, as it is not anticipated that there will be any funds available for distribution to the Holders of Allowed Equity Interests.

c.    <u>Treatment</u>

To the extent that funds remain in the Rockport Canada Fund following payment in full of all senior Claims, including all General Unsecured Claims of Rockport Canada and all fees and expenses of the Rockport Canada Plan Administrator, such funds shall be transferred to the Liquidating Trust on account of Allowed Equity Interests in Rockport Canada. As it is not anticipated that there will be any residual funds transferred to the Liquidating Trust, Class 6(b) shall be deemed an impaired rejecting Class under the Plan, and all Equity Interests in Rockport Canada will be cancelled as of the Effective Date.

**C.    <u>Modification of Treatment of Claims and Interests</u>**

The Plan Proponents, with the consent of the Prepetition Noteholders, reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the Holder of such Claim or Equity Interest at any time after the Effective Date upon the consent of the Holder of the Claim or Equity Interest whose Allowed Claim or Equity Interest, as the case be, is being adversely affected.

**VIII.    PROVISIONS REGARDING THE LIQUIDATING TRUST**

**A.    <u>Appointment of the Liquidating Trustee</u>**

The Liquidating Trustee shall be selected by the Creditors' Committee, in consultation with the Debtors and the Prepetition Noteholders, and shall be identified by the Debtors in the Plan Supplement. At the Plan Confirmation Hearing, the Bankruptcy Court shall consider and, if appropriate, ratify the selection of the Liquidating Trustee. All compensation for the Liquidating Trustee shall be paid from the ~~Liquidating~~ Post-Effective Date Trust ~~Assets Reserve~~ in accordance with the terms of the Plan and Liquidating Trust Agreement. The approved Person shall serve as the Liquidating Trustee upon execution of the Liquidating Trust Agreement on the Effective Date. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. The Liquidating Trust Agreement shall be provided in the Plan Supplement. On the Effective Date, all Beneficiaries of the Liquidating Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidating Trust Agreement. In the event that the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as Liquidating Trustee, then successors shall be appointed as set forth in the Liquidating Trust Agreement. Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, and the Liquidating Trust Agreement.

Following the Effective Date, the Liquidating Trustee shall also be, and shall enjoy the powers of, the Debtors' authorized representative for all purposes, including, without limitation, Section 1123 of the Bankruptcy Code. No further proof of such power shall be necessary or required.

### B. Creation of Liquidating Trust

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in its capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Liquidating Trust Assets not in its possession or control and to prosecute the U.S. Litigation Claims. The Liquidating Trust will then be created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the primary purpose of prosecuting the U.S. Litigation Claims, liquidating the Liquidating Trust Assets and making Distributions in accordance with this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

The Liquidating Trustee shall also receive and administer the ~~Pre-Closing Expense Reserve amount and the~~ Pre-Effective Date Professional Fee Reserve, the Pre-Effective Date SAP Claims Reserve and the Sale Escrow Amounts, but such amounts shall not be considered Liquidating Trust Assets and shall not be available for distribution to the beneficiaries of the Liquidating Trust.

### C. Beneficiaries of Liquidating Trust

The Holders of Allowed General Unsecured Claims against the U.S. Debtors entitled to Distributions hereunder shall be the Beneficiaries of the Liquidating Trust. Such Beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and transferable in accordance with the terms set forth in this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

### D. Vesting and Transfer of Assets to the Liquidating Trust

Under Section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets shall be assigned, transferred, and vest in the Liquidating Trust upon the Effective Date free and clear of all Claims and Liens; *provided, however*, that the Liquidating Trustee may abandon or otherwise not accept any Assets that the Liquidating Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement. Any Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. As of the Effective Date, all Liquidating Trust Assets vest in the Liquidating Trust and all Assets dealt with in this Combined Plan and Disclosure Statement shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Combined Plan and Disclosure Statement or in the Plan Confirmation Order.

### E. Funding of the Liquidating Trust

~~In accordance with the terms of the Final DIP Order Supplement, the Liquidating Trust shall be funded from (i) any unused portion of the Wind-Down Reserve, excluding any unused portion of the Pre-Closing Expense Reserve Amount, (iii) net recoveries resulting from~~

~~the prosecution of any and all U.S. Litigation Claims, (iv) the proceeds of any Insurance Policies,
and (v) any and all other Assets belonging to the U.S. Debtors' Estates. The Liquidating Trustee
shall receive and administer the Pre-Closing Expense Reserve and the Professional Fee Escrow,
but such amounts shall not be considered assets of the Liquidating Trust.~~

The Liquidating Trust shall be funded with (i) the Pre-Effective Date Professional
Fee Reserve; (ii) the Pre-Effective Date SAP Claims Reserve; (iii) the Post-Effective Date Trust
Reserve; (iv) net recoveries resulting from the prosecution of any and all U.S. Litigation Claims;
(v) the benefits, rights, interests and proceeds of any Insurance Policies with respect to the U.S.
Debtors only to the extent payable to the U.S. Debtors in accordance with the terms of the
Insurance Policies; and (vi) any and all other Assets belonging to the U.S. Debtors' Estates
(subject to the distribution of such Assets in accordance with the terms of the Plan).

To the extent not paid in full in Cash on the Effective Date, reserves for payment
of Disputed Claims and U.S. Professional Fee Administrative Claims shall be set aside and held
by Liquidating Trustee until such Claims are approved, Allowed and authorized to be paid, by
the Bankruptcy Court.

On or after the Effective Date, the Debtors shall cause to be transferred to the
Liquidating Trust the Sale Escrow Amounts, which shall be held and administered by the
Liquidating Trustee in accordance with the terms of the Sale Order or other applicable
documents or agreements. For the avoidance of doubt, the Sale Escrow Amounts shall not be
considered Liquidating Trust Assets and shall not be available for distribution to the Holders of
Allowed Class 4 General Unsecured Claims. To the extent that any of the Sale Escrow Amounts
revert to the U.S. Debtors, they shall be distributed to the Holders of Allowed Prepetition Note
Secured Claims in accordance with the terms of the Plan.

On the Effective Date, the Debtors and the Debtors' Estates shall transfer and be
deemed to have transferred the Liquidating Trust Assets to the Liquidating Trust and such
Liquidating Trust Assets shall vest in the Liquidating Trust to be utilized, administered, and
distributed by the Liquidating Trustee in accordance with the terms and conditions of this
Combined Plan and Disclosure Statement, the Plan Confirmation Order, and the Liquidating
Trust Agreement.

### F.    Distributions from the Liquidating Trust

Distributions from the Liquidating Trust shall be made in accordance with the
Combined Plan and Disclosure Statement and the Liquidating Trust Agreement. For the
avoidance of doubt, the U.S. Litigation Proceeds shall be used to pay any Liquidating Trust
Operating Expenses prior to making any Distributions to Beneficiaries of the Liquidating Trust.

### G.    Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee

#### 1.    General Powers of the Liquidating Trustee

The Liquidating Trustee shall have, and enjoy the powers of, the Debtors'
authorized representative for all purposes and shall have the power and authority to perform the
acts described in the Liquidating Trust Agreement (subject to approval by the Bankruptcy Court

where applicable), in addition to any powers granted by law or conferred to it by any other provision of this Combined Plan and Disclosure Statement, including without limitation any set forth herein, *provided, however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein, to conserve and protect the Liquidating Trust and the Liquidating Trust Assets, or to confer on the Beneficiaries the benefits intended to be conferred upon them by this Combined Plan and Disclosure Statement.  The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority, power, and responsibility to: (a) receive, manage, invest, supervise, and protect Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and Distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, the U.S. Litigation Claims vested in the Liquidating Trust, as set forth in the Liquidating Trust Agreement; (f) resolve issues involving Claims and Equity Interests in accordance with this Combined Plan and Disclosure Statement, including the power to object to Claims against the U.S. Debtors, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding against the U.S. Debtors without any further notice to or action, order or approval by the Court; (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of Statutory Fees incurred post-Effective Date with respect to distributions from the Liquidating Trust and the ultimate closing of the Chapter 11 Cases and dissolution of the U.S. Debtor entities; (h) dissolve the Debtors' Employee Benefit Plans not sold and transferred to the Purchaser in connection with the Sale; and (i) take such other action as may be vested in or assumed by the Liquidating Trustee consistent with this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and any applicable Orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Combined Plan and Disclosure Statement.

Except as expressly set forth in this Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion to pursue or not to pursue any  U.S. Litigation Claims as he/she/it determines is in the best interests of the Liquidating Trust's Beneficiaries and consistent with the purposes of the Liquidating Trust, and shall be indemnified to the fullest extent permitted under applicable law by the Liquidating Trust for the outcome of his, her, or its decisions, other than those decisions constituting fraud, gross negligence, willful misconduct, bad faith or self-dealing. The Liquidating Trustee may incur any reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to Cash.  Other than as provided for in the Sale Documents, the Liquidating Trust is the successor to the Debtors, their Estates, their books and records, and their Privileges and protections (it being understood that to the extent the Liquidating Trustee is a successor with respect to documents subject to a common interest

privilege with any third party, nothing herein shall relieve the Liquidating Trustee of any formal or informal obligations with respect to such common interest agreements). The Liquidating Trustee shall have standing, authority, power, and right to assert, prosecute, and/or settle the U.S. Litigation Claims, including, with respect to the Liquidating Trust, making a claim under Insurance Policies based upon its powers as a bankruptcy-appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials. The U.S. Litigation Claims will vest in the Liquidating Trust as set forth in the Liquidating Trust Agreement; *however*, there can be no assurance as to the outcome of such U.S. Litigation Claims or the dollar amount of any recovery that will be obtained by the Liquidating Trust. With respect to the provisions of the Asset Purchase Agreement, which survive the Effective Date and Consummation of this Plan, the Liquidating Trustee shall be deemed a permitted assignee of the Debtors under the Asset Purchase Agreement and shall receive the benefit thereunder.

### 2.    Books and Records

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with the Sale; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, after consultation with the Rockport Canada Plan Administrator, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or beneficial. The Liquidating Trustee shall cooperate and make commercially reasonable efforts to provide the Rockport Canada Plan Administrator with any books, records, and files of Rockport Canada or its Estate in the possession of the Liquidating Trust upon the request of the Rockport Canada Plan Administrator which shall be at the sole cost and expense of Rockport Canada.

### 3.    Investments of Cash

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Section 345 of the Bankruptcy Code or in other prudent investments, *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 4.    Costs and Expenses of Administration of the Liquidating Trust

All Liquidating Trust Operating Expenses shall be the responsibility of and paid by the Liquidating Trust in accordance with the Liquidating Trust Agreement from the ~~Liquidating~~ Post-Effective Date Trust ~~Assets~~Reserve or U.S. Avoidance Action Litigation Proceeds.

### 5.    Reporting

In no event later than thirty (30) Business Days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been released or paid out in accordance with this Combined Plan and

Disclosure Statement, the Liquidating Trustee shall File reports setting forth the amounts, recipients, and dates of all Distributions through each applicable reporting period.

**H.**    **United States Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury regulations and that the trust be owned by its Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable Assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

The Liquidating Trustee shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust and for the Debtors. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from a Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder under this Combined Plan and Disclosure Statement unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidating Trustee, as the case may be, until such time as Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

**I.**    **Term of Liquidating Trust**

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated at such time as (i) all Disputed Claims against the U.S. Debtors have been resolved, (ii) all of the U.S. Litigation Claims have been prosecuted to completion and the Liquidating Trust Assets have been collected and liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement have been made, and (v) the Chapter 11 Cases of the U.S. Debtors have been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period

approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, unless the Liquidating Trust has procured a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

### J.    Limitation of Liability of the Liquidating Trustee

The Liquidating Trust shall indemnify its Liquidating Trustee and its professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidating Trustee or its professionals may incur or sustain by reason of being or having been a Liquidating Trustee or professionals of the Liquidating Trust for performing any functions incidental to such service; *provided, however*, the foregoing shall not relieve the Liquidating Trustee or its professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney professional and, as required under Rule 1.8(h)(1) of the Delaware Layers' Rules of Professional Conduct, malpractice.

### IX.    PROVISIONS REGARDING THE ROCKPORT CANADA PLAN ADMINISTRATOR

### A.    Appointment of the Rockport Canada Plan Administrator

Rockport Canada shall designate a Person or Entity to serve as the Rockport Canada Plan Administrator pursuant to the Rockport Canada Plan Administrator Agreement and the Combined Plan and Disclosure Statement, until the resignation or discharge and the appointment of a successor Rockport Canada Plan Administrator in accordance with the Rockport Canada Plan Administrator Agreement and the Combined Plan and Disclosure Statement. The Rockport Canada Plan Administrator shall be identified by Rockport Canada in the Plan Supplement. Rockport Canada shall file a notice on a date that is not less than ten calendar days prior to the Confirmation Hearing designating the Person who it has selected as the Rockport Canada Plan Administrator. The appointment of the Rockport Canada Plan Administrator shall be approved in the Confirmation Order and such appointment shall be as of the Effective Date. The Rockport Canada Plan Administrator shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Combined Plan and Disclosure Statement and the Rockport Canada Plan Administrator Agreement, as applicable.

### B.    The Rockport Canada Plan Administrator Agreement

Prior to or on the Effective Date, Rockport Canada shall execute a Rockport Canada Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Rockport Canada Plan Administrator Agreement made by Rockport Canada prior to the Effective Date will be ratified. The Rockport Canada Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Rockport Canada Plan Administrator Agreement necessary to implement the provisions of the Combined Plan and Disclosures Statement.

C.    **Vesting of the Rockport Canada Litigation Claims and Rockport Canada Litigation Proceeds**

Under Section 1141(b) of the Bankruptcy Code, the Rockport Canada Litigation Claims shall be assigned, transferred and vest in Rockport Canada and any Rockport Canada Litigation Proceeds shall be assigned, transferred and vest in the Rockport Canada Fund for the benefit of Holders of Allowed Claims against Rockport Canada free and clear of all Claims and Liens.

D.    **Rights, Powers and Duties of Rockport Canada and the Rockport Canada Plan Administrator**

Rockport Canada shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under the Combined Plan and Disclosure Statement.  Such rights, powers and duties, which shall be exercisable by the Rockport Canada Plan Administrator on behalf of Rockport Canada and its Estate pursuant to the Combined Plan and Disclosure Statement and the Rockport Canada Plan Administrator Agreement, shall include, among others, (i) receiving and administering the Rockport Canada Fund, and taking all steps and executing all instruments and documents necessary to effectuate the Plan; (iii) resolving all Disputed Claims and any Claim objections with respect to Rockport Canada pending as of the Effective Date, including the power to object to Claims against Rockport Canada, and to subordinate and recharacterize Claims against Rockport Canada by objection, motion, or adversary proceeding; (iii) settling, without further order of the Bankruptcy Court, all Claims and any Claim objections with respect to Rockport Canada pending as of the Effective Date; (iv) making iv) seeking estimation of contingent or unliquidated Claims, under Section 502(c) of the Bankruptcy Code; (v) calculating and making Distributions to Holders of Allowed Claims against Rockport Canada as provided for in the Combined Plan and Disclosure Statement and the Rockport Canada Plan Administrator Agreement; (v (vi) paying any and all Allowed Rockport Canada Professional Fee Claims incurred after the Closing Date and any and all unpaid postpetition claims of the Information Officer and its professionals; (vii) investigating, prosecuting, compromising, or settling, in accordance with the specific terms of the Rockport Canada Plan Administrator Agreement and without further order of the Bankruptcy Court, the Rockport Canada Litigation Claims; (viii) making decisions regarding the retention, (viengagement, payment and replacement of professionals, employees, and consultants retained to assist the Rockport Canada Plan Administrator in administering the Plan with respect to Rockport Canada; (ix) undertaking administrative functions of Rockport Canada, including payment of Statutory Fees incurred post-Effective Date with respect to Rockport Canada and the ultimate closing of the Chapter 11 Case of Rockport Canada; and (viix) taking such other action as may be vested in or assumed by Rockport Canada consistent with this Combined Plan and Disclosure Statement, the Rockport Canada Plan Administrator Agreement, and any applicable Orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Combined Plan and Disclosure Statement.  Notwithstanding anything herein to the contrary, the Prepetition Noteholders shall retain the ability to object to any claims filed against the U.S. Debtors that are to be paid from the Pre-Effective Date SAP Claims Reserve.

Except as expressly set forth in this Combined Plan and Disclosure Statement and in the Rockport Canada Plan Administrator Agreement, the Rockport Canada Plan Administrator shall have absolute discretion to pursue or not to pursue any Rockport Canada Litigation Claims as he/she/it determines is in the best interests of the Holders of Allowed Claims against Rockport Canada, and shall be indemnified to the fullest extent permitted under applicable law by Rockport Canada for the outcome of his, her, or its decisions, other than those decisions constituting found by a final judgment by a court of competent jurisdiction (not subject to appeal) to have resulted primarily and directly from fraud, gross negligence, willful misconduct, bad faith or self-dealing.  The Rockport Canada Plan Administrator shall have authority, power, and right to assert, prosecute, and/or settle the Rockport Canada Litigation Claims on behalf of Rockport Canada, including, making a claim under Insurance Policies based upon its powers as a bankruptcy-appointed representative of the Rockport Canada's Estate with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials.  The Rockport Canada Litigation Claims will vest in Rockport Canada; however, there can be no assurance as to the outcome of such Rockport Canada Litigation Claims or the dollar amount of any recovery that will be obtained by the Rockport Canada Plan Administrator.

The Rockport Canada Plan Administrator shall be responsible for filing all federal, state, and local tax returns for Rockport Canada.  Rockport Canada shall comply with all withholding and reporting requirements imposed by any federal, state, provincial or local taxing authority, and all Distributions made by Rockport Canada shall be subject to any such withholding and reporting requirements.  The Rockport Canada Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder.  Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from Rockport Canada shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder under this Combined Plan and Disclosure Statement unless and until such Holder has made arrangements satisfactory to Rockport Canada to allow it to comply with its tax withholding and reporting requirements.  Any property to be distributed by Rockport Canada shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Rockport Canada Plan Administrator, as the case may be, until such time as the Rockport Canada Plan Administrator is satisfied with the Holder's arrangements for any withholding tax obligations.

### E.    Compensation of the Rockport Canada Plan Administrator

The Rockport Canada Plan Administrator shall be compensated solely from the Rockport Canada Fund pursuant to the terms of the Rockport Canada Plan Administrator Agreement.  Rockport Canada Plan Administrator Professionals shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Rockport Canada Fund.  The payment of the fees and expenses of the Rockport Canada Plan Administrator

77

and the Rockport Canada Plan Administrator Professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court. Notwithstanding anything contrary herein, Rockport Canada Plan Administrator and its Professionals shall not be compensated by Liquidating Trust Assets.

### F.    Limitation of Liability of the Rockport Canada Plan Administrator

Rockport Canada shall indemnify the Rockport Canada Plan Administrator and its professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Rockport Canada Plan Administrator or its professionals may incur or sustain by reason of being or having been the Rockport Canada Plan Administrator or professionals of the Rockport Canada Plan Administrator for performing any functions incidental to such service; *provided, however*, the foregoing shall not relieve the Rockport Canada Plan Administrator or its professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney professional and, as required under Rule 1.8(h)(1) of the Delaware Layers' Rules of Professional Conduct, malpractice.

## X.    ADDITIONAL MEANS FOR IMPLEMENTATION

### A.    Substantive Consolidation of the U.S. Debtors

#### 1.    The Basis for Substantive Consolidation

Substantive consolidation of the U.S. Debtors and their Estates is an important element of the Debtors' successful implementation of the Plan. The U.S. Debtors' proposed substantive consolidation structure is supported by the applicable legal standards, practical considerations, and available information regarding the U.S. Debtors' prepetition financial affairs.

Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the cases of affiliated debtors, among other instances. When debtors are substantively consolidated, the assets and liabilities of such debtors are pooled and essentially treated as the assets and liabilities of a single debtor. The United States Court of Appeals for the Third Circuit (the "**Third Circuit Court of Appeals**"), the circuit in which the Chapter 11 Cases are pending, articulated a test in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), for determining whether substantive consolidation is warranted. In setting forth the test, the Third Circuit Court of Appeals looked to five principles behind substantive consolidation: (i) limiting the cross-creep of liability by respecting entity separateness is a fundamental ground rule; (ii) the harms substantive consolidation addresses are nearly always those caused by debtors; (iii) mere benefit of administration of the case is hardly a harm calling for substantive consolidation into play; (iv) substantive consolidation should be a rare remedy and one of last resort after considering and rejecting other remedies; and (v) while substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively. *Id.* at 211. Based on these principles, the Third Circuit Court of Appeals held that, in the Third Circuit, the party calling for substantive consolidation must prove: (i) that prepetition, the entities

to be consolidated disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) that postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.*  Substantive consolidation is appropriate if either factor is justified.  *Id.*

The U.S. Debtors believe that the substantive consolidation provided for under the Plan is appropriate under the standards set forth by the Third Circuit Court of Appeals in the *Owens Corning* case, for several reasons.  First, the U.S. Debtors believe that, prepetition, many of their creditors effectively treated the U.S. Debtors as a single entity.  Second, the U.S. Debtors believe that while they did observe appropriate corporate formalities and separateness during the prepetition period, as a practical matter the U.S. Debtors' business was operated as an integrated enterprise.  Third, the Plan provides substantial benefits to creditors, available only to the extent that substantive consolidation provided for in the Plan occurs.  Fourth, to the extent that individual U.S. Debtors have little or no assets, and the recovery to the creditors of such US. Debtors is comprised largely of proceeds of the Sale, individual restructurings of these U.S. Debtors would not be a viable option.  Accordingly, the U.S. Debtors believe that the Plan's partial substantive consolidation structure is beneficial to creditors.

The Plan does not provide for substantive consolidation of Rockport Canada and its estates with the U.S. Debtors.  Unlike the U.S. Debtors, Rockport Canada is not an obligor or guarantor for the Prepetition Notes pursuant to the Prepetition Note Purchase Agreement.  As a result, Holders of Prepetition Note Claims are not entitled to Distributions on account of Assets of Rockport Canada.  Accordingly, the Plan shall constitute a separate Plan for Rockport Canada. In addition, as set forth herein, the Rockport Canada Fund will be established for the benefit of Holders of Claims against Rockport Canada.

### 2.    Impracticality of Separate Entity Plans

Substantive consolidation will avoid the onerous costs and substantial delay that would result from attempting to confirm individual plans of liquidation for each of the U.S. Debtors, which separate plans of liquidation will be prone to inaccuracies that may prejudice certain creditors.  Separate plans for each entity will inevitably rest on certain assumptions; for instance, as the U.S. Debtors were not managed operationally on an individual entity basis, it is difficult to allocate value and operational costs and benefits on a legal entity basis.  In addition, many financial obligations of the U.S. Debtors are based on the U.S. Debtors as a whole or other combinations of entities that make allocation to legal entities difficult, fact-intensive and subject to challenge.  Seeking to overcome the inherent limitations of separate plans of liquidation for each of the U.S. Debtors would entail the U.S.  Debtors' dedication of enormous resources and significant time to the project – and it cannot be assured, even after such an endeavor, that such plan of liquidation would be free of such assumptions, or free of potential prejudice to certain creditors resulting from such assumptions.

The assumptions that the U.S. Debtors would necessarily adopt to confirm separate plans of liquidation would likely be the focus of protracted and lengthy litigation.  The attendant delay from such litigation could threaten the U.S.  Debtors' consummation of the plans of liquidation in a timely manner.  Even if the Estates were exposed to such a risk and cost, there would still be no assurances that the information contained therein would be accurate on an

entity-by-entity basis (if even available at such time).  The U.S. Debtors believe that substantive consolidation is warranted in these Chapter 11 Cases because of the connection of assets and liabilities of the U.S. Debtors.

### 3.    Basis for Substantive Consolidation

Given the significant roadblocks to the proposal of separate, confirmable plans of liquidation, the U.S. Debtors reviewed their organizational, operational, and financial history in order to determine the substantive consolidation structure that best meets the application of the existing case law governing substantive consolidation.  This Plan is a result of that lengthy and wide-ranging analysis, which revealed that significant creditors conducted business (including extending credit) to the U.S. Debtors as consolidated entities, while other creditors extended credit to a single entity.

The factors supporting substantive consolidation are satisfied.  The *Owens Corning* court specifically found that entanglement among affiliated debtors provides a basis for substantive consolidation, where, as here, creditors disregarded entity separateness and separating debtor entities would harm creditors.

### 4.    The Effect of Substantive Consolidation

Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes.  The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors without duplication for purposes of voting on the reorganization plan.

On and after the Effective Date, each of the U.S. Debtors will be deemed consolidated for the following purposes under the Plan:

- all assets and liabilities of each of the U.S. Debtors will be treated as though they were merged with the assets and liabilities of each other U.S. Debtor,

- no Distributions will be made under the Plan on account of any Claim held by a U.S. Debtor against any other U.S.  Debtor,

- except as otherwise set forth in the Plan, no Distributions will be made under the Plan on account of any Equity Interest held by a U.S. Debtor in any other U.S. Debtor,

- all guaranties of any U.S. Debtor of the obligations of any other U.S. Debtor will be eliminated so that any Claim against any U.S. Debtor and any guaranty thereof executed by any other U.S. Debtor and any joint or several liability of any of the U.S. Debtors will be one obligation of the U.S. Debtors, and

80

- each and every Claim filed or to be filed in the Chapter 11 Cases against any of the U.S. Debtors will be deemed filed against all of the U.S. Debtors, and will be one Claim against, and obligation of, the U.S. Debtors.

The Plan shall serve as a motion of the U.S. Debtors seeking entry of a Bankruptcy Court order approving the substantive consolidation of the U.S. Debtors' Estates provided for in the Plan as well as any additional consolidation that may be proposed by the U.S. Debtors in connection with confirmation and consummation of the Plan. The U.S. Debtors reserve the right to file appropriate alternative pleadings in support of the proposed substantive consolidation in connection with the Plan Confirmation Hearing. Unless an objection to consolidation is made in writing by any creditor affected by the Plan on or before 4:00 p.m. (prevailing Eastern Time), on the date fixed by the Bankruptcy Court for objections to confirmation of the Plan, the substantive consolidation proposed by the Plan may be approved by the Bankruptcy Court at the Plan Confirmation Hearing.

~~Upon~~ On or about the Effective Date, ~~without the need for further order of the Bankruptcy Court or~~ the Debtors and/or the Liquidating Trustee, as applicable, intend to close all of the Chapter 11 Cases, with the exception of the Chapter 11 Cases for Rockport and Rockport Canada, by separate motion ~~of, or notice from, the U.S.~~in accordance with Local Rule 3017-2. ~~Debtors or the Liquidating Trustee, the Chapter 11 Cases of each of the U.S. Debtors shall be deemed closed as of the Effective Date.~~ Such relief shall be without prejudice to the rights of any party in interest to seek to reopen any of the Chapter 11 Cases under Section 350(b) of the Bankruptcy Code~~; *provided, however*, that the cases of Rockport and Rockport Canada shall remain open until the Liquidating Trustee for Rockport or the Rockport Canada Plan Administrator for Rockport Canada, as applicable, files a motion seeking entry of a final decree closing their respective cases. In accordance with Local Rule 3017-2, following the Effective Date, Rockport, to the extent necessary, may file under certification of counsel a form of order effectuating the closing of the Chapter 11 Cases (other than the Chapter 11 Cases for Rockport and Rockport Canada). Furthermore,~~. The Chapter 11 Cases of Rockport and Rockport Canada shall be separately administered such that (i) all motions, contested matters, adversary proceedings and other matters ~~with respect to those closed cases and those U.S. Debtors shall be administered in the open case of Rockport,~~ relating to the U.S. Debtors shall be administered under Rockport's Chapter 11 Case; and (ii) all motions, contested matters, adversary proceedings and other matters relating to Rockport Canada shall be administered under Rockport Canada's Chapter 11 Case. All motions, contested matters, adversary proceedings or other matters pending on the Effective Date and relating to a U.S. Debtor whose Chapter 11 Case has been closed shall be administered in the open Chapter 11 Case for Rockport without prejudice to the rights of any party in interest ~~and (ii) the case caption shall be amended to reflect that it is the only remaining open case for each of the U.S. Debtors.~~ The Chapter 11 Cases for Rockport and Rockport Canada shall remain open until such time as the Liquidating Trustee (with respect to Rockport) or the Rockport Canada Plan Administrator (for Rockport Canada) obtain a final decree closing their respective Chapter 11 Case.

RLF1 2049205480v.1

**B.**     <u>**Preservation of Right to Conduct Investigations**</u>

The preservation for the Liquidating Trust of any and all rights to conduct investigations under Bankruptcy Rule 2004 is necessary and relevant to the Liquidating Trust and with respect to the prosecution of U.S. Litigation Claims and the administration of the Liquidating Trust Assets.    Accordingly, any and all rights to conduct investigations under Bankruptcy Rule 2004 held by the U.S. Debtors prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

**C.**     <u>**Prosecution and Resolution of U.S. Litigation Claims**</u>

From and after the Effective Date, the Liquidating Trust shall have the sole responsibility, standing (including derivative standing), and authority to prosecute and settle all U.S. Litigation Claims under this Combined Plan and Disclosure Statement and the Plan Confirmation Order.    From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the U.S. Debtors' Estates, subject to the provisions of the Plan Documents and the Sale Documents, to pursue, settle, or abandon such U.S. Litigation Claims as the sole representatives of the U.S. Debtors' Estates under Section 1123(b)(3) of the Bankruptcy Code.    The Liquidating Trustee shall have the exclusive right, authority, and discretion to determine to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigation to judgment any U.S. Litigation Claims, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court; provided, however, that notwithstanding the foregoing any settlement of the Expeditors Litigation Claims shall require the consent and approval of the Prepetition Noteholders.  Any and all U.S. Litigation Claims that are not expressly released or waived under this Combined Plan and Disclosure Statement are reserved and preserved and vest in the Liquidating Trust in accordance with this Combined Plan and Disclosure Statement.  No Person may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement or the Plan Supplements to any U.S. Litigation Claim against it as any indication that the U.S. Debtors or Liquidating Trustee will not investigate or pursue any and all available U.S. Litigation Claims against such Person.  Such U.S. Litigation Claims may include, but are not limited to, claims grounded in tort, claims for negligence, claims based upon breach of contract, and/or claims for professional malpractice to the fullest extent permitted by law.    The Liquidating Trustee expressly reserves all U.S. Litigation Claims, except for U.S. Litigation Claims against any Person that are expressly released or waived under this Combined Plan and Disclosure Statement or have otherwise been released under any agreement or Final Order, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such U.S. Litigation Claims upon, after, or as a consequence of Confirmation or substantial consummation of this Combined Plan and Disclosure Statement.

**D.**     <u>**Prosecution and Resolution of Rockport Canada Litigation Claims**</u>

From and after the Effective Date, the Rockport Canada Plan Administrator on behalf of Rockport Canada shall have the sole responsibility and authority to prosecute and settle all Rockport Canada Litigation Claims under this Combined Plan and Disclosure Statement and the Plan Confirmation Order.  From and after the Effective Date, the Rockport Canada Plan

Administrator shall have exclusive rights, powers, and interests of Rockport Canada's Estates, subject to the provisions of the Plan Documents and the Sale Documents, to pursue, settle, or abandon such Rockport Canada Litigation Claims as the sole representatives of the Rockport Canada's Estates under Section 1123(b)(3) of the Bankruptcy Code.  Any and all Rockport Canada Litigation Claims that are not expressly released or waived under this Combined Plan and Disclosure Statement are reserved and preserved and vest in Rockport Canada in accordance with this Combined Plan and Disclosure Statement.  No Person may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement or the Plan Supplements to any Rockport Canada Litigation Claim against it as any indication that the Rockport Canada or the Rockport Canada Plan Administrator will not investigate or pursue any and all available Rockport Canada Litigation Claims against such Person.  Such Rockport Canada Litigation Claims may include, but are not limited to, claims grounded in tort, claims for negligence, claims based upon breach of contract, and/or claims for professional malpractice to the fullest extent permitted by law.  Rockport Canada expressly reserves all Rockport Canada Litigation Claims, except for Rockport Canada Litigation Claims against any Person that are expressly released or waived under this Combined Plan and Disclosure Statement or have otherwise been released under any agreement or Final Order, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Rockport Canada Litigation Claims upon, after, or as a consequence of Confirmation or substantial consummation of this Combined Plan and Disclosure Statement.

Unless otherwise provided in this Plan, for the avoidance of doubt, the Debtors, the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, expressly reserve the right to pursue all claims and Causes of Action other than Causes of Action transferred to the Purchaser under the terms of the Asset Purchase Agreement.

### E.    Effectuating Documents and Further Transactions

Upon entry of the Plan Confirmation Order, the Debtors, the Liquidating Trustee and the Rockport Canada Plan Administrator shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, notices, resolutions, programs, and other agreements, instruments, and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, substantially consummate, and/or further evidence the terms and conditions of this Combined Plan and Disclosure Statement and any transactions described in or contemplated by this Combined Plan and Disclosure Statement. The Debtors, Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, may, and all Holders of Allowed Claims or Allowed Equity Interests receiving Distributions under this Combined Plan and Disclosure Statement or as Beneficiaries of the Liquidating Trust, at the request or direction of the Debtors or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Combined Plan and Disclosure Statement.

83

F.    **Authority to Act**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Combined Plan and Disclosure Statement that would otherwise require approval of the members, managers, or other owners, direct or indirect, of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) under applicable law, without any further vote, consent, approval, authorization, or other action by such members, managers, or other owners of the Debtors or notice to, order of, or hearing before, the Bankruptcy Court.

G.    **Cancellation of Documents**

On the Effective Date, except to the extent otherwise provided in this Combined Plan and Disclosure Statement, any and all notes, instruments, debentures, certificates and other documents evidencing Claims against and Equity Interests in the Debtors shall be deemed automatically extinguished, canceled, and of no further effect with the Debtors having no continuing obligations thereunder, and shall be deemed rejected and terminated; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, the Prepetition Note Purchase Agreement shall continue in effect solely for purposes of enabling Prepetition Noteholders to receive Distributions under the Plan on account of the Allowed Prepetition Note Claims as provided herein; *provided, further*, that the preceding proviso shall not affect the discharge of Allowed Prepetition Note Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Debtors or to the Liquidating Trust, except to the extent set forth in or provided for under this Combined Plan and Disclosure Statement; *provided, further*, that nothing in this section shall effect a cancellation of any Warrants.

H.    **Termination of Debtors' Plans**

Upon the entry of an order of the Bankruptcy Court confirming this Combined Plan and Disclosure Statement, all Employee Benefit Plans not assumed by the Purchaser under the Sale Order shall automatically terminate.

I.    **Corporate Action; Effectuating Documents; Further Transactions**

On the Effective Date, all matters and actions provided for under this Combined Plan and Disclosure Statement that would otherwise require approval of the directors, officers, members, or managers of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors, officers, members, and managers of the Debtors.  The Debtors, the Liquidating Trustee and the Rockport Canada Plan Administrator are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement.

J.    **Release of Liens**

Except as otherwise provided in this Combined Plan and Disclosure Statement, or in any contract, instrument, release, or other agreement or document created under this Combined Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other interests in or against any property of the Estates shall be deemed fully released without any further action of any party, including, but not limited to, further Order of the Bankruptcy Court or filing updated schedules or statements typically filed under the Uniform Commercial Code or other applicable law.

K.    **Exemption from Securities Laws**

The offering, issuance and distribution of (a) beneficial interests in the Liquidating Trust under this Combined Plan and Disclosure Statement, (b) the Warrants under this Combined Plan and Disclosure Statement, and (c) all Warrant Units or other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, in each such case, shall be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon Section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable.

In addition, any and all (x) beneficial interests in the Liquidating Trust issued or distributed under this Combined Plan and Disclosure Statement, (y) Warrants issued or distributed under this Combined Plan and Disclosure Statement, and (z) Warrant Units or other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, in each such case, will be freely tradable by the recipients thereof, subject to: (A) the provisions of Bankruptcy Code Section 1145(b)(1) relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (B) in the case of the beneficial interests in the Liquidating Trust, the provisions of the Liquidating Trust Agreement; (C) in the case of the Warrants, the provisions of the Warrant Agreement; and (D) in the case of the Warrant Units and any other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, the provisions of the CB Marathon Holdings LLC Agreement.

L.    **Exemption from Certain Taxes and Fees**

Under Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument or transfer from a Debtor to the Liquidating Trust, or to any other Person under this Combined Plan and Disclosure Statement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Plan Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the forgoing instruments or other documents without the payment of any such tax or governmental assessment.

M.      **Privileges as to Certain Causes of Action**

Effective as of the Effective Date, all Privileges of the Debtors relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and is entitled to assert such Privileges. No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information, or communications subject to attorney-client privileges, work product protections or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtors. The Debtors' Privileges relating to the Liquidating Trust Assets will remain subject to the rights of third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement. Nothing contained herein or in the Plan Confirmation Order, nor any Professional's compliance herewith and therewith, shall constitute a breach of any Privileges of the Debtors.

N.      **Preservation of Causes of Action**

Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Combined Plan and Disclosure Statement, or the Plan Confirmation Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Debtors and the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No entity may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement, the Plan Supplement, or the Plan Confirmation Order to any Cause of Action against them as any indication that the Debtors the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, will not pursue any and all available Causes of Action against them. The Debtors, the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Combined Plan and Disclosure Statement, the Debtors, the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, expressly reserve all Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of this Combined Plan and Disclosure Statement.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to this Section X.M that any of the U.S. Debtors may hold against any entity shall be transferred to the Liquidating Trust upon the Effective Date and any Causes of Action preserved pursuant to this Section X.M that Rockport Canada may hold against an entity shall vest in Rockport Canada. The Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, through its authorized agents or representatives, shall retain and

may exclusively enforce any and all such Causes of Action.  The Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in this Combined Plan and Disclosure Statement.  For the avoidance of doubt, the Liquidating Trustee may not settle the Expeditors Litigation Claims without the approval of the Prepetition Noteholders.

For the avoidance of doubt, the Expeditors Litigation Claims and the Attune Litigation Claims are preserved Causes of Action pursuant to the Plan and shall be transferred to the Liquidating Trust upon the Effective Date and shall constitute U.S. Litigation Claims.

## O.    **Insurance Policies**

Nothing in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies, including any replacement or tail policies or coverages following the Effective Date.  All of the U.S. Debtors' Estates' benefits, rights, interests and proceeds under any Insurance Policy to which the U.S. Debtors and/or the U.S. Debtors' Estates may be insureds or beneficiaries shall vest with the Liquidating Trust for the benefit of the Beneficiaries of the Liquidating Trust and all of the beneficiaries of such policies.  All of Rockport Canada's benefits, rights, interests and proceeds under any Insurance Policy to which Rockport Canada and/or Rockport Canada's Estate may be insureds or beneficiaries shall vest with Rockport Canada for the benefit of Holders of Allowed Claims against Rockport Canada.

### 1.    **Chubb Insurance Policies**

(x)    Except as set forth in paragraphs (y) and (z) of this section, notwithstanding anything in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, the Rockport Canada Plan Administrator Agreement, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (i) nothing alters, modifies, amends, affects, impairs or prejudices the rights and obligations of the Debtors (and their Estates) and the Chubb Companies under the Chubb Insurance Policies, (ii) nothing modifies the coverage or benefits provided under any Chubb Insurance Policies or the terms and conditions thereof or diminishes or impairs the enforceability of the Chubb Insurance Policies, including any replacement or tail policies or coverages except that, on and after the Effective Date, the rights of the U.S. Debtors, if any, shall be transferred to the Liquidating Trust and rights of Rockport Canada, if any, shall be transferred to the Rockport Canada Plan Administrator under the Chubb Insurance Policies, and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article XIII of the Plan, if and to

87

the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (A) claimants with valid workers' compensation claims or with valid direct action claims against a Chubb Company  under applicable non-bankruptcy law to proceed with their claims; and (B) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Chubb Company under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XIII of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing. For the avoidance of doubt, except as set forth in paragraphs (y) and (z) of this section, all rights and obligations under the Chubb Insurance Policies shall be determined under the applicable Chubb Insurance Policies and applicable non-bankruptcy law.

(y)    To the extent that the Chubb Companies believe a Claim against the Debtors has become liquidated and due and owing (regardless of whether such Claims arise before or after the Effective Date and notwithstanding any release provisions in the Plan or Confirmation Order) under the Chubb Insurance Policies, the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, and the Chubb Companies each reserve their rights with respect to whether such Claim shall be treated as an Administrative Expense Claim or a General Unsecured Claim in accordance with the Plan Confirmation Order and the Combined Plan and Disclosure Statement and should the Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, and the Chubb Companies not agree upon such treatment, the dispute shall be submitted to the Bankruptcy Court for determination thereon; provided, however, the Chubb Companies shall not be required or need to file a proof of Claim or Administrative Expense Claim or object to any cure amount or Cure Notice; provided further, however, that the Liquidating Trustee and/or Rockport Canada Plan Administrator, as applicable, agrees to provide the Chubb Companies' counsel of record in the Chapter 11 Cases with sixty (60) days' notice of its intention to make a distribution and/or close the Chapter 11 Case of Rockport or Rockport Canada and the Chubb Companies shall advise counsel to the Liquidating Trust or counsel to the Rockport Canada Plan Administrator, as applicable, within thirty (30) days thereof of any amounts that are or are estimated to become due and owing in the future pursuant to the Chubb Insurance Policies; provided further however, that neither the Liquidating Trustee nor the Rockport Canada Plan Administrator, as applicable, shall be required to provide the Chubb Companies with advance notice of any distributions that are anticipated to be made on or around the Effective Date in accordance with the terms of the Plan, including, but not limited to, any distribution to the Holders of Allowed Prepetition Secured Noteholder Claims; and provided further, that neither the Liquidating Trustee nor the Rockport Canada Plan Administrator is required to establish any reserve as of the Effective Date on account of any claims that may be asserted by the Chubb Companies pursuant to the Chubb Insurance Policies.

(z)    

(I)    The Debtors have represented to the Chubb Companies that all of their records with respect to claims covered by the Chubb Insurance Policies are in the possession, custody or control of the Purchaser and/or the Debtors' third

party administrator and the Debtors and the Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, agree that within five (5) calendar days of receiving a written request from the Chubb Companies requesting access to such materials, the Liquidating Trustee or Rockport Canada Plan Administrator, as applicable,  will provide any consents reasonably requested by the Chubb Companies in furtherance of the Chubb Companies' efforts to obtain records and/or claims files in the possession, custody or control of the Purchaser and/or the Debtors' third party administrator.

(II)    Without in any way altering Article X.O.(z)(I), the Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, shall reasonably cooperate with the Chubb Companies in accordance with the terms of the Chubb Insurance Policies, to the extent practicable, through the date that the Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, is discharged of their respective duties in accordance with the terms of the Plan, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement; provided, however, that to the extent such cooperation requires the Liquidating Trustee or Rockport Canada Plan Administrator to incur costs, the Chubb Companies shall be solely responsible for bearing such costs; provided further, however, that the Liquidating Trustee and/or the Rockport Canada Plan Administrator must obtain the Chubb Companies' written consent prior to incurring such costs, and no costs shall be incurred by the Liquidating Trustee and/or the Rockport Canada Plan Administrator unless and until the Chubb Companies agree in writing to such particular costs being incurred.

**P.    Filing of Monthly and Quarterly Reports and Payment of Statutory Fees**

The Filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly Liquidating Trust or Rockport Canada Plan Administrator reports shall be the responsibility of the Liquidating Trustee (with regards to the Chapter 11 case of Rockport) or the Rockport Canada Plan Administrator (with regards to the Chapter 11 case of Rockport Canada), as applicable; provided, however, that (i) upon notification by the Liquidating Trustee that it no longer requires the Chapter 11 Cases to remain open, from and after such date the responsibility for any Statutory Fee or to file reports shall be solely and exclusively by the Rockport Canada Plan Administrator or (ii) upon notification by Rockport Canada Plan Administrator that it no longer requires the Chapter 11 Cases to remain open, from and after such date the responsibility for any Statutory Fee or to file reports shall be solely and exclusively by the Liquidating Trustee.  All Statutory Fees shall be payable as set forth in Section V.C. hereof and such obligation shall continue until such time as the Chapter 11 Cases of Rockport and Rockport Canada are closed, dismissed, or converted.  All monthly operating reports covering pre- Effective Date periods shall be prepared and filed by the Debtors or Liquidating Trustee, as applicable.

### Q.    Closing of the Chapter 11 Cases and the Canadian Proceeding

The Chapter 11 Case of Rockport shall remain open until the Estates of both Rockport and Rockport Canada are "fully administered" pursuant to the Bankruptcy Code, Bankruptcy Rules and Local Rules.  When (i) all Liquidating Trust Assets have been collected, liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan Confirmation Order and (ii) the Rockport Canada Cash has been distributed in accordance with the Rockport Canada Plan Administrator Agreement, the Liquidating Trustee or Rockport Canada Plan Administrator shall seek authority from the Bankruptcy Court to close the Rockport and Rockport Canada Chapter 11 Cases in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, *provided, however*, that in the event that the Estate of Rockport Canada is "fully administered" pursuant to the Bankruptcy Code, Bankruptcy Rules and Local Rules prior to the Estate of Rockport, the Rockport Canada Plan Administrator shall seek to close the Chapter 11 Case of Rockport Canada in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

On December ___, 2018, the Debtors filed the [Title of Motion] seeking separate administration of the Chapter 11 Cases of Rockport and Rockport Canada upon the Effective Date.  The Liquidating Trustee (with respect to Rockport) and the Rockport Canada Plan Administrator (with respect to Rockport Canada) may close their respective Chapter 11 Cases only after they have been "fully administered" pursuant to the Bankruptcy Code, Bankruptcy Rules and Local Rules.

## XI.    PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED PLAN AND DISCLOSURE STATEMENT

### A.    Distribution Record Date; Transferability

With respect to Distributions to Beneficiaries of the Liquidating Trust, the Liquidating Trustee shall set such Distribution Record Dates as may be necessary in accordance with the terms of the Liquidating Trust Agreement.  To the fullest extent permitted by applicable law, the beneficial interests in the Liquidating Trust may be assigned or otherwise transferred by any Beneficiary to any Person, subject to the terms of the Liquidating Trust Agreement.

With respect to Distributions to Holders of Allowed Claims against Rockport Canada, the Rockport Canada Plan Administrator shall set such Distribution Record Dates as may be necessary in accordance with the Rockport Canada Plan Administrator Agreement.

### B.    Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made under this Combined Plan and Disclosure Statement shall be made by check drawn on a domestic or Canadian bank or an electronic wire transfer.

### C.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, the Liquidating Trustee (solely with respect to Claims against the U.S. Debtors) and the Rockport Canada Plan

Administrator (solely with respect to Claims against Rockport Canada) shall have the sole authority to, but is not required to: (1) file, withdraw or litigate to judgment objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Court; and (3) administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Court, provided, however, that any settlement of U.S. Priority Tax Claims shall require the approval of the Prepetition Noteholders.

### D.    Claims Objection Deadline

The Liquidating Trustee (with respect to Claims against U.S. Debtors), the Rockport Canada Plan Administrator (with respect to Claims against Rockport Canada) and any other party in interest to the extent permitted under Section 502(a) of the Bankruptcy Code, shall File and serve any objection to any Claim no later than the Claims Objection Deadline; *provided, however*, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable.  The filing of such a motion shall automatically extend the Claims Objection Deadline until entry of an order on account of such motion, in accord with Local Rule 9006-2.

### E.    No Distribution Pending Allowance

Notwithstanding any other provision of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement.  For the avoidance of doubt, the Prepetition Note Claims are not Disputed Claims.  The procedures with respect to resolution of Disputed Claims shall be set forth in the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement.

### F.    Reserve of Cash Distributions

On any date that Distributions are to be made under the terms of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement, the Liquidating Trustee (with respect to Claims against the U.S. Debtors) and the Rockport Canada Plan Administrator (with respect to Claims against Rockport Canada) shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.  Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

### G.    Distribution After Allowance

Within the later of (i) as soon as reasonably practicable after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline,

the Liquidating Trustee (with respect to Claims against the U.S. Debtors) and the Rockport Canada Plan Administrator (with respect to Claims against Rockport Canada) shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder of an Allowed Claim is then entitled; *provided*, that to the extent any Liquidating Trust Assets have not yet been collected or liquidated by the Liquidating Trustee, including any U.S. Litigation Proceeds, such Liquidating Trust Assets shall be distributed to Holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof.

## H.    Delivery of Distributions

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim last Filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules if no proof of Claim is Filed and the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, has not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, as undeliverable, no further Distribution shall be made to such Holder unless and until the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, is notified in writing of such Holder's then current address.  Undeliverable Distributions shall remain in the possession of the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution under Section XI.H of this Combined Plan and Disclosure Statement.

Until such time as an undeliverable Distribution becomes an Unclaimed Distribution, within thirty (30) days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, shall make Distributions of all Cash and property that has become deliverable during the preceding quarter.  Each such Distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such Distribution would have been due had it then been deliverable to the date that such Distribution becomes deliverable.

The Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable,  shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions, *provided, however*, nothing contained in this Combined Plan and Disclosure Statement shall require the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, to locate any Holder of an Allowed Claim.

## I.    Unclaimed Distributions

Any Cash or other property to be distributed under this Combined Plan and Disclosure Statement shall revert to the Liquidating Trustee or the Rockport Canada Plan

Administrator, as applicable, if it is not claimed by the Holder within one hundred and twenty (120) days after the date of such Distribution.  If such Cash or other property is not claimed on or before such date, the Distribution made to such Holder shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code.

### J.    Set-Off

Except as otherwise provided herein, the Debtors, Liquidating Trustee and Rockport Canada Plan Administrator, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records.  Rights of a setoff ~~against~~ of any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action of the Debtors, their Estates, the Liquidating Trustee or the Rockport Canada Plan Administrator and regardless of whether such Entity or Person is the Holder of an Allowed Claim.

### K.    Postpetition Interest

Interest shall not accrue on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Allowed secured claims under Section 506(b) of the Bankruptcy Code.

### L.    Distributions After Effective Date

For Disputed Claims as of the Effective Date, any Distributions made after the Effective Date to Holders of such Disputed Claims (which later become Allowed Claims after the Effective Date) shall be deemed to have been made on the Effective Date.

### M.    Distributions Free and Clear

Except as may be otherwise provided in this Combined Plan and Disclosure Statement, all Distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

### N.    Allocation of Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under this Combined Plan and Disclosure Statement comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### O.    De-Minimis Distribution and Donation

There shall be no Distribution on account of Allowed General Unsecured Claims to the extent such Distribution will result in a payment of less than $50.00 to the Holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the Liquidating

Trust or the Rockport Canada Plan Administrator, as applicable. Unless otherwise set forth in this Plan, the Liquidating Trustee or the Rockport Canada Plan Administrator, as applicable, may donate remaining Assets of the Liquidating Trust or the Rockport Canada Fund to a charitable institution if the Distribution of such Assets is too costly, too burdensome, or impracticable.

### P.    Prepayment

Except as otherwise provided herein or the Plan Confirmation Order, the Debtors the Liquidating Trustee, and/or the Rockport Canada Plan Administrator, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## XII.    EXECUTORY CONTRACTS

### A.    Rejection of Executory Contracts

On the Effective Date, all Executory Contracts not previously assumed and/or assigned (including in connection with the Sale and under the Sale Order), not subject to a pending motion to assume and/or assign as of the Effective Date, or not rejected before the Effective Date, will be deemed rejected. The Plan Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

Unless otherwise specified, each Executory Contract assumed or rejected by the Debtors shall be assumed or rejected *cum onere*, to include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly to any agreement, instrument, or other document that in any manner affects such Executory Contract.

### B.    Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Under this Combined Plan and Disclosure Statement

If the rejection by the Debtors, under this Combined Plan and Disclosure Statement or otherwise, of an Executory Contract gives rise to a Claim for rejection damages in accordance with Section 502(g) of the Bankruptcy Code, a proof of Claim must be filed with the Claims Agent at the following address: The Rockport Company, LLC Claims Processing Center c/o Prime Clerk LLC, 850 Third Avenue, Suite 412 Brooklyn, New York 11232, by no later than thirty (30) days after the earlier of (i) the Effective Date or (ii) the date provided in any other applicable Order of the Bankruptcy Court. Any proofs of Claim with respect to a Rejection Damages Claim not filed within such time shall be forever barred from assertion against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trust Assets, the Rockport Canada Plan Administrator or the Rockport Canada Fund, and their property and such Persons holding such Claims will not receive and will be barred from receiving any Distributions on account of such untimely Rejection Damages Claims, absent further order of the Bankruptcy Court. All Rejection Damages Claims will be treated as General Unsecured Claims under this Combined Plan and Disclosure Statement and, to the extent they are deemed Allowed General Unsecured Claims, will receive the treatment afforded Allowed General Unsecured Claims.

## XIII.   INJUNCTION, EXCULPATION AND RELEASES

### A.    Injunction to Protect Estate Assets

**From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims or rights giving rise to any equitable relief against the Assets or any Equity Interests in the Debtors arising prior to the Effective Date are permanently enjoined from taking any of the following actions against the Estates, the Released Parties, any member of the Creditors' Committee in its capacity as such, the Liquidating Trust, the Liquidating Trustee, the Rockport Canada Fund, the Rockport Canada Plan Administrator or any of their respective property or Assets (collectively, the "Estate Assets") on account of any such Claims or Equity Interests: (a) commencing or continuing, in any manner or in any place, any action or proceeding seeking to collect or to recover in any manner against, or assert control or dominion over, the Estate Assets; (b) enforcing, attaching, collecting, or recovering in any manner against the Estate Assets, any judgment, award, decree or order; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Estate Assets; (d) asserting recoupment unless such recoupment was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Plan Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment) or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests ~~discharged~~, released, exculpated, or settled pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan; *provided, however*, that such Persons and Entities shall not be precluded from exercising their rights under and consistent with the terms of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement.**

### B.    Discharge

Given the complete liquidation of the Debtors' property pursuant to the terms of the Plan, the Debtors are not receiving a discharge pursuant to Section 1141(d)(3) of the Bankruptcy Code.

### C.    ~~B.~~Term of Injunctions or Stays

Unless otherwise provided in this Combined Plan and Disclosure Statement or Plan Confirmation Order, all injunctions or stays in the Chapter 11 Cases (pursuant to Sections 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court) and existing on the Plan Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the later of the Effective Date and the date indicated in the Order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Combined Plan and Disclosure Statement or the Plan Confirmation Order, as applicable.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

95

### D.    ~~C.~~Injunction Against Interference with Plan

Upon the Bankruptcy Court's entry of the Plan Confirmation Order, all Holders of Claims and Equity Interests, and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the Debtors', the Liquidating Trust's, the Liquidating Trustee's, the Rockport Canada Plan Administrator's and their respective Related Persons' implementation or substantial Consummation of this Combined Plan and Disclosure Statement.

### E.    ~~D.~~Exculpation

**The Exculpated Parties shall not have or incur any liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, action, proceeding, Cause of Action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, setoff, or right to payment arising or accruing on or after the Petition Date, or the decision to initiate these Chapter 11 Cases or the Canadian Proceeding, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Disputed, admitted, secured, or unsecured, with or without priority, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any Claim Holder or Holder of an Equity Interest, or any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases or the Canadian Proceeding, the negotiation, solicitation, Filing, and confirmation of this Combined Plan and Disclosure Statement, the pursuit of confirmation of this Combined Plan and Disclosure Statement, the substantial Consummation or Consummation of this Combined Plan and Disclosure Statement, the administration of this Combined Plan and Disclosure Statement, or the property to be liquidated and/or distributed under this Combined Plan and Disclosure Statement, except for their fraud, willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under this Combined Plan and Disclosure Statement.**

### F.    ~~E.~~Releases

#### 1.    Debtor Releases

**Except as may otherwise be expressly provided in this Combined Plan and Disclosure Statement, as of the Effective Date, for good and valuable consideration provided by each of the Released Parties and each member of the Creditors' Committee (solely in its capacity as such), the adequacy of which is hereby confirmed, on the Plan Confirmation Date and effective as of the Effective Date, to the fullest extent permitted under applicable law, the Released Parties shall be deemed released and discharged by the Debtors and the Estates of and from any and all Claims and Causes of Action and all other interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, setoffs and liabilities (other than the rights of the Debtors to enforce this Combined Plan and Disclosure Statement, and the contracts, instruments, releases, and other agreement or**

documents delivered hereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, tort, contract, or otherwise that are based in whole or part on any act or omission, transaction, event, or other occurrences or circumstances, whether direct or derivative, taking place on or prior to the Effective Date arising from or related in any way to, (i) the Debtors or their operations; (ii) the Chapter 11 Cases or the Canadian Proceeding; (iii) any investment by any Releasing Party or Released Party in the Debtors or the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest in the Debtors, including the 2017 Transaction; (iv) any action or omission with respect to any indebtedness under which the Debtors are or were a borrower or guarantor, or any equity investment in the Debtors; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest in the Chapter 11 Cases or the Canadian Proceeding; (vi) the negotiation, formulation, preparation, entry into, administration of or dissemination of the (a) the Prepetition ABL Credit Agreement, (b) the Prepetition Note Purchase Agreement, (c) the Sale Documents; (d) the DIP ABL Credit Agreement; (e) the DIP Note Purchase Agreement; (f) the Combined Plan and Disclosure Statement; and (g) any other action or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, including the 2017 Transaction, other than with respect to Claims, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to constitute actual fraud, willful misconduct, or gross negligence.

~~Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Releases; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Liquidating Trustee's, the Rockport Canada Plan Administrator's or the Debtors' Estates asserting any claim, Cause of Action or other assertion of liability released pursuant to the Debtor Releases.~~

## 2.    Releases by Holders of Claims

To the fullest extent permitted under applicable law, all of the Releasing Parties shall be deemed fully, completely, unconditionally, irrevocably, and forever to release the Released Parties of and from any and all Claims and Causes of Action and any other all other interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, setoffs and liabilities whatsoever, whether accrued or unaccrued, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, event, or other occurrence or

circumstances, whether direct or derivative, existing or taking place prior to or on the Effective Date arising from or related in any way to (i) the Debtors or their operations; (ii) the Chapter 11 Cases or the Canadian Proceeding; (iii) any investment by any Releasing Party or Released Party in the Debtors or the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest in the Debtors; (iv) any action or omission with respect to any indebtedness under which the Debtors are or were a borrower or guarantor, or any equity investment in the Debtors, including the 2017 Transaction; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest in the Chapter 11 Cases or the Canadian Proceeding; (vi) the negotiation, formulation, preparation, entry into, administration of, or dissemination of the (a) the Prepetition ABL Credit Agreement, (b) the Prepetition Note Purchase Agreement, (c) the Sale Documents; (d) the DIP ABL Credit Agreement; (e) the DIP Note Purchase Agreement; (f) the Combined Plan and Disclosure Statement; and (g) any other action or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, including the 2017 Transaction, other than with respect to Claims, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to constitute actual fraud, willful misconduct, or gross negligence.

~~Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.~~

Notwithstanding the foregoing, or any of the releases, discharges, injunctions or waivers set forth herein, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to an unexpired lease of non-residential real property to assert any right of setoff or recoupment that such counterparty may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, the ability, if any, of such counterparties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease with the Debtors.

Notwithstanding any language to the contrary contained in the Plan or the Confirmation Order, no provision of this Plan or the Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

3.    Waiver of Statutory Limitations on Releases

**Each of the parties providing the releases contained in Sections XIII.E.1 and XIII.E.2 above expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Combined Plan and Disclosure Statement are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.**

### G. ~~F.~~ Necessity and Approval of Releases and Injunctions

The releases, exculpations, and injunctions set forth in Section XIII of this Combined Plan and Disclosure Statement are not severable and are appropriately tailored and constitute integral consideration and critical parts of this Combined Plan and Disclosure Statement, and the Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions and exchanging consideration in connection with the Chapter 11 Cases and under this Combined Plan and Disclosure Statement. Under Bankruptcy Code Sections 1123(a)(5), 1123(b)(3), and 1123(b)(6)~~, as well as Bankruptcy Rule 9019,~~ entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the releases, exculpations, and injunctions set forth in Section XIII of this Combined Plan and Disclosure Statement and shall constitute the Bankruptcy Court's finding that such releases, exculpations, and injunctions are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtors, the Estates, and Holders of Claims and Interests; (iii) fair, equitable, and reasonable; and (iv) a bar to all Persons barred as set forth in this Combined Plan and Disclosure Statement asserting any Claims or Causes of Action released under the Plan in favor of the Released Parties.

## XIV.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  **General**

The following discussion summarizes certain material United States federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Allowed Claims. This summary does not address the federal income tax consequences to Holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code, or Holders whose Claims are entitled to payment in full in Cash.

This summary is based on the Internal Revenue Code ("**IRC**"), existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan. Creditors who are non-U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.** **Consequences to the Debtors**

**1.** **Cancellation of Debt**

The Debtors may realize cancellation of debt ("**COD**") income by reason of the discharge of the Debtors' indebtedness. COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of Cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). Consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not expect to incur COD as a result of the implementation of the Plan prior to the distribution of all or substantially all of its Assets (other than to the extent any Allowed Claim's Distribution is subject to a maximum or has been or is separately settled for less than its carrying value). However, the Debtors do not expect to recognize any income.

**2.** **Transfer of Assets to Liquidating Trust**

The Debtors' transfer of Assets to the Liquidating Trust may result in the recognition of gain or loss by the Debtors, depending in part on the value of such Assets on the date of such transfer to the Liquidating Trust relative to the Debtors' tax basis in such Assets.

C.    **Consequences to Holders of Claims and Equity Interests**

1.    **Realization and Recognition of Gain or Loss, In General**

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim or Equity Interest will depend, among other things, upon the origin of the Holder's Claim, when the Holder receives payment in respect of such Claim or Equity Interest, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim at a discount, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes.  A Holder of an Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any Liquidating Trust Interests and Pro Rata share of the Warrants), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, including, as discussed below, any beneficial interests in a Liquidating Trust or Pro Rata share of the Warrants (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the Holder and has been held for more than one year.  Each Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

As discussed below, each Holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust).  Pursuant to the Plan, the Liquidating Trustee will in good faith value the Assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A Holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the Assets of the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying Assets of the Liquidating Trust.

A Holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such interest, and the Holder's holding period generally will begin

the day following the establishment of a Liquidating Trust. A Holder's tax basis in the Warrants should equal the fair market value of the Holder's Pro Rata share of the Warrants and the holding period of the Warrants received on the Effective Date would begin on the date following the Effective Date.

### 2.    Allocation of Consideration to Interest

Pursuant to the Section XI.M of the Plan, all Distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received (whether stock, Cash, or other property) by a Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### D.    <u>Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests</u>

### 1.    Classification of the Liquidating Trust

A Liquidating Trust, if created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the Liquidating Trust Beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Any Liquidating Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims, and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that any Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Debtors or Liquidating Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust).

### 2.    General Tax Reporting by the Liquidating Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims, and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those Assets, directly to the Holders of the respective Claims receiving Liquidating Trust Interests (with each Holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the Holders of such Assets to the Liquidating Trust in exchange for the Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the Holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its Assets (valued at their tax book value, and other than Assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, Holders of Allowed Claims, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. It is currently unknown whether and to what extent the Liquidating Trust Interests will be transferable.

The U.S. federal income tax obligations of a Holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a

concurrent Distribution to the Holder.  In general, a Distribution of Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the Beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding requirements.  Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).  As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Liquidating Trustee also will send annually to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

### E.    Tax Treatments of Holders of Warrants

As described above, certain Holders of Allowed Claims that receive a Pro Rata share of the Warrants and other consideration should be treated as exchanging such Allowed Claim for the Warrants and other consideration in fully taxable exchange.

Holders of Warrants generally will not realize gain or loss upon the exercise of the Warrants into Warrant Units.  A Holder's basis in the Warrant Units received upon the exercise of such Holder's Warrants will equal the sum of (i) the exercised portion of the fair market value of such Holder's Pro Rata share of the Warrants on the Effective Date and (ii) the aggregate exercise price of the exercised Warrants.  A Holder's holding period in the Warrant Units acquired through exercise of Warrants will begin on the date of exercise of the Warrants.

Sales or other taxable dispositions (including lapse of unexercised Warrants) by Holders of Warrants generally will give rise to gain or loss equal to the difference between the amount realized on the disposition, if any, and the Holder's tax basis in such Warrants.  In general, gain or loss recognized on the sale or exchange of Warrants may be long-term capital gain or loss if the Warrants disposed of are capital assets in the hands of the Holder and have been held for more than one year.  Each Holder should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

### F.    Withholding on Distributions, and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of an Allowed Claim or a Liquidating Trust Beneficiary that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. *A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trustee.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

### XV.    CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE

### A.    Conditions Precedent to Confirmation

Confirmation of this Combined Plan and Disclosure Statement shall not occur, and the Plan Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived in accordance with Section XV.E of the Plan:

1.      The proposed Plan Confirmation Order shall be reasonably acceptable in form and substance to the Debtors and the Prepetition Noteholders.

2.      The Plan Supplements and any other exhibits or schedules incorporated as part of this Combined Plan and Disclosure Statement are in form and substance reasonably acceptable to the Debtors and the Prepetition Noteholders.

## B.    Conditions Precedent to the Effective Date

This Combined Plan and Disclosure Statement shall not become effective unless and until the following conditions shall have been satisfied or waived in accordance with Section XV.E of the Plan:

1.      The Plan Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance reasonably acceptable to the Debtors, the Prepetition Noteholders and the Creditors' Committee.

2.      The Plan Confirmation Date shall have occurred and no request for revocation of the Plan Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

3.      The Canadian Court shall have made an order in the Canadian Proceeding recognizing the Plan Confirmation Order (the "**Plan Confirmation Recognition Order**") and the Plan Confirmation Order shall have become a Final Order in full force and effect with no stay thereof in effect, and shall be in the form and substance reasonably acceptable to the Debtors and the Prepetition Noteholders.

4.      All actions, documents, and agreements necessary to implement this Combined Plan and Disclosure Statement, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Plan and Disclosure Statement, including the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement, shall have been effectuated or executed.

5.      The absence of any pending or threatened government action or any law that has the effect of or actually does prevent Consummation of any transaction contemplated under this Combined Plan and Disclosure Statement.

6.      All Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtors or placed in a reserve for such purpose.

7.      The Liquidating Trust Agreement shall have been executed by the Liquidating Trustee in form and substance reasonably acceptable to the Prepetition Noteholders and the Creditors' Committee.

8.      The Rockport Canada Plan Administrator Agreement shall have been executed by the Rockport Canada Plan Administrator.

C.    **Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on, or promptly following the satisfaction or waiver of all conditions the Effective Date, which date will be selected by the Debtors in consultation with the Prepetition Noteholders and the Creditors' Committee.

D.    **Effect of Failure of Conditions**

If each condition to the Effective Date has not been satisfied or duly waived within one hundred and twenty (120) days after the Plan Confirmation Date, then upon motion by any party in interest if applicable, and upon notice to such parties in interest as the Bankruptcy Court may direct, the Plan Confirmation Order may be vacated by the Bankruptcy Court; *provided, however*, that notwithstanding the Filing of such motion, the Plan Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtors, if applicable, before any Order granting such relief becomes a Final Order.  If the Plan Confirmation Order is vacated, this Combined Plan and Disclosure Statement shall be deemed null and void in all respects and nothing contained herein shall (i) constitute an admission or a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtors.

E.    **Waiver of Conditions to Confirmation and Effective Date**

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, and the Prepetition Noteholders and, in the case of the conditions set forth in Sections XV.A.1, XV.A.2, XV.B.1, XV.B.2, XV.B.3 and XV.B.4, without notice or an Order of the Bankruptcy Court.

## XVI.    RETENTION OF JURISDICTION

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction to the fullest extent provided by law, including, without limitation over all matters arising in, arising under, and related to the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement are carried out.  The Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases, this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and the Rockport Canada Plan Administrator Agreement for, among other things, the following purposes:

1.    To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

2.    To enter and implement such Orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, revoked, modified, or vacated;

3.      To issue such Orders in aid of execution and Consummation of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement;

4.      To consider any amendments to or modifications of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Plan Confirmation Order;

5.      To hear and determine all requests for compensation and reimbursement of expenses under Section 330 or 503 of the Bankruptcy Code;

6.      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement, including the releases, exculpations, and injunctions provided hereunder;

7.      To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

8.      To hear any other matter not inconsistent with the Bankruptcy Code;

9.      To enter a final decree closing the Chapter 11 Cases;

10.     To ensure that Distributions to Holders of Allowed Claims are accomplished under the provisions of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement;

11.     To decide or resolve any motions, adversary proceedings, contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including those brought by the Liquidating Trustee on behalf of the Liquidating Trust or the Rockport Canada Plan Administrator on behalf of Rockport Canada;

12.     To issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Rockport Canada Plan Administrator Agreement;

13.     To approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidating Trust or the Rockport Canada Plan Administrator;

14.     To resolve any dispute or matter arising under or in connection with the Liquidating Trust or the Rockport Canada Plan Administrator Agreement, including any request for an extension of the term of the Liquidating Trust;

15. To determine any other matters that may arise in connection with or related to this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, the Rockport Canada Plan Administrator Agreement, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement or the Rockport Canada Plan Administrator Agreement;

16. To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

17. To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

18. To hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Causes of Action; and

19. To resolve any other matter or for any purpose specified in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, the Rockport Canada Plan Administrator Agreement or any other document entered into in connection with any of the foregoing.

## XVII. MISCELLANEOUS PROVISIONS

A. **Amendment or Modification of this Combined Plan and Disclosure Statement**

This Combined Plan and Disclosure Statement or any exhibits hereto, including, without limitation, the Plan Supplement, may be amended, modified, or supplemented by the Plan Proponents with the consent of the Creditors' Committee and the Prepetition Noteholders and consistent with the terms of the Final DIP Order Supplement in the manner provided for by Section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure under Section 1125 of the Bankruptcy Code. In addition, after the Plan Confirmation Date, the Debtors, Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, with the consent of the Prepetition Noteholders and the Creditors' Committee and consistent with the terms of the Final DIP Order Supplement, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Combined Plan and Disclosure Statement or the Plan Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Combined Plan and Disclosure Statement. The Debtors may make appropriate technical adjustments and modifications to this Combined Plan and Disclosure Statement prior to the Effective Date without further order or approval of the Bankruptcy Court. Notwithstanding the foregoing, any amendment, modification, supplement or adjustment to this Combined Plan and Disclosure Statement, any exhibits thereto, or the Plan Confirmation Order that adversely affect a Released Party, shall require the prior written consent of such Released Party.

B.      **Severability**

This Combined Plan and Disclosure Statement is not severable; all of the terms and conditions are fully integrated.  Nevertheless, if, prior to the entry of the Plan Confirmation Order, any term or provision of this Combined Plan and Disclosure Statement is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Combined Plan and Disclosure Statement will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Plan Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Combined Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable under its terms.

C.      **Revocation or Withdrawal of this Combined Plan and Disclosure Statement**

The Plan Proponents reserve the right to revoke or withdraw this Combined Plan and Disclosure Statement before the Plan Confirmation Date.  If the Plan Proponents revoke or withdraw this Combined Plan and Disclosure Statement before the Plan Confirmation Date, then this Combined Plan and Disclosure Statement shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors, the Liquidating Trustee or the Rockport Canada Plan Administrator or to prejudice in any manner the rights of the Debtors, the Liquidating Trustee or the Rockport Canada Plan Administrator in any further proceedings involving the Debtors.

D.      **Binding Effect**

This Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Interests, and the Released Parties and their respective successors and assigns.

E.      **Notices**

All notices to or requests of the Plan Proponents, Liquidating Trustee or the Rockport Canada Plan Administrator by parties in interest in connection with this Combined Plan and Disclosure Statement shall be in writing and delivered either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery, all charges prepaid, and shall be deemed to have been given when received by:

If to the Debtors (prior to the Effective Date):

The Rockport Company, LLC
1220 Washington Street
West Newton, Massachusetts 02465
Attn: Paul Kosturos

-with a copy to-

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Michael J. Merchant and Amanda R. Steele

If to the Prepetition Noteholders:

Pachulski Stang Ziehl & Jones
919 N. Market Street, 17th Floor
PO Box 8505
Wilmington, Delaware 19899
Attn:  Bradford J. Sandler and James E. O'Neill

-and-

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attn: My Chi To and Daniel E. Stroik

If to the Liquidating Trustee and the Debtors (after the Effective Date):

The Relay Shoe Company, LLC
Liquidating Trustee c/o [●]MHR Advisory Group
6701 Bay Parkway
[●]
[●]
3rd Floor
Brooklyn, New York 11204
Attn: [●]Steve Balasiano

-with a copy to-

COOLEY LLP
The Grace Building
1114 Avenue of the Americas
New York, New York 10036-7798
Attn: Jay R. Indyke and Robert Winning

If to the Rockport Canada Plan Administrator and Rockport Canada (after the Effective Date)

Rockport Canada Plan Administrator c/o [●]Richter Advisory Group
181 Bay Street, Suite 3320
[●]
[●]
Bay Wellington Tower
Toronto, ON M5J 2T3
Attn: [●]Adam Sherman and Pritesh Patel

-with a copy to-

Chipman Brown Cicerco & Cole LLP
Hercules Plaza
1313 N. Market Street
Suite 5400
Wilmington, Delaware 19801
Attn: Mark L. Desgrosseilliers

### F.    **Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, or to the extent an exhibit to this Combined Plan and Disclosure Statement provides otherwise, the rights and obligations arising under this Combined Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

### G.    **Withholding and Reporting Requirements**

In connection with the Consummation of this Combined Plan and Disclosure Statement, the Debtors, the Liquidating Trustee and the Rockport Canada Plan Administrator shall comply with all withholding and reporting requirements imposed by any United States or Canadian federal, state, provincial, territorial or local taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.    All Beneficiaries, as a condition to receiving any Distribution, shall provide the Liquidating Trustee with a completed and executed Form W-9 and shall provide to the Liquidating Trustee and the Rockport Canada Plan Administrator such other documentation they may request for the purposes of complying with any applicable withholding or reporting obligations.    Failure to timely provide the Liquidating Trustee or the Rockport Canada Plan Administrator with any of the foregoing documentation may result, at the option of the Liquidating Trustee or the Rockport Canada Plan Administrator, as the case may be, in the forfeiture by a Holder of Claim of its Distribution under the Plan, the Liquidating Trust Agreement and the Rockport Canada Administrator Agreement.

112

**H.**    **Headings**

Headings are used in this Combined Plan and Disclosure Statement for convenience and reference only, and shall not constitute a part of this Combined Plan and Disclosure Statement for any other purpose.

**I.**    **Exhibits/Schedules**

The Plan Documents are an integral part of this Combined Plan and Disclosure Statement, and are hereby incorporated by reference and made a part thereof.

**J.**    **Filing of Additional Documents**

On or before substantial Consummation of this Combined Plan and Disclosure Statement, the Debtors, Liquidating Trustee or Rockport Canada Plan Administrator, as applicable, shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement; *provided that* the Plan Supplement shall be Filed on or before November 9, 2018.

**K.**    **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in this Combined Plan and Disclosure Statement shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**L.**    **Successors and Assigns**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assignee of such Person or Entity.

**M.**    **Reservation of Rights**

Except as expressly set forth herein, this Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Plan Confirmation Order.  None of the Filing of this Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights or Causes of Action of the Debtors, Holders of Claims, or Equity Interest before the Effective Date.

**N.**    **Inconsistency**

In the event of any inconsistency among this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, the Rockport Canada Plan Administrator Agreement or any other instrument or document created or executed under this Combined Plan and Disclosure Statement, the provisions of this Combined Plan and Disclosure Statement shall govern; provided that in the event of any inconsistency among this Combined Plan and

113

Disclosure Statement and the Plan Confirmation Order, the provisions of the Plan Confirmation Order shall govern.

### O.    Dissolution of the U.S. Debtors

Immediately following the Distribution of all of the Debtors' and the Estates' property under the terms of this Combined Plan and Disclosure Statement, on the Effective Date, the Debtors' members, directors, managers, and officers and any remaining employees shall be deemed to have resigned, and, as to all U.S. Debtors other than Rockport, the entity dissolved for all purposes and of no further legal existence under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the State of Delaware or any other state or government authority, and, as to Rockport, upon termination of the Liquidating Trustee or the wind down of the Liquidating Trust, Rockport shall be deemed dissolved for all purposes and of no further legal existence under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the Delaware or any other authority.

### P.    Dissolution of the Creditors' Committee

Upon the occurrence of the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of this Combined Plan and Disclosure Statement, and (iv) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

## XVIII. RISKS AND OTHER CONSIDERATIONS

### A.    Bankruptcy Considerations

Although the Plan Proponents believe that this Combined Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm this Combined Plan and Disclosure Statement as proposed. Moreover, there can be no assurance that modifications of this Combined Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived. In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within one hundred and twenty (120) days after the Plan Confirmation Date, which period may be extended by the Plan Proponents, then the Plan Confirmation Order may be vacated, no Distributions will be made under this Combined

Plan and Disclosure Statement, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.   The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Plan Proponents believe that there are sufficient Liquidating Trust Assets to make Distributions to Liquidating Trust Beneficiaries, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay all Liquidating Trust Operating Expenses or make Distributions to the Liquidating Trust Beneficiaries.

### B.   No Duty to Update Disclosures

The Plan Proponents have no duty to update the information contained in this Combined Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponents are required to do so under an Order of the Bankruptcy Court.   Delivery of this Combined Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### C.   Alternatives to Confirmation and Consummation of the Plan

#### 1.   Alternate Plan

If this Combined Plan and Disclosure Statement is not confirmed, the Debtors or any other party in interest (if, under Section 1121 of the Bankruptcy Code, the Debtors have not Filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan.   Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance).   The Plan Proponents believe that this Combined Plan and Disclosure Statement, which is the result of extensive negotiations provides for an orderly and efficient liquidation of the Debtors' remaining Assets and enables creditors to realize the best return under the circumstances.

#### 2.   Chapter 7 Liquidation

If a plan under Chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, under applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtors for Distribution in accordance with the priorities established by the Bankruptcy Code.   The Plan

Proponents believe that such a liquidation would result in smaller Distributions being made to the Debtors' creditors than those provided for in this Combined Plan and Disclosure Statement because (a) the likelihood that other Assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.  See Liquidation Analysis, attached to this Plan as **Exhibit C**.

## XIX.   RECOMMENDATION AND CONCLUSION

The Debtors believe that this Combined Plan and Disclosure Statement is in the best interests of the Estates and the Creditors and urge the Holders of impaired Claims entitled to vote to vote to accept this Combined Plan and Disclosure Statement and to evidence such acceptance by properly voting and timely returning their Ballots.

**The Relay Shoe Company, LLC**

By: /s/ *Paul Kosturos     Draft*
_____

___Name: Paul Kosturos
Title: Restructuring Officer

**Relay Blocker, LLC**

By: /s/ *Paul KosturosDraft*
_____

___Name: Paul Kosturos
Title: Restructuring Officer

**The Relay Group Holdings, LLC**

By: /s/ *Paul KosturosDraft*
_____

Name: Paul Kosturos
Title: Restructuring Officer

**Relay 1-P Holdings, LLC**

By: /s/ *Paul KosturosDraft*
_____

Name: Paul Kosturos
Title: Restructuring Officer

**Relay Intermediate Holdings, LLC**

116

By: /s/ *Paul Kosturos*Draft _____

_____

     Name: Paul Kosturos
     Title: Restructuring Officer

**Relay Class D, LLC**

By: /s/ *Paul Kosturos*Draft _____

_____

     Name: Paul Kosturos
     Title: Restructuring Officer

**The Relay Group, LLC**

By: /s/ *Paul Kosturos*Draft _____

_____

     Name: Paul Kosturos
     Title: Restructuring Officer

**Drydock Footwear, LLC**

By: /s/ *Paul Kosturos*Draft _____

_____

     Name: Paul Kosturos
     Title: Restructuring Officer

**DD Management Services LLC**

By: /s/ *Paul Kosturos*Draft _____

_____

     Name: Paul Kosturos
     Title: Restructuring Officer

**Relay Opco Canada ULC**

By: /s/ *Paul Kosturos*Draft _____

_____

     Name: Paul Kosturos
     Title: Restructuring Officer

## Exhibit A

**Pre-Sale Organizational Structure**

## **Exhibit B**

**Post-Sale Organizational Structure**

**Exhibit C**

**Liquidation Analysis**